1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  GEORGE E. SCHULMAN (State Bar No. 64572)
   *gschulman@DanningGill.com*
3  ZEV SHECHTMAN (State Bar No. 266280)
   *zs@DanningGill.com*
4  SONIA SINGH (State Bar No. 311080)
   *ssingh@DanningGill.com*
5  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
6  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
7  Facsimile: (310) 277-5735

8  Attorneys for Plaintiff and
   Counterdefendant Michael A. McConnell,
9  Chapter 11 Trustee

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                    **NORTHERN DIVISION**

| | |
|---|---|
| 13  In re | Case No.  9:19-bk-11573-MB |
| 14  HVI CAT CANYON, INC., | Chapter 11 |
| 15          Debtor. | |
| 16 | |
| 17  MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | Adv. No. 9:20-ap-01006-MB |
| 18          Plaintiff, | **TRUSTEE'S NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT PURSUANT TO FRBP 7015; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF ZEV SHECHTMAN, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| 19          vs. | |
| 20  GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware limited liability company, | |
| 21 | |
| 22          Defendants. | |
| 23  GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware limited liability company, | Date:    June 15, 2020 |
| 24 | Time:    10:30 a.m. |
| 25          Counterclaimants, | Crtrm.:  201 |
| 26 | 1415 State Street |
| 27          vs. | Santa Barbara, CA 93101 |
| 28  MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | |

1590958.1  26932                                    1

1

Counterdefendant.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that on June 15, 2020, at 10:30 a.m., plaintiff Michael A. McConnell, the Chapter 11 trustee (the "Trustee" or "Plaintiff") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), will and hereby does move this Court (the "Motion"), under Rule 7015 of the Federal Rules of Bankruptcy Procedure, which makes Rule 15 of the Federal Rules of Civil Procedure applicable herein, Local Bankruptcy Rule 9013-1 and other applicable law, for an order authorizing the Trustee to amend the complaint in the above-captioned adversary proceeding and to allow the filing of the *Chapter 11 Trustee's Second Amended Complaint: (1) to Avoid and Recover Preferential Transfers; (2) to avoid and Recover Fraudulent Transfers; and (3) for Turnover and Accounting*, which is attached as Exhibit "A" to the Declaration of Zev Shechtman appended hereto (including Exhibits 1-8 to the Second Amended Complaint).

This Motion is made on the grounds that the Trustee's first amended complaint (docket no. 13), contained two possible errors. The Trustee added to the complaint two transfers dating back to November 6, 2015. The Trustee did not intend to allege that those transfers were preferential. During the required conference under LBR 7026-1, Defendants' counsel informed the Trustee's counsel that he construed the first amended complaint to be attempting to avoid such transfers as preferences. To the extent the complaint could be incorrectly construed in such a way, the Trustee believes it is appropriate to amend the complaint. Further, since filing the first amended complaint, the Trustee seeks to add 11 U.S.C. § 544 and California Civil Code §§ 3439.04 and 3439.05 as alternative claims for the applicable transfers, providing for an appropriate reach back up to four or more years. Although their

1  counsel pointed out these two issues, the Defendants have not agreed to these

2  amendments.  Hence, the Trustee feels compelled to bring this Motion.

3          The Motion is based upon the grounds set forth in this Notice of Motion and

4  Motion, the Memorandum of Points and Authorities, the Declaration of Zev

5  Shechtman, the Request for Judicial Notice, the papers and pleadings on file in this

6  case, and such other evidence as may be presented to the Court.

7          PLEASE TAKE FURTHER NOTICE that pursuant to Local Bankruptcy Rule

8  9013-1(f), each interested party opposing, joining, or responding to the Motion must,

9  not later than 14 days before the date of the hearing, file with the Clerk of the

10  Bankruptcy Court and serve upon (1) counsel for the Trustee at 1901 Avenue of the

11  Stars, Suite 450 Floor, Los Angeles, CA 90067 and via email at zs@danninggill.com

12  (2) the Office of the United States Trustee, 915 Wilshire Boulevard, Suite 1850, Los

13  Angeles, CA 90017; and (3) all other parties in interest who are entitled to notice of

14  this matter, either: (i) a complete written statement of all reasons in opposition

15  thereto or in support or joinder thereof, declarations and copies of all documentary

16  evidence on which the responding party intends to rely, and any responding

17  memorandum of points and authorities; or (ii) a written statement that the Motion

18  will not be opposed.

19

20  DATED:  May 22, 2020                    DANNING, GILL, ISRAEL &

21                                           KRASNOFF, LLP

22

23                                  By:        /s/ Zev Shechtman

24                                           ZEV SHECHTMAN
                                             Attorneys for Plaintiff and
25                                           Counterdefendant Michael A. McConnell,
26                                           Chapter 11 Trustee

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    Overview and History of the Debtor's Business**

The Debtor is a Colorado corporation authorized to conduct business in the State of California.  It is the owner and operator of producing oil and gas interests in California.  According to the Debtor, it owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County ("SMV"), North Belridge in Kern County ("Belridge"), and Richfield East Dome Unit in Orange County ("Redu").  The Trustee is advised that the Debtor has over 1,000 oil wells.

**B.    The Debtor's Bankruptcy Filing and the Trustee's Appointment**

On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Code").  The case was originally filed in the Southern District of New York.  It was transferred to the Northern District of Texas, and then later to the Central District of California.

The Debtor initially operated its business as a "debtor in possession," allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was appointed.

On or about October 16, 2019, the Court entered its Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee.

On or about October 21, 2019, the U.S. Trustee appointed Michael A. McConnell as the Chapter 11 trustee in this case and, on or about October 22, 2019, the Court entered its order approving the appointment.

1  **C.    The Initial Complaint**

2        The Trustee brought the initial complaint in this action to recover three

3  transfers made by the Debtor on July 19, 2019, six days before the Petition Date.

4  The complaint was filed on January 9, 2020 (doc. no. 1).  The transfers at issue were

5  describe in the original complaint as follows:

6        20.    Plaintiff is informed and believes, and based thereon alleges, that
      on or about July 19, 2019, a quitclaim deed was recorded in the Santa
7      Barbara County Recorder's Office as document number 2019-0030457,
      purporting to transfer an interest in real property from the Debtor to
8      GRL, a copy of which is attached hereto as Exhibit "1" and incorporated
      herein by this reference.  Such deed was signed by Alex G. Dimitrijevic,
9      as President of the Debtor, and dated January 16, 2019.

10        21.    Plaintiff is informed and believes, and based thereon alleges, that
      on or about July 19, 2019, a quitclaim deed was recorded in the Santa
11      Barbara County Recorder's Office as document number 2019-0030458,
      purporting to transfer an interest in real property from the Debtor to
12      GLR, a copy of which is attached hereto as Exhibit "2" and incorporated
      herein by this reference.  Such deed was signed by Alex G. Dimitrijevic,
13      as President of the Debtor, and dated January 16, 2019.

14        22.    Plaintiff is informed and believes, and based thereon alleges, that
      on or about July 19, 2019, a quitclaim deed was recorded in the Santa
15      Barbara County Recorder's Office as document number 2019-0030459,
      purporting to transfer an interest in real property from the Debtor to
16      GLR, a copy of which is attached hereto as Exhibit "3" and incorporated
      herein by this reference.  Such deed was signed by Alex G. Dimitrijevic,
17      as President of the Debtor, and dated January 16, 2019.

18        23.    The transfers described in the above paragraphs 20, 21 and 22 are
      hereinafter referred to, collectively, as the "Subject Transfers."
19

20  See Exhibit "B" to RJN.

21  On February 3, 2020, the Defendants answered and filed a counterclaim (doc. no. 6).

22  The Defendants served the Trustee with the summons on February 17, 2020 (doc. no.

23  11).  A response to the counterclaim was due by March 9, 2020.

24  **D.    The First Amended Complaint**

25        Sometime after the initial complaint was filed, the Defendants provided the

26  Trustee with two purported amendments to the leases that were the subjects of the

27  quitclaim deeds evidencing the Subject Transfers of the initial complaint.  Those

28  amendments were dated November 6, 2015.  The Trustee concluded that those

1  amendments were also voidable transactions.  Accordingly, on March 9, 2015, the

2  Trustee filed his answer (doc. no. 12) to the Defendants' counterclaim as well as his

3  first amended complaint (doc. no. 13).  A copy of the first amended complaint is

4  attached herewith as Exhibit "C."

5       In preparing the first amended complaint, the Trustee added factual allegations

6  regarding the transfers.  Thus, the discussion regarding the "Subject Transfers" was

7  expanded and amended to read, in pertinent part, as follows:

8       **The Subject Transfers**

9            **The North Orcutt Lease**

10  20.    Plaintiff is informed and believes, and based thereon alleges, based on
copies of documents received from Defendants, if genuine, that on or about
11  February 24, 2012, the Debtor, as lessee executed a twenty-year oil, gas and
mineral lease, commencing March 1, 2012, described as the "North Orcutt
12  Lease," with Grewal (Royalty) LLC, a Delaware limited liability company, as
lessor.  A copy of the North Orcutt Lease is attached herewith as Exhibit "1."

13
14  21.    Plaintiff is informed and believes, and based thereon alleges, based on
copies of documents received from Defendants, if genuine, that on or about
14  November 6, 2015, the Debtor as lessee, executed with Defendant GRL, LLC
(f/k/a Grewal (Royalty) LLC), the "First Amendment to Oil, Gas and Mineral
15  Lease," amending the North Orcutt Lease to the detriment of the Debtor in a
number of respects, including changing the commencement date of from
16  March 1, 2012 to March 1, 2007, and changing the term of the lease from
twenty years to three years from November 6, 2015.  A copy of the First
17  Amendment to Oil, Gas and Mineral Lease regarding the North Orcutt Lease
is attached herewith as Exhibit "2."
18
19  22.    Plaintiff is informed and believes, and based thereon alleges, that on or
about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara
20  County Recorder's Office as document number 2019-0030457, purporting to
transfer an interest in the real property that is the subject of the North Orcutt
21  Lease from the Debtor to GRL, a copy of which is attached hereto as Exhibit
"3" and incorporated herein by this reference.  Such deed was signed and
22  dated January 16, 2019.

23
24            **The Lakeview/Golco Lease**

25  23.    Plaintiff is informed and believes, and based thereon alleges, based on
copies of documents received from Defendants, if genuine, that on or about
26  January 15, 2013, but effective March 1, 2007, the Debtor, as lessee executed
a twenty-year oil, gas and mineral lease, commencing March 1, 2007,
27  described as the "Lakeview/Golco Lease," with Grewal Land Holdings, LLC,
a Delaware limited liability company, as lessor.  A copy of the
28  Lakeview/Golco Lease is attached herewith as Exhibit "4."

24.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor as lessee, executed with Defendant GLR, LLC (f/k/a Grewal Land Holdings, LLC), as lessor, a "First Amendment to Oil, Gas and Mineral Lease," amending the Lakeview/Golco Lease in a number of respects, including changing the term of the lease from twenty years to three years from November 6, 2015.  A copy of the First Amendment to Oil, Gas and Mineral Lease regarding the Lakeview/Golco Lease is attached herewith as Exhibit "5."

25.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030458, purporting to transfer an interest in the real property that is the subject of the Lakeview/Golco Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "6" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

**The Mortensen Lease**

26.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor, as lessee executed a three-year oil, gas and mineral lease, commencing December 1, 2015, described as the "Mortensen Lease," with Defendant GLR, LLC, as lessor.  A copy of the Mortenson Lease is attached herewith as Exhibit "7."

27.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030459, purporting to transfer an interest in the real property that is the subject of the Mortenson Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

28.    The transfers and transactions described in the above paragraphs 21, 22, 24, 25, and 27, without limitation, are hereinafter referred to, collectively, as the "Subject Transfers."

See Exhibit "C."

**E.    Determination that Complaint Should be Further Amended**

On or about March 17, 2020, the Trustee's counsel conferred with Defendants' counsel as required under LBR 7026-1.  At that time, Defendants' counsel identified two pleading issues with the Complaint.  First, Defendants advised that the Trustee's preference claim, the first claim for relief, could only apply to the July 19, 2019

1   transfers as preferential transfers, not the newly pled transfers there were more than

2   one-year prior to the Petition Date.  That was not the Trustee's intent, but the Trustee

3   understands that the form of the pleading could be construed as argued by

4   Defendants.  Second, Defendants contended that the Trustee, on the voidable

5   transactions claims, failed to reference California law allowing relief that would

6   reach back more than two years as provided by section 548.  In order to supplement

7   and correct these claims, the Trustee wishes to amend the complaint as to the second,

8   third, fourth and fifth claims for relief.

9        The Trustee requested that the Defendants stipulate to the necessary

10   amendments, but the Defendants' counsel advised that he lacked authority to do so.

11   See Exhibit "D" to Declaration of Zev Shechtman.  Accordingly, the Trustee brings

12   this Motion to authorize the filing of the Second Amended Complaint attached as

13   Exhibit "A," with a redline comparing the first and second amended complaint at

14   Exhibit "E."[1]

15

16   **F.      Status Conference and Scheduling Order**

17        The Court held a status conference on the Trustee's complaint and the

18   Defendants' counter-claims on April 17, 2020.  Pursuant to the scheduling order

19   entered herein (doc. no. 26), the last day to amend the pleadings or add parties is

20   October 30, 2020.

21

22

23

24

25

26   _____

27   [1] All versions of the complaint included exhibits.  However, for purposes of this
     filing, only the proposed Second Amended Complaint (Exhibit A hereto) is
28   submitted with its Exhibits 1-8.

## II.

## LEGAL DISCUSSION

**A.      Leave Should be Granted for the Trustee to Amend the Complaint**

Federal Rule of Bankruptcy Procedure ("FRBP") 7015 incorporates Federal Rule of Civil Procedure ("FRCP") 15 and states in pertinent part that, unless the party may amend as a matter of course under FRCP 15(a), "a party may amend its pleading only with the opposing party's written consent or the court's leave."  FRCP 15(a)(2).  FRBP 7015 requires liberal amendment in the interests of resolving cases on the merits.  "The court should freely give leave when justice so requires."  *Id.*

FRBP 7015 places leave to amend "within the sound discretion of the trial court." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).  In exercising its discretion, the Court "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Webb*, 655 F.2d at 979.  The Supreme Court has "instructed the lower federal courts to heed carefully the command of Rule 15(a) … by freely granting leave to amend when justice so requires."  *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973).  Accordingly, "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality.'"  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) ("[L]iberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties."); *see also Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (noting that "this policy is to be applied with extreme liberality.").

The Supreme Court established four factors that are now commonly used to determine whether a motion for leave to amend pleadings should be denied: (1) undue delay, (2) bad faith or dilatory motive, (3) futility of amendment, and (4) prejudice to the opposing party.  *See Foman v. Davis*, 371 U.S. 178, 182 (162).  These factors "are not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend."  *DCD Programs, Ltd.*, 833 F.2d at 186.  Only where

"prejudice is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading." *Howey*, 481 F.2d at 1191; *see also Wyshak v. City Nat. Bank*, 607 F.2d 824, 826 (9th Cir. 1979) ("In the absence of prejudice to the opposing party, leave to amend should be freely given."). The Trustee has satisfied each of these factors, and this Court should grant this motion to amend.

**1.    Defendant is not Prejudiced by the Filing of the Amended Complaint**

Prejudice is the "touchstone of the inquiry under rule 15(a). … Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 9th Cir. 2003); *see also Howey*, 481 F.2d at 1190 (stating that "the crucial factor is the resulting prejudice to the opposing party."). The party "opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd*., 833 F.2d at 187.

The Defendant will not be prejudiced by the requested amendment. The Trustee's proposed second amended complaint asserts the same claims for relief and is between the same parties as in the original complaint and the first amended complaint. The only new changes are to correct pleading errors or perceived pleading errors with respect to the legal grounds.

Under 11 U.S.C. § 546, the deadline for the Trustee to assert claims for fraudulent transfers is two years after the date of entry of the order for relief. Since the voluntary Petition was filed on July 25, 2019, the deadline for the Trustee to assert any additional claims would not be until July 25, 2021. As such, the Trustee could simply file a new adversary, but it is more efficient and a better use of judicial resources to include all of the claims, clearly and correctly pleaded, in this action.

1    Nor will the amendment impact discovery.  The parties are in the early stages

2  of discovery.   Moreover, the Court set October 30, 2020 as the deadline to amend

3  the pleadings or add parties.  This motion is timely.

4    In addition, the Trustee has no problem with the Defendants' answer they filed

5  to the First Amended Complaint being treated as their answer to the Second

6  Amended Complaint.

7

8    **2.      Trustee's Amendment to the Complaint are not Futile**

9    An amendment to a complaint is futile where it "would fail as a matter of law

10  on a motion for summary judgment." *Yakama Indian Nation v. State of Wash. Dept.*

11  *of Revenue*, 176 F.3d 1241, 1246 (9th Cir. 1999).  If the underlying facts or

12  circumstances "relied upon by a plaintiff may be a proper subject of relief, he ought

13  to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at

14  182.

15    The Trustee's proposed amendment is not futile.  The Trustee is simply

16  seeking to clarify one claim for relief (first claim for relief regarding preferences)

17  and add the correct legal bases for others (second through fifth claims for relief

18  regarding fraudulent transfers).

19    **3.      Trustee Does Not Seek to File His Amended Complaint in Bad Faith**

20    The Supreme Court describes bad faith as a "dilatory motive on the part of the

21  movant." *Foman*, 371 U.S. at 182.  In *Thornton v. McClatchy Newspapers, Inc*., 261

22  F.3d 789 (9th Cir. 2001), the appellate court affirmed a magistrate's finding of bad

23  faith where the magistrate "specifically referenced the plaintiff's history of dilatory

24  tactics and the doubtful value of the proposed amendment." *Thornton*, 261 F.3d at

25  799.

26    The Trustee has shown no history of dilatory tactics or any history of frivolous

27  filings and there is no bad faith here.  The Trustee learned of the Defendants'

28  contentions regarding defects in the complaint in the course of complying with his

procedural obligations.  The Trustee acted promptly to address those corrections, in the most appropriate manner, first by requesting to stipulate, and subsequently by filing a motion.

**4.**     **Trustee Has Not Unduly Delayed the Filing of His Amended Complaint**

Delay, alone, "no matter how lengthy is an insufficient ground for denial of leave to amend." *Webb*, 655 F.2d at 980.  In *Howey*, the Court held that the District Court had abused its discretion in denying leave to amend even five years after the original pleadings, where neither bad faith nor prejudice was apparent.  *Howey*, 481 F.2d at 1190-1192.

Here, there was no significant delay on behalf of the Trustee.  As set forth in the email string attached as Exhibit "D" to the Declaration of Zev Shechtman appended hereto, shortly after learning of the issues with the complaint, the Trustee requested that the parties stipulate to the amendments to save time, expense, and judicial resources.  However, the Defendants have not agreed to stipulate.

Pursuant to the Court's scheduling order, the deadline to file a motion to amend the complaint is October 30, 2020 (*doc. no. 26*).  This adversary proceeding is in the early stages of discovery, and the Defendants are well aware of the Trustee's intention to amend the complaint. Indeed, the amendments are minor, almost clerical, and should not substantively change the course of the adversary proceeding.

**III.**

**CONCLUSION**

For all the foregoing reasons, the Trustee requests leave of the Court to file his second amended complaint attached hereto as Exhibit "A," and for all other relief the Court deems appropriate.

1    DATED:  May 22, 2020                  DANNING, GILL, ISRAEL &
                                           KRASNOFF, LLP
2

3

4                                    By:  ____/s/ Zev Shechtman_____
5                                         ZEV SHECHTMAN
                                          Attorneys for Plaintiff and
6                                         Counterdefendant Michael A. McConnell,
7                                         Chapter 11 Trustee

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF ZEV SHECHTMAN</u>

I, Zev Shechtman, declare as follows:

1.       I am an attorney duly admitted to practice before this Court.  I am the principal of a professional corporation that is a partner of Danning, Gill, Israel & Krasnoff, LLP, attorneys of record for Plaintiff and Counterdefendant Michael A. McConnell, Chapter 11 Trustee.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.       I make this declaration in support of Trustee's Notice of Motion and Motion for Leave to Amend Complaint Pursuant to FRBP 7015.

3.       Sometime after the initial complaint was filed, I became aware of two purported amendments to the leases that were the subjects of the quitclaim deeds evidencing the Subject Transfers of the initial complaint.  Those amendments were dated November 6, 2015.

4.       On March 17, 2020, I conferred with William Beall, Defendants' counsel as required under LBR 7026-1.  During that call, Mr. Beall informed me that the Defendants challenged the complaint on at least two grounds based in the pleadings.  First, Defendants challenged the Trustee's preference claim, the first claim for relief, on the grounds that the Trustee is seeking to avoid as preferences transfers dated more than one-year prior to the Petition Date.  That was not the my or the Trustee's intent, but I understand that the form of the pleading could be construed as contended by Defendants.  Second, Defendants contended that the Trustee failed to plead a claim for relief that would reach back four years.  It was my intent to do so, but I inadvertently omitted the applicable California law in the second, third, fourth and fifth claims for relief.

5.       On March 18, 2020, I emailed Mr. Beall and requested that the Defendants stipulate to the necessary amendments, but Mr. Beall informed me on March 27, 2020 that he lacked authority to do so.  See Exhibit "D" hereto, an email chain showing my request and Mr. Beall's eventual response.

1    6.    Accordingly, I believe that it is necessary and appropriate for the

2  Trustee to bring the above Motion to authorize the filing of the Second Amended

3  Complaint attached as Exhibit "A." A redline comparing the first and Second

4  Amended Complaint is attached at Exhibit "E" (without exhibits to the redline).

5

6    I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8    Executed on this 22nd day of May, 2020, at Los Angeles, California.

9

10    /s/ Zev Shechtman
      Zev Shechtman
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  GEORGE E. SCHULMAN (State Bar No. 64572)
   *gschulman@DanningGill.com*
3  ZEV SHECHTMAN (State Bar No. 266280)
   *zs@DanningGill.com*
4  SONIA SINGH (State Bar No. 311080)
   *ssingh@DanningGill.com*
5  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
6  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
7  Facsimile: (310) 277-5735

8  Attorneys for Plaintiff and
   Counterdefendant Michael A. McConnell,
9  Chapter 11 Trustee

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                    **NORTHERN DIVISION**

13  In re                               Case No.  9:19-bk-11573-MB

14  HVI CAT CANYON, INC.,               Chapter 11

15            Debtor.

16  ─────────────────────────

17  MICHAEL A. McCONNELL,               Adv. No. 9:20-ap-01006-MB
    CHAPTER 11 TRUSTEE,
18                                      **CHAPTER 11 TRUSTEE'S**
              Plaintiff,                **SECOND AMENDED**
19                                      **COMPLAINT: (1) TO AVOID AND**
          vs.                           **RECOVER PREFERENTIAL**
20                                      **TRANSFERS; (2) TO AVOID AND**
    GLR, LLC, a Delaware limited liability  **RECOVER FRAUDULENT**
    company; and GRL, LLC, a Delaware   **TRANSFERS; AND (3) FOR**
21  limited liability company,          **TURNOVER AND ACCOUNTING**

22            Defendants.
                                        Continued Statue Conference
23  ─────────────────────────          Date:    July 15, 2020
                                        Time:    2:30 p.m.
24  GLR, LLC, a Delaware limited liability  Crtrm.:  201
    company; and GRL, LLC, a Delaware            1415 State Street
    limited liability company,                   Santa Barbara, CA 93101
25
              Counterclaimants,
26
          vs.
27
    MICHAEL A. McCONNELL,
28  CHAPTER 11 TRUSTEE,

1590957.1  26932
                              **0017**
                                1

1

Counterdefendant.

2

3          Plaintiff Michael A. McConnell, the Chapter 11 trustee (the "Trustee" or

4   "Plaintiff") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), alleges as follows:

5

6                                    **JURISDICTION**

7          1.      This Court has jurisdiction over this adversary proceeding pursuant to

8   28 U.S.C. §§ 157(b) and 1334(b).  This adversary proceeding is brought pursuant to

9   11 U.S.C. §§ 542, 544, 547, 548, and 550.  This adversary proceeding arises in and

10  under and relates to the bankruptcy case under Chapter 11 of the Bankruptcy Code

11  (the "Code") entitled *In re HVI Cat Canyon, Inc.*, Case No. 9:19-bk-11573-MB (the

12  "Bankruptcy Case"), which is presently pending before the United States Bankruptcy

13  Court for the Central District of California, Northern Division.

14         2.      This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E),

15  (F), (H), and (O).

16         3.      This action is commenced pursuant to Federal Rule of Bankruptcy

17  Procedure 7001.

18         4.      The Court can and should enter a final judgment herein.  If and to the

19  extent that the Court determines that it lacks jurisdiction or authority to enter a final

20  judgment, Plaintiff requests that the Court submit findings of fact and conclusions of

21  law for consideration by the District Court.

22

23                                   **THE PARTIES**

24         5.      Plaintiff is Michael A. McConnell, who brings this adversary

25  proceeding solely in his capacity as the Chapter 11 Trustee serving in the Bankruptcy

26  Case pending for the Debtor.

27

28

1590957.1  26932

2

1    6.    Plaintiff is informed and believes, and based thereon alleges, that

2    defendant, GLR, LLC, a Delaware limited liability company ("GLR") is and, at all

3    relevant times, was a business with an address in New York, New York.

4    7.    Plaintiff is informed and believes, and based thereon alleges, that

5    defendant, GRL, LLC, a Delaware limited liability company ("GRL") is and, at all

6    relevant times, was a business with an address in New York, New York.

7    8.    GLR and GRL are referred to herein jointly and severally as the

8    "Defendants."

9    9.    Plaintiff is informed and believes, and based thereon alleges, that the

10    Defendants are each affiliates of each other and of the Debtor.

11    10.    Plaintiff is informed and believes, and based thereon alleges, that the

12    Defendants are insiders of the Debtor.

13

14    **GENERAL ALLEGATION**

15    **Bankruptcy Background**

16    11.    On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary

17    petition for relief under Chapter 11 of title 11 of the United States Code (the

18    "Code").

19    12.    The case was originally filed in the Southern District of New York.  The

20    case was transferred to the Northern District of Texas, and then later to the Central

21    District of California.

22    13.    On or about October 16, 2019, the Court entered its order directing the

23    United State Trustee to appoint a Chapter 11 trustee.

24    14.    On or about October 21, 2019, the Court approved the appointment of

25    Michael A. McConnell as the Chapter 11 trustee in the Debtor's case.

26

27

28

1590957.1  26932

3

**0019**

**The Debtor's Business**

15.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor is a Colorado corporation authorized to conduct business in the state of California.

16.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor is the owner and operator of producing oil and gas interests in California.

17.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in Kern County, and Richfield East Dome Unit in Orange County.

18.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor has over 1,000 oil wells, although many of them are currently idle.

**The Subject Transfers**

**The North Orcutt Lease**

19.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about February 24, 2012, the Debtor, as lessee executed a twenty-year oil, gas and mineral lease, commencing March 1, 2012, described as the "North Orcutt Lease," with Grewal (Royalty) LLC, a Delaware limited liability company, as lessor.  A copy of the North Orcutt Lease is attached herewith as Exhibit "1."

20.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor as lessee, executed with Defendant GRL, LLC (f/k/a Grewal (Royalty) LLC), the "First Amendment to Oil, Gas and Mineral Lease," amending the North Orcutt Lease to the detriment of the Debtor in a number of

1   respects, including changing the commencement date of from March 1, 2012 to

2   March 1, 2007, and changing the term of the lease from twenty years to three years

3   from November 6, 2015.  A copy of the First Amendment to Oil, Gas and Mineral

4   Lease regarding the North Orcutt Lease is attached herewith as Exhibit "2."

5          21.    Plaintiff is informed and believes, and based thereon alleges, that on or

6   about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County

7   Recorder's Office as document number 2019-0030457, purporting to transfer an

8   interest in the real property that is the subject of the North Orcutt Lease from the

9   Debtor to GRL, a copy of which is attached hereto as Exhibit "3" and incorporated

10  herein by this reference.  Such deed was signed and dated January 16, 2019.

11

12         **The Lakeview/Golco Lease**

13         22.    Plaintiff is informed and believes, and based thereon alleges, based on

14  copies of documents received from Defendants, if genuine, that on or about January

15  15, 2013, but effective March 1, 2007, the Debtor, as lessee executed a twenty-year

16  oil, gas and mineral lease, commencing March 1, 2007, described as the

17  "Lakeview/Golco Lease," with Grewal Land Holdings, LLC, a Delaware limited

18  liability company, as lessor.  A copy of the Lakeview/Golco Lease is attached

19  herewith as Exhibit "4."

20         23.    Plaintiff is informed and believes, and based thereon alleges, based on

21  copies of documents received from Defendants, if genuine, that on or about

22  November 6, 2015, the Debtor as lessee, executed with Defendant GLR, LLC (f/k/a

23  Grewal Land Holdings, LLC), as lessor, a "First Amendment to Oil, Gas and Mineral

24  Lease," amending the Lakeview/Golco Lease in a number of respects, including

25  changing the term of the lease from twenty years to three years from November 6,

26  2015.  A copy of the First Amendment to Oil, Gas and Mineral Lease regarding the

27  Lakeview/Golco Lease is attached herewith as Exhibit "5."

28

1590957.1  26932

5

24.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030458, purporting to transfer an interest in the real property that is the subject of the Lakeview/Golco Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "6" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

**The Mortensen Lease**

25.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor, as lessee executed a three-year oil, gas and mineral lease, commencing December 1, 2015, described as the "Mortenson Lease," with Defendant GLR, LLC, as lessor.  A copy of the Mortenson Lease is attached herewith as Exhibit "7."

26.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030459, purporting to transfer an interest in the real property that is the subject of the Mortenson Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

27.    The transfers and transactions described in the above paragraphs 21 and 24, are hereinafter referred to, collectively, as the "11/6/15 Transfers."

28.    The transfers and transactions described in the above paragraphs 22, 25 and 27 are hereinafter referred to, collectively, as the "7/19/19 Transfers."

29.    The 11/6/15 Transfers and the 7/19/19 Transfers are hereinafter referred to, collectively, as the "Subject Transfers."

30.    The real property interests described in the above paragraphs 20 through 27 are hereinafter referred to, collectively, as the "Properties."

31.    The Debtor's statement of financial affairs, in the list of transfers made to insiders within one year before the Petition Date, says that the Debtor "returned defaulted non-producing property" to the Defendants in January 2019.

32.    There exists one or more creditors holding an unsecured claim that is allowable under section 502 of this title, or that is not allowable only under section 502(e) of this title, that could avoid a transfer under applicable nonbankruptcy law, including, without limitation, UBS AG, London Branch.

## FIRST CLAIM FOR RELIEF

**(To Avoid and Recover Preferential Transfers Under 11 U.S.C. §§ 547 and 550)**

33.    Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32, inclusive, of this Complaint as though fully set forth herein.

34.    Plaintiff is informed and believes, and based thereon alleges, that the Defendants are creditors of the Debtor.

35.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers transferred an interest in property of the Debtor to the Defendants.

36.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers were made to or for the benefit of the Defendants as creditors of the Debtor.

37.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendants before such transfers were made.

38.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers were made while the Debtor was insolvent.

39.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers, which were made within one-year prior to the Petition Date, are preferential transfers.

40.    Plaintiff is informed and believes, and based thereon alleges, that the 7/19/19 Transfers enabled the Defendants, as creditors, to receive more than the Defendants would have received if the transfers had not been made and the Defendants instead were to receive payment on the Defendants' claims only to the extent provided by Chapter 7 of the Code.

41.    By reason of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the 7/19/19 Transfers.

42.    Pursuant to Section 550 of the Code, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the 7/19/19 Transfers, in a sum according to proof.

## SECOND CLAIM FOR RELIEF

**(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548 and 550 and California Civil Code § 3439.04(a)(1))**

43.    Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32, inclusive, of this Complaint as though fully set forth herein.

44.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor made the Subject Transfers with the actual intent to hinder, delay or defraud one or more of its creditors.

45.    Pursuant to 11 U.S.C. §§ 544 and/or 548, and California Civil Code § 3439.04(a)(1), Plaintiff is entitled to avoid the Subject Transfers.

46.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or the value thereof plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

**THIRD CLAIM FOR RELIEF**

**(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548 and 550 and California Civil Code § 3439.05)**

47.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32, inclusive, of this Complaint as though fully set forth herein.

48.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor received less than a reasonably equivalent value in exchange for the Subject Transfers.

49.     Plaintiff is informed and believes, and based thereon alleges, that at the time the Subject Transfers were made, the Debtor was either insolvent or became insolvent as a result of the Subject Transfers.

50.     Pursuant to 11 U.S.C. §§ 544 and/or 548, and California Civil Code § 3439.05, Plaintiff is entitled to avoid the Subject Transfers.

51.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or the value thereof plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

**FOURTH CLAIM FOR RELIEF**

**(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548 and 550 and California Civil Code § 3439.04(a)(2)(A))**

52.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 32, inclusive, and paragraph 47 of this Complaint as though fully set forth herein.

53.     Plaintiff is informed and believes, and based thereon alleges, that at the time of the Subject Transfers, the Debtor was engaged, or was about to engage, in business or a transaction or transactions for which its remaining assets were unreasonably small in relation to the business or transaction.

1   54.    Pursuant to 11 U.S.C. §§ 544 and/or 548, and California Civil Code §

2   3439.04(a)(2)(A), Plaintiff is entitled to avoid the Subject Transfers.

3   55.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

4   the Properties, or the value thereof plus interest thereon at the maximum legal rate

5   from the date of the Subject Transfers, in a sum according to proof.

6

7   **FIFTH CLAIM FOR RELIEF**

8   **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548
    and 550 and California Civil Code § 3439.04(a)(2)(B))**

9

10   56.    Plaintiff refers to and incorporates herein by reference each and every

11   allegation contained in paragraphs 1 through 32, inclusive, and paragraph 47, of this

12   Complaint as though fully set forth herein.

13   57.    Plaintiff is informed and believes, and based thereon alleges, that the

14   Debtor intended to incur, or believed or reasonably should have believed that it

15   would incur, debts that would be beyond its ability to pay as such debts became due.

16   58.    Pursuant to 11 U.S.C. §§ 544 and/or 548, and California Civil Code §

17   3439.04(a)(2)(B), Plaintiff is entitled to avoid the Subject Transfers.

18   59.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

19   the Properties, or the value thereof plus interest thereon at the maximum legal rate

20   from the date of the Subject Transfers, in a sum according to proof.

21

22   **SIXTH CLAIM FOR RELIEF**

23   **(For Turnover and Accounting under 11 U.S.C. § 542)**

24   60.    Plaintiff refers to and incorporates herein by reference each and every

25   allegation contained in paragraphs 1 through 32, inclusive, of this Complaint as

26   though fully set forth herein.

27

28

1590957.1  26932

10

61.     Plaintiff is informed and believes, and based thereon alleges, that the Properties each are property that the Trustee may sell, use, or lease under 11 U.S.C. § 363.

62.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are in possession of the Properties.

63.     Pursuant to 11 U.S.C. § 542(a), Plaintiff is entitled to turnover of the Properties, and an accounting thereof, from the Defendants.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

## ON THE FIRST THROUGH FIFTH CLAIMS FOR RELIEF:

1.     For judgment in favor of Plaintiff and against the Defendants avoiding the Subject Transfers and recovering the Properties, or damages, subject to proof at trial, plus interest thereon as provided by law.

## ON THE SIXTH CLAIM FOR RELIEF:

2.     For turnover of the Properties.

3.     For an accounting with respect to the Properties.

1       **ON ALL CLAIMS FOR RELIEF:**

2       4.    For an award of Plaintiff's reasonable costs incurred in connection with

3 this Complaint.

4       5.    For such other and further relief as the Court deems just and proper.

5

6 DATED:  May 22, 2020             DANNING, GILL, ISRAEL &

7                             KRASNOFF, LLP

8

9                           By:        /s/ Zev Shechtman

10                              ZEV SHECHTMAN

11                              Attorneys for Plaintiff and

12                              Counterdefendant Michael A. McConnell,
                             Chapter 11 Trustee

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1590957.1  26932

# EXHIBIT "1"

# OIL, GAS AND MINERAL LEASE

THIS LEASE AND AGREEMENT, made and entered into this 24ᵗʰ day of February, 2012 by and between Grewal (Royalty) LLC, a Delaware limited liability company, hereinafter called "Lessor" and HVI Cat Canyon, Inc., a Colorado corporation, hereinafter called "Lessee"

WITNESSETH: That for and in consideration of a rental paid in advance upon execution hereof, the receipt and sufficiency of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of Lessee to be kept and performed, Lessor does hereby lease, let and demise unto Lessee the lands hereinafter described (herein sometimes referred to as the "leased lands") for the purpose and with the exclusive right of prospecting, exploring, mining, drilling and operating leased land for oil, gas, other hydrocarbons, associated substances, sulphur, nitrogen, carbon dioxide, helium, geothermal steam and other commercially valuable substances which may be produced through wells on the leased land, whether or not similar to the above mentioned substances (collectively called "substances") and producing, taking, treating, storing, removing and disposing of said substances from the leased land, together with the right for such purposes for the free use of oil, gas and water (but not water from Lessor's well unless Lessor shall expressly allow such use) from the leased land and the right to inject in the leased land gas, water or other fluids for purposes of pressure maintenance or secondary and tertiary recovery of oil, gas and other hydrocarbon substances from the leased lands and the right to conduct secondary and tertiary recovery operations: and also the right to construct, erect, maintain, operate, use, repair, replace and remove (including casing in wells) tanks, oil and gas treating plants, roads, pipelines, power lines, telephone and telegraph lines, machinery, appliances, buildings and all structures or improvements as may be necessary or convenient in carrying on Lessee's operations on the leased land, together with all other rights necessary or convenient for any and all said purposes, including, but not limited to, rights of way for road and easements over, upon and across and ingress and egress to and from leased land for any or all above-mentioned purposes. Any pipelines, pole lines or roads constructed by Lessee may also be used by it in operations on lands in the vicinity of the leased land. Lessor shall have the right to occupy and use the leased land in any manner and to the extent not inconsistent with Lessee's rights or in interference with Lessee's operations hereunder. The land hereby leased is situated in the County of Santa Barbara, State of California, and is described as follows:

> The Southeast Quarter of Southwest Quarter of Section 2, containing 40 acres, more or less, and
> the Northwest Quarter of the Northeast Quarter of Section 11, containing 40 acres, more or less, and
> the Northeast Quarter of the Northwest Quarter of Section 11, containing 40 acres, more or less,
> in Township 9 North, Range 34 West, SBB&M in the County of Santa Barbara, State of California.

together with such rights as Lessor may have in any roads, streets, alleys, waterways, canals, sloughs, levees, ditches, easements, right of way upon, within or adjoining the above described property, and containing 120 acres, more or less.

To have and to hold the same for a term of **twenty (20)** years from and after the date hereof (hereinafter referred to as the "primary term") and so long thereafter oil, gas, hydrocarbons, or other substances are produced therefrom in quantities deemed paying by Lessee; or so long thereafter Lessee shall conduct drilling (including without limitations, deepening, plugging back, repairing, redrilling and reworking operations on the leased land or be excused therefrom as in this lease provided, and should production result form such operations, this lease shall remain in full force and effect so long as oil, gas, hydrocarbons or other substance shall be produce therefrom.

In consideration of the premises, the parties hereby mutually agree as follow:

1.    Notwithstanding anything herein to the contrary, commencing March 1, 2012, Lessee shall pay to Lessor annually for as long as this lease remains in full force and effect a minimum royalty in the amount of **Twenty-Five Thousand Dollars ($25,000.00)** (hereinafter referred to as "annual rental") which shall serve as rental for each following year paid. For each rental year commencing March 1, 2013, Lessee shall calculate the amount of royalties actually paid to Lessor for the prior year from March 1 through February 28 and shall deduct said actual royalties paid from the annual rental, the balance of which shall be payable to Lessor by April 1ˢᵗ. This lease shall terminate as to all rights and obligations created hereby unless Lessee (a) shall make or tender the royalty payments as herein provided or (b) shall within said period commence drilling operations or reworking existing wells for oil, gas or other substances on the leased land and prosecute the drilling or reworking of such well with reasonable diligence until oil, gas or other substances are found in quantities deemed paying by Lessee or (c) and until Lessee deems that further drilling or operations of the existing wells would be unprofitable or impracticable in which event Lessee may abandon such wells. In the event Lessee shall not have commenced such drilling operations or reworking of a well on or before the expiration of each one-year rental period, Lessee may, at its option, from time to time defer commencement of drilling operations or reworking of wells only within the primary term hereof by the payment or tender to Lessor of annual rental payable annually and such payments shall operate to defer obligation to commence drilling operations or reworking of wells during any period for which rental is paid, or Lessee may, quitclaim and surrender this lease as is hereafter provided. Notwithstanding anything herein to the contrary, Lessor acknowledges and agrees that there are four (4) wells existing on the leased land and Lessee has met its drilling or reworking obligations as described in this Paragraph (b). Notwithstanding the foregoing or anything herein to the contrary, it is the intent hereof that the annual rental shall be paid under this Paragraph, before and after the primary term, and that so long as such annual rental is paid, this lease shall continue in full force and effect just as if it were a producing lease.

2.    The payments or tenders required to be made by Lessee hereunder may be made by check issued and made payable as hereinafter provided and mailed or delivered. The mailing of the rental payment shall be deemed a timely tender thereof and shall preclude termination of this lease. The payment or tender of rentals in the manner provided above shall be binding upon the successors and assigned of Lessor. A waiver by Lessee of the provisions of this paragraph in the making of any payment or payments shall not be deemed a waiver thereof with respect to subsequent payments. If at any time there is no person or other entity authorized to receive payments hereunder, the time of making such payments shall be extended until Lessee has been notified in writing of such designation.

**EXHIBIT "1"**
**0030**

**0014**

3.    Any notice to be given by either party to the other hereunder, which notice shall be in writing, may be delivered in person or by registered or certified mail, postage prepaid / return receipt requested, addressed to the party for whom intended as follows:

to Lessor:

45 Rockefeller Plaza, Suite 2410
New York, NY 10111;

to Lessee:

P.O. Box 5489
Santa Maria, California 93456

Either party may from time to time, by written notice to the other, designate a different address, which shall be substituted for the one above specified.  Service of notice will be considered when actually delivered.  Lessee shall be allowed 60 days to alter records before such address shall be deemed effective for rental and royalty payment.

4.    The term "royalty share" wherever used herein shall mean the fraction **one-fourth (1/4) or twenty-five percent (25%).**

5.    Lessee shall pay Lessor as royalty on oil the value of the royalty share of the oil produced from the leased land (after making the customary adjustments for temperature, water, b.s., and the actual cost of treating said royalty oil for market or pipeline acceptance), at the posted available market price at the well or oil of like gravity and quality on the day the oil is so removed, or, if Lessee is unable to sell oil at a price equal to said posted price then royalty settlement shall be made on the basis of the price received by Lessee, or if Lessee sells said oil at a price higher than said posted price then royalty settlement shall be made on the basis of such higher price.  Lessee may deduct from any royalty payment to Lessor a reasonable charge for the cost of any diluent used in connection with production and for the dehydration, cleaning and treating of such oil and reasonable charge for transportation to the treating plant or refinery.  Nothing herein contained shall be construed as obligating Lessee to treat oil.

6.    Lessee shall pay to Lessor as royalty on gas the royalty share of the net proceeds derived from the sale of gas produced hereunder, after deducting treatment and delivery costs, and also the royalty share of the value at the field market price of any gas used by Lessee in operations other than those conducted under this lease.  Nothing herein contained shall obligate Lessee to treat or process natural gas nor shall Lessee be obligated to save, sell or otherwise dispose of natural gas or residual dry gas, as the case may be, unless there is a market therefor at the well or processing plant at a price and under conditions which Lessee believes to be for the best interests of both parties hereto, or to pay royalty on any gas which is neither sold nor used..

7.    Lessee shall pay Lessor as royalty the market value at the well, in the condition as produced, of the royalty share of any substance covered by this lease, other than oil and gas and the products thereof, which Lessee may elect to produce and save or market or utilize from the leased land. Provided, however, that, Lessee shall not be required to account to Lessor for or pay royalty on oil, gas or other substances used by Lessee in its operations hereunder, including, but not limited to, fuel, lifting, injecting, gathering, compressing for processing and processing purposes, and Lessee may use such substance free of charge.  In no event shall Lessee be liable to Lessor for its failure or inability to save any of said substances, or for shrinkage or loss thereof, and royalty shall not be payable in respect to any of such substances lost through evaporation, leakage, fire or otherwise.

Lessee shall have the right to treat or cause to be treated all or any portion of the oil and gas produced from the leased land for the purpose of extraction, and for such purpose Lessee may transport or cause to be transported to a facility or plant either on the leased land or other land all or portion of such oil and gas where it may be commingled with oil and gas from other properties.  Lessee shall meter such oil and gas to be transported, and such meter readings together with tests that are standard and custom in the industry at regular intervals, such as once each month, shall furnish the basis for computation of the amounts of such oil and gas or other hydrocarbons, and of the residue to be credited to this lease.  Oil and gas actually and reasonably used or consumed or lost in the operations of any such extraction shall be free of charge and Lessee shall not be held accountable to Lessor for that proportion of the oil and gas used, consumed or lost which, on the basis of quantity determinations made as above stated, is reasonably estimated to come from the leased land.

8.    Settlement shall be made by Lessee on or before the last day of each calendar month for all royalties which accrued during the preceding month and Lessee shall furnish Lessor monthly statements showing the computation of royalties.  Lessor agrees to examine promptly each and all statements and remittance forwarded by Lessee to it hereunder and promptly advise Lessee of any objection thereto.

9.    The rentals and royalties provided for in this lease are based on the whole of the oil and gas rights in the leased land described above.  If Lessor owns less than the whole of the oil and gas rights in said land, the rentals and royalties accruing hereunder shall be proportionately reduced.  If any claim is asserted or any action or proceeding instituted by Lessor, or by any third party claiming title to the leased land or any part thereof or any interest therein or in any production therefrom, adverse to Lessor or in hostility to rights claimed in good faith by Lessee under this lease, then during the pendency of such controversy and until 90 days after final determination thereof, Lessee may defer or discontinue all operations on the leased lands which are subject of controversy, or, if it operates wells, it may hold any contested royalties accruing hereunder in suspense until thirty (30) days following the final determination (including applicable judicial and administrative appeal periods) of such controversy.

Unless expressly prohibited by covenant, it is hereby agreed between the Lessor and Lessee that the right to use of the surface is a part of the mineral rights and the mineral estate leased.  If Lessor owns a greater interest in the lands described than is purported to be leased hereby or hereafter acquires any additional interest or title in the leased land, then this lease shall cover such greater or additional after-acquired interest or title as if owned by Lessor on the date hereof, and Lessor agrees to give

2/24/12
North Orcutt Lease
Santa Barbara County, California

2

**0031**                                                                              **0015**

Lessee written notice of any such acquisition as soon as the same is made; in which event the rentals and royalties payable to Lessor shall be increased proportionately.

10.    Lessee, or its agents, shall have the exclusive right during the term hereof to enter upon the leased land at any time for the purpose of conducting any geological and geophysical work and the drilling of holes and other operations to secure geological and geophysical information.

11.    [reserved]

12.    Except as otherwise provided herein, Lessee shall drill any new well and operate each completed well in accordance with good oil field practice so long as such well shall produce oil or gas in quantities deemed paying by Lessee but in conformity with any reasonable conservation or curtailment program affecting the drilling of wells or the production of oil or gas or either thereof from said leased land to which Lessee may voluntarily subscribe or become a party, or with any conservation or curtailment program which may be imposed by law, or by any appropriate governmental agency.

13.    Lessee shall pay all taxes levied upon or assessed against its improvements, fixtures and personal property on the leased land, including Lessee's oil stored thereon. Taxes levied upon or assessed against the minerals and mineral rights subject to this lease (or, if same shall not be separately assessed, such part of the taxes on the leased land as are due to the discovery of oil, gas or any of the above mentioned other substances on the leased land or lands adjacent thereto) shall be paid as follows; The royalty share thereof by all the persons entitled to share in the royalty hereunder, according to their several interests in said royalty, and the remainder thereof by Lessee. Any severance tax or other tax assessment, or license now or hereafter levied or imposed, measured by the quantity or value of the oil, natural gasoline, gas, or said other substances produced from the leased land, or allocated thereto, shall be borne by the parties in the same ratio as taxes on minerals or mineral rights. Lessee shall not be liable for any special assessment for local improvements or benefits. If Lessor shall fail to pay any taxes, assessments, or charges required to be paid by Lessor, Lessee may at its option pay the same and recover such costs, plus maximum interest allowed by law, from Lessor, at its option. Lessee may recover such charges paid by it, plus interest, from any royalties or rental accruing hereunder.

14.    Lessor agrees that Lessee, at its option, may pay and discharge any taxes, mortgages or other liens existing, levied or accessed on or against the leased land and, in the event it exercises such option, it shall subrogate to the rights of any holder or holders thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien, any royalty or rental accruing hereunder. Lessee, at its option, shall have the right to defend any suit brought attacking Lessor's title to the leased land, or to bring a quiet-title action in Lessor's name to validate Lessor's title thereto or its own name to validate Lessee's title to the leasehold created hereby, and in such case Lessor agrees to assist and cooperate with Lessee in any such action and to indemnify and hold Lessee, its affiliates, offices, directors, employees, contractors, and agents harmless from any and all claims, damages, and liabilities arising out of any dispute over Lessor's title (including, without limitation, attorneys fees and costs incurred by Lessee in defending Lessor's title or asserting Lessee's title as a result of such defense).

15.    Lessee, at its own cost and expense, shall pay for all labor performed and materials furnished in the operations of Lessee hereunder and Lessor shall not be chargeable with, or liable for, any part thereof. Lessee shall protect the leased land from liens of every character arising from its operations. Lessor may post and keep posted on the leased land notices to protect the same from liens.

16.    Upon written request of Lessor at least 30 days prior to pipeline installation, Lessee shall lay all pipelines, which it constructs through cultivated portions of the leased land below plow depth. Upon similar request Lessee shall fence all excavations to safeguard livestock.

17.    If Lessor is the owner of the surface of the leased land, Lessee shall pay the amount of all damages to livestock, crops, fruit or nut trees, timber, fences, ditches, buildings and other improvements caused by Lessee's operations on the leased land, which payment shall be made to Lessor or Lessor's tenant, whichever shall sustain such damage. If Lessor is not the owner of such surface, Lessee will hold Lessor harmless from all claims and demands arising out of Lessee's operations hereunder which may be asserted by the owner of the surface or by any tenant of such owner.

18.    Notwithstanding anything to the contrary in this lease or any addenda or modifications thereto, if Lessor is not the owner of the surface of the leased land, then all the provisions of this lease requiring Lessor's written consent to utilize the surface of the leased land shall not be applicable to this lease and shall not be binding upon Lessee.

19.    Lessee shall not drill any well on said leased land within 100 feet of any dwelling house now on the leased land without written consent of the owner of such dwelling house.

20.    Lessor, at all reasonable times, may inspect the leased land and the work done and in progress thereon, and the production therefrom. During normal business hours, Lessor may examine the books kept by Lessee in relation to the amount and character of the production from the leased land and disposition thereof.

21.    Lessee shall have the right at any time to remove from the leased land any machinery, rigs, piping, casing and other property and improvements belonging to or furnished by Lessee, including that installed wells or otherwise affixed to the land; provided that, in the event of termination of the lease in its entirety, such removal shall be completed within six (6) months thereafter and, in the event of termination of this lease as to a portion of the leased lands, all such property not needed by Lessee for its operations on land retained under the lease shall be removed from the land as to which lease is terminated within six (6) months after such partial termination. Lessee, after termination of this lease, shall fill all sump holes and other excavation made by it on the leased land and in other respects restore the leased land as nearly to its original condition as is reasonably practical, but Lessee shall not be obligated to restore anything for which it may theretofore have made payment by way of damages.

2/24/12
North Orcutt Lease
Santa Barbara County, California

3

**0032**                                                                                     **0016**

22.     Notwithstanding anything herein contained to the contrary, Lessee, at its option may at any time quitclaim and surrender all of the leased land, in which event this lease shall be at an end and Lessee shall be released and discharged from all obligations thereunder, save and except the obligation to pay royalties therefore accrue and any obligations hereby imposed for the removal of equipment and the restoration of the leased land.  Lessee, at its option, may at any time, quitclaim and surrender any part of the leased land not desired by it, and in such event the amount of any rental provided for in this lease shall thereafter accrue only on the basis of the land not so quitclaimed.  Lands so quitclaimed shall remain subject to the easements and rights of way herein provided for so long as operations are being carried on by Lessee on the retained part of the leased land or on lands with which any part of the leased lands may be pooled, and Lessor agrees that there shall not be drilled on the quitclaimed land any oil or gas well which is within 330 feet of any boundary of the retained leased land.

23.     Lessee may at any time with respect to a designated part or all of the leased land, (a) surrender its right to produce oil or (b) surrender its rights to produce gas.  A surrender of the rights to produce oil shall include the surrender of the rights to produce gas which will necessarily be produce therewith; however, a surrender of gas shall limit Lessee's right to produce gas which may be necessarily be produce with oil.

24.     Other than Lessee's obligation to pay the annual rent, performance of covenants and conditions imposed upon Lessee hereunder shall be excused while, and to the extent that, Lessee is hindered in or prevented from complying therewith, in whole or in part directly or indirectly, by war, riots, strike, lockouts, action of the elements, accidents, lack of suitable production facilities or equipment due to damage, inability to obtain drilling rigs, equipment or other materials in the open market or to obtain transportation therefore, laws, rules, and regulations of any federal state, municipal or other government agency, including but not limited to processing delays in obtaining drilling permits, or any other cause beyond the control of the Lessee, whether similar or dissimilar to those herein specifically enumerated and without regard to whether such cause exists at the date thereof or thereafter arises.  In no event shall Lessee be compelled to settle strikes, or lockouts on any term except those acceptable to Lessee in its own discretion.

25.     In case of default by Lessee with respect to any conditions or covenant hereof and the failure to commence to remedy the same within ninety (90) days following written notice from Lessor to Lessee to perform such condition or covenant, then at the option of Lessor this Lease shall forthwith cease and terminate; EXCEPT THAT, as to any well on the leased land which Lessee is not in default in connection therewith, the lease shall nevertheless continue in effect as to an area (amount of acres) to be selected by Lessee.  Lessee shall not, however, be deemed to be in default while work is in progress in good faith which when completed will constitute compliance with such condition or covenant.  The right to terminate this lease as to the leased land in respect to which Lessee is in default and the right to re-enter and take possession of said leased land shall be the sole and exclusive remedy of Lessor for such breach and default except as to accrued royalty obligations herein specified and the obligations of Lessee to restore the leased as provided for in this lease.  A termination of this lease as to a part only of the leased land or as to a part only of Lessor's rights shall not affect such right of way and easements over the terminated portion of the leased land as may be necessary in Lessee's operation on the part of the leased land as to which no such termination shall have occurred.  Temporary discontinuance of production from any well in order to work on such well, or cessation of production in any well which is followed by work on such well diligently conducted to restore production therefrom shall not be deemed to be an end of production from such well within the meaning of this Paragraph.

26.     If the estate of either party hereto is assigned or conveyed (and the privilege of assigning in whole or in part is expressly allowed), the rights and obligations created hereby and the covenants hereof shall extend to and be binding upon such party's assigns or transferees, and the party so assigning or transferring such interest shall thenceforth be released from all obligations hereunder to the extent of the interest so assigned or transferred, but no change of ownership in the land or in the rentals or royalties shall be recognized by Lessee until Lessee has been furnished with satisfactory written notice of such transfer or assignment, together with a certified, recorded copy of the instruments of transfer or assignments.  Upon receipt of such instruments, Lessee shall be allowed 60 days to alter its records for payment purposes.

27.     If this lease shall be assigned as to a particular part or parts of the leased land, such division of the leasehold estate shall constitute and create separate and distinct holdings under the lease of and according to the several portions of the leased land as thus divided, and the holder or owner of each such portion of the leased land shall be required to comply with and perform Lessee's obligations under this lease for, and only to the extent of, its portion of the leased land; provided, however, that nothing herein shall be construed to impose a drilling obligation or to enlarge the rental obligations upon Lessee or any assignee, and provided further that payment of the annual rental, as set forth in this lease, either by the Lessee or any assignee hereunder shall protect and continue the lease as a whole.

28.     Lessee shall have the right at its option at any time and from time to time to combine and pool all or any part of the leased land or interest therein into one or more operating units with any other land or interest therein (whether held by Lessee or others and whether or not the surface of such other land may be used for oil or gas development purposes).  Each operating unit may be of the size and shape, as Lessee may desire.  Each operating unit created hereunder shall be created by and shall become effective upon the execution by Lessee of a Declaration of Pooling setting forth the exterior boundaries of the unit so created and describing the land pooled thereunder.  If there are any lands or interests to such unit by executing a Supplemental Declaration of Pooling, but no retroactive adjustment of royalties shall be made.  Promptly after execution of each Declaration of Pooling and each Supplemental Declaration of Pooling Lessee shall give written notice thereof to Lessor.  Any operating unit may include land upon which a well has therefore been completed or upon which operations for drilling have therefore been commenced, and within meaning of the requirements of this lease any such well or operations if off the leased land shall be considered as having been commenced immediately after the effective date of such pooling.  Production, drilling or reworking operations anywhere on any pooled land in an operating unit created hereunder shall be treated a production, drilling or reworking operations on the leased land.  There shall be allocated to the leased land the proportion of the pooled production from any such operating unit (whether or not such production is from the leased land) that the number of surface acres covered by this lease and included in such unit bears to the total number of surface acres pooled in such unit; royalties shall be paid hereunder only upon that portion of such production so allocated and as to pooled production from land in such unit such royalties shall be in lieu of any other royalties.  If taxes of any kind are levied or assessed which are based on the quantity of pooled substances underlying or produced from any such operating unit, then the share of such taxes to be borne by Lessor as provided in this lease shall be

proportion to the share of production from such unit allocated to the leased land.  Lessee may at any time quitclaim to the persons entitled thereto all or any part of the land in any such operating unit, and no owner or land in such unit not owning any interest in the quitclaimed land, except by virtue of such pooling, shall have any interest in such quitclaimed land after quitclaim is delivered or recorded.  Allocation of production as aforesaid from any such operating unit, whether to the leased land or in like manner to other lands therein, shall continue not withstanding any quitclaim or other termination, either in whole or in part of this or any other lease covering lands in such unit until such time as the owner of such land, or owner's agent or representative, shall drill or produce any of the pooled substances from any part of such lands, whereupon all such lands formerly included in such unit and as to which the lease covering the same shall have been terminated shall be excluded in determining the production to be allocated to the respective lands in such unit and in prorating taxes; and in the event of the failure of Lessor's or any other owner's title as to the portion of the land included in any such operating unit, such portion of such land shall likewise be excluded from such unit; provided, that Lessee shall not be held to account for any production allocated to any lands excluded from any such operating unit unless and until Lessee has actual knowledge of the aforesaid circumstances requiring such exclusion.  Lessee may at any time either before or after the commencement of the drilling of a well on lands included in any such operating unit but prior to the discovery thereon of the substances for which the unit was formed, or at any time after the abandonment of all wells drilled on such units, wholly dissolve such units by executing a Declaration of Dissolution.  Promptly after execution of such Declaration of Dissolution Lessee shall give written notice thereof to Lessor.  Upon the dissolution of any such operating unit, whether or not this lease or any other lease involved therein remains in effect, all rights of Lessor hereunder to royalty on pooled substances from the lands which were so pooled (other than the leased land) shall cease and terminate; but such dissolution shall not otherwise affect or impair any of the Lessee any of the Lessee's rights or obligations under this lease, including its right to create a new operating unit or units out of the lands previously pooled pursuant to this paragraph, or constitute a surrender of any part of or any interest in the leasehold estate created hereby.  The sale, conveyance or other transfer of, or of any interest in, any portion or portions of the leased land which are at the time of such transfer subject to an operating unit shall (unless the instrument effecting such transfer expressly provides otherwise) be deemed to include and shall operate as a transfer and assignment of all the transferor's interest, rights and benefits under this lease (including the right to royalty on allocated production from the lands subject to any such unit) insofar as such interest, rights and benefits pertain to or are allocable hereunder to the portion or portions of leased land or interest therein so transferred.  The size and/or shape of any such unit created pursuant to the provisions of this paragraph may be changed at any time within twenty one (21) years from the date hereof without Lessor's Joinder or further consent to permit more efficient and economical operations, to include acreage believed to be productive and to exclude acreage believed to be unproductive or which is not committed to the unit, but any increase or decrease in Lessor's royalties resulting from any such change in any such unit shall not be retroactive.

29.    Drilling operations under this lease may be conducted by means of a well or wells, the surface locations of which are on other lands and which are drilled into and bottomed in the lease land (any such well being deemed to be drilled on the leased land), or by means of a well or wells, the surface locations of which are on the leased land and which are bottomed in the leased land, or by a combination of such wells.  Drilling operations under lands pooled in accordance with the terms of this lease may also be conducted by means of a well or wells, the surface location of which are on other lands and which are drilled into and bottomed in the pooled lands (any such well being deemed to be drilled on the pooled lands) or by means of a well or wells, the surface locations of which are on the pooled lands and which are bottomed in the pooled lands, or by combination of such wells.

30.    Lessee has acquired, or may acquire, rights in respect to oil gas or other substances underlying other lands in the vicinity of the leased land in which the Lessor has no interest and Lessor hereby grants unto Lessee such right of way, easements and servitudes in and through the subsurface of the leased land as Lessee may from time to time desire for boring well holes through the subsurface of the leased land from the surface locations outside of the leased land and casing same and otherwise completing and maintaining such wells in and producing such wells from the lands other than the leased land.  Such right of way, easements and servitudes, notwithstanding the prior termination of this lease, shall continue for so long as Lessee, its successors and assigns, retain its or their interest in such other lands.

31.    During the term of this lease, Lessor shall not execute and/or grant an oil and gas lease or oil, gas and mineral lease to a third party or agree to execute or grant such a lease by letter agreement or otherwise.  Should Lessor grant such a lease during the term of this lease, it shall be deemed a breach of this lease and shall excuse all further performance by Lessee under this lease until such lease or agreement is terminated Lessee is provided with satisfactory evidence of such termination.  Further, the term of this lease shall be continued during such suspension of Lessee's performance hereunder.

32.    Lessor acknowledges that oil and gas operations on this property may result in the presence of substances covered by California Health and Safety Code S25249.5 and/or S25359.7.  Lessor acknowledges that clear and reasonable notices and warnings have been provided by Lessee to Lessor as required by law.  If any third party asserts any claim against Lessor on account of Lessee's extraction or removal of hydrocarbons from the leased land or other operations of Lessee thereon (including without limiting the generality of the foregoing, any governmental or other action or proceeding for the abatement of a nuisance or the cleanup, removal or other protection against a hazardous waste as now defined), Lessee will defend and indemnify and hold harmless from all such claims except such portion thereof as represents a claim to Lessor's royalty, provided that upon receiving notice thereof, Lessor shall notify Lessee with reasonable promptness of bringing any action or the assertion of any such claim and shall allow Lessee to have Lessee's attorney's appear therein, either alone or in association with Lessor's attorney (as Lessor may elect).

33.    "Drilling Operations" as used in this lease is defined to mean any work or actual operations on the leased land for the purpose of drilling a well, including but not limited to the preparation of the ground therefore and the building of road and facilities, provided the same be followed by construction or erection of derrick, the installation of drilling equipment and actual drilling in the ground, and that all such work be prosecuted diligently.  If drilling operations are in progress at the end of the primary term hereof, drilling operations shall be deemed to continue so long as the Lessee diligently continue to drill allowing not more than 6 months to elapse between the completion or abandonment of one well and the commencement of the next succeeding well.

34.    The terms "paying quantities" or "quantities deemed paying" as used in this lease shall mean revenue from production sufficient to yield Lessee a reasonable profit over and above direct operating costs (not including exploration, drilling, completing, testing and equipping costs) and after deducting royalties, taxes and other burdens on production.

35.    In the event that Lessee drills a water well on the leased land for the production of water for its operation on the leased land, Lessee agrees that if said well is no longer desired by Lessee, or upon termination of this lease, it will, at Lessor's request, remove the pump, tubing and power plant from said water well and will cap the surface casing and otherwise leave same in such condition as may be required by law or regulatory agency, but otherwise will leave said well in such condition that Lessor may subsequently equip the well for the production of water for Lessor's own use.  Lessor hereby indemnifies and hold Lessee harmless against any and all liability arising from Lessor's use of said well.

36.    If at the termination of the primary term hereof, oil or gas or another of said substances is being produced by Lessee, and if thereafter such production shall cease, then and as often as such event shall occur, the term of this lease shall continue for six (6) months from the date of last production, and if during that time Lessee resumes operations for the drilling of a well or restoration of production, the term shall continue during the prosecution of such operations, and, if production results therefrom, as long as production continues, with no cessation thereof for periods in excess of six (6) months.

37.    On the expiration or sooner termination of this lease in its entirety Lessee shall surrender possession to Lessor and file for record a quitclaim deed in the County Recorder's office of said County and State.

38.    If any term, covenant, condition or provision of this lease is held by court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and in no way be affected, impaired or invalidated thereby.

39.    [reserved]

40.    If more than one person is named as Lessor herein and one or more of them fails to execute this lease, it shall, nevertheless (if acceptable by Lessee) become effective as a lease from each such Lessor as may have executed the same.

41.    This lease may be executed with electronic signatures and in any number of counterparts and all such counterparts shall be deemed to constitute a single lease and the execution of one counterpart by any Lessor shall have the same force and effect as if he or she had signed all other counterparts.

42.    This lease and all its terms, conditions and stipulations shall extend to and be binding upon all successors and assigns of said Lessor and Lessee.

**IN WITNESS WHEREOF,** the parties hereto have caused this lease to be executed as of the day and year first hereinabove written.

**Grewal (Royalty) LLC**                                    **HVI Cat Canyon, Inc.**

By: _____              By: _____
     Randeep S. Grewal, Ch. & CEO                        Andrew DeVegvar, President

34.    The terms "paying quantities" or "quantities deemed paying" as used in this lease shall mean revenue from production sufficient to yield Lessee a reasonable profit over and above direct operating costs (not including exploration, drilling, completing, testing and equipping costs) and after deducting royalties, taxes and other burdens on production.

35.    In the event that Lessee drills a water well on the leased land for the production of water for its operation on the leased land, Lessee agrees that if said well is no longer desired by Lessee, or upon termination of this lease, it will, at Lessor's request, remove the pump, tubing and power plant from said water well and will cap the surface casing and otherwise leave same in such condition as may be required by law or regulatory agency, but otherwise will leave said well in such condition that Lessor may subsequently equip the well for the production of water for Lessor's own use.  Lessor hereby indemnifies and hold Lessee harmless against any and all liability arising from Lessor's use of said well.

36.    If at the termination of the primary term hereof, oil or gas or another of said substances is being produced by Lessee, and if thereafter such production shall cease, then and as often as such event shall occur, the term of this lease shall continue for six (6) months from the date of last production, and if during that time Lessee resumes operations for the drilling of a well or restoration of production, the term shall continue during the prosecution of such operations, and, if production results therefrom, as long as production continues, with no cessation thereof for periods in excess of six (6) months.

37.    On the expiration or sooner termination of this lease in its entirety Lessee shall surrender possession to Lessor and file for record a quitclaim deed in the County Recorder's office of said County and State.

38.    If any term, covenant, condition or provision of this lease is held by court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and in no way be affected, impaired or invalidated thereby.

39.    [reserved]

40.    If more than one person is named as Lessor herein and one or more of them fails to execute this lease, it shall, nevertheless (if acceptable by Lessee) become effective as a lease from each such Lessor as may have executed the same.

41.    This lease may be executed with electronic signatures and in any number of counterparts and all such counterparts shall be deemed to constitute a single lease and the execution of one counterpart by any Lessor shall have the same force and effect as if he or she had signed all other counterparts.

42.    This lease and all its terms, conditions and stipulations shall extend to and be binding upon all successors and assigns of said Lessor and Lessee.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed as of the day and year first hereinabove written.

Grewal (Royalty) LLC                                     HVI Cat Canyon, Inc.

By: _____          By: _____
        Randeep S. Grewal, Ch. & CEO                        Andrew DeVegvar, President

# EXHIBIT "2"

FIRST AMENDMENT TO OIL, GAS AND MINERAL LEASE

THIS FIRST AMENDMENT ("Amendment"), made and entered into on November 6, 2015 by and between GRL, LLC, a Delaware limited liability company (f/k/a Grewal (Royalty), LLC, a Delaware limited liability company), hereinafter called "Lessor" and HVI Cay Canyon, Inc., a Colorado corporation, hereinafter called "Lessee".

W I T N E S S E T H :

THAT, REFERENCE IS HERBY MADE to that certain Oil, Gas and Mineral Lease dated February 24, 2012, (such lease or a memorandum of such lease being made of record in the Office of the County Recorder of Santa Barbara County, California, on February 28, 2012 as Instrument No. 2012-0012590 of Official Records) whereby Lessor did demise, lease, and let unto Lessee for oil and gas development purposes, certain lands situated in said County and State particularly described in such lease, and in said memorandum, such lease and such memorandum, together with previous amendments thereof, if any, being hereinafter collectively referred to as "said lease";

AND, WHEREAS, Lessor and Lessee have agreed to amend said lease in the particulars hereinafter set forth;

NOW, THERFORE, in consideration of the sum of One Dollar ($1.00) and other valuable consideration paid to Lessor by Lessee, receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.  Said lease is hereby amended as follows:

A. Notwithstanding anything herein to the contrary, the primary term shall be three (3) years from November 06, 2015.

B. Paragraph 1 of said lease shall be replaced in its entirety with the following language:

"Notwithstanding anything herein to the contrary, commencing March 1, 2007, Lessee shall pay to Lessor annually for as long as this lease remains in full force and effect a minimum royalty in the amount of Twenty-Five Thousand Dollars ($25,000.00) (hereinafter referred to as "annual rental") which shall serve as rental for each following year paid. For each rental year commencing March 1, 2008, Lessee shall calculate the amount of royalties actually paid to Lessor for the prior year from March 1 through February 28 and shall deduct said actual royalties paid from the annual rental, the balance of which shall be payable to Lessor by April 1st. Notwithstanding anything herein to the contrary, this lease shall terminate as to all rights and obligations created hereby unless Lessee (a) shall make or tender the royalty payments as herein provided or (b) shall within said primary term commence drilling operations or reworking existing wells for oil, gas or other substances on the leased land and prosecute the drilling or reworking of such well with reasonable diligence until either injection or oil, gas or other substances are found in quantities deemed paying by Lessee for no less than six (6) consecutive months by November 6, 2018 or (c) and until Lessee deems that further drilling or operations of the existing wells would be unprofitable or impracticable in which event Lessee may abandon such wells. In the event Lessee shall not have commenced such drilling operations or reworking of a well on or before the expiration of each one-year rental period, Lessee may, at its option, from time to time defer commencement of drilling operations or reworking of wells only within the primary term hereof by the payment or tender to Lessor of annual rental payable annually and such payments shall operate to defer obligation to commence drilling operations or reworking of wells during any period for which rental is paid, or Lessee may, quitclaim and surrender this lease as is hereafter provided."

C. Paragraph 25 of said lease shall be amended by inserting the following language at the beginning of the first sentence: "Except as to a default by Lessee to pay Lessor any monetary obligations owed hereunder,".

2.  All other covenants, terms and conditions of said lease shall remain unchanged and in full force and effect.

3.  This Amendment may be executed in any number of counterparts which shall be construed together and constitute one agreement, and this instrument and each such counterpart shall, as to the party or parties signatory thereto, be effective when signed and the failure of any person to execute this instrument or a

No. Orcutt Lease

**EXHIBIT "2"**

counterpart hereof shall not affect the binding force of this instrument as to those who have executed this instrument or such a counterpart or counterparts.

4.  This Amendment shall bind and inure to the benefit of the respective heirs, executors, administrators, successors, and assigns of the parties hereto.

IN WITNESS WHEREOF, said parties have caused this Amendment to be duly executed as of the date first hereinabove written.

"LESSOR"
GRL, LLC

By
Randeep S. Grewal,
Chairman

"LESSEE"
HIV Cat Canyon, Inc.

By:
Susan M. Whalen
SVP and General Counsel

3

# EXHIBIT "3"



RECORDING REQUESTED BY AND

WHEN RECORDED MAIL TO:
AND MAIL TAX STATEMENTS
TO:

2019-0030457

| | Recorded | REC FEE | 30.00 |
| Official Records | | |
| County of | PCOR | 20.00 |
| Santa Barbara | SB2 HOUSING | 75.00 |
| Joseph E. Holland | |
| County Clerk Recorder | |
| | JKH | |
| 04:34PM 19-Jul-2019 | Page 1 of 3 |

NAME

GRL, LLC

45 Rockefeller Plaza, #2410
New York, NY 10111

MAILING
ADDRESS

CITY,
STATE
ZIP CODE

(SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE)

Documentary Transfer Tax $ 0.00
___ Computed on value of interest conveyed.
___ Computed on value of interest conveyed less liens
and encumbrances remaining thereon at time of sale.
_√_ No property transfer tax due (value of interest or property conveyed is less than $100.00 [Rev. & Tax. Code § 11911]).

## QUITCLAIM DEED

FOR GOOD AND VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, HVI Cat Canyon, Inc., a Colorado Corporation ("Grantor") hereby remises, releases, relinquishes, surrenders and forever quitclaims to GRL, LLC, a Delaware limited liability company (hereinafter referred to as "Grantee") any and all right, title and interest that Grantor may have in that certain real property described in Exhibit "A" attached hereto and incorporated herein by this reference, in the County of Santa Barbara, State of California, including without limitation any rights Grantor may have had under the following instrument:

| Instrument | Original Lessor / | |
| Date of Instrument | Original Lessee | Recording Data |
| --- | --- | --- |
| Oil, Gas & Mineral Lease | Grewal (Royalty) LLC / | No. 2012-0012590 |
| 2/24/12 | HVI Cat Canyon, Inc. | |

IN WITNESS WHEREOF, Grantor has executed this Quitclaim Deed on the date affixed to its signature.

**HVI CAT CANYON, INC.**

By: _____

Alex G. Dimitrijevic, President

Dated: January _16_, 2019

## EXHIBIT "3"

Exhibit "A"

The Southeast Quarter of the Southwest Quarter of Section 2, containing 40 acres, more or less, and the Northwest Quarter of the Northeast Quarter of Section 11, containing 40 acres, more or less, and the Northeast Quarter of the Northwest Quarter of Section 11, containing 40 accres, more o less, in Township 9 North, Range 34 West, SBB&M in the County of Santa Barbara, State of California.

> **A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA      )
                          ) ss.
COUNTY OF SANTA BARBARA    )

On _January 16, 2019_ before me, _Victoria A. Winn_, a notary public, personally appeared _Alex G. Dimitrijevic_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(AFFIX NOTARIAL SEAL)

_Victoria A. Winn_
NOTARY PUBLIC

VICTORIA A. WINN
COMM. #2243692
Notary Public - California
Santa Barbara County
My Comm. Expires June 20, 2022

# EXHIBIT "4"

# OIL, GAS AND MINERAL LEASE

THIS LEASE AND AGREEMENT, made and entered into this 15ᵗʰ day of January, 2013 but effective March 1, 2007 by and between **Grewal Land Holdings, LLC, a Delaware limited liability company**, hereinafter called "Lessor" and HVI Cat Canyon, Inc., a Colorado corporation, hereinafter called "Lessee"

WITNESSETH: That for and in consideration of a rental paid in advance upon execution hereof, the receipt and sufficiency of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of Lessee to be kept and performed, Lessor does hereby lease, let and demise unto Lessee the lands hereinafter described (herein sometimes referred to as the "leased lands") for the purpose and with the exclusive right of prospecting, exploring, mining, drilling and operating leased land for oil, gas, other hydrocarbons, associated substances, sulphur, nitrogen, carbon dioxide, helium, geothermal steam and other commercially valuable substances which may be produced through wells on the leased land, whether or not similar to the above mentioned substances (collectively called "substances") and producing, taking, treating, storing, removing and disposing of said substances from the leased land, together with the right for such purposes for the free use of oil, gas and water (but not water from Lessor's well unless Lessor shall expressly allow such use) from the leased land and the right to inject in the leased land, water or other fluids for purposes of pressure maintenance or secondary and tertiary recovery of oil, gas and other hydrocarbon substances from the leased lands and the right to conduct secondary and tertiary recovery operations: and also the right to construct, erect, maintain, operate, use, repair, replace and remove (including casing in wells) tanks, oil and gas treating plants, roads, pipelines, power lines, telephone and telegraph lines, machinery, appliances, buildings and all structures or improvements as may be necessary or convenient in carrying on Lessee's operations on the leased land, together with all other rights necessary or convenient for any and all said purposes, including, but not limited to, rights of way for road and easements over, upon and across and ingress and egress to and from leased land for any or all above-mentioned purposes. Any pipelines, pole lines or roads constructed by Lessee may also be used by it in operations on lands in the vicinity of the leased land. Lessor shall have the right to occupy and use the leased land in any manner and to the extent not inconsistent with Lessee's rights or in interference with Lessee's operations hereunder. The land hereby leased is situated in the County of Santa Barbara, State of California, and is described in Exhibit "A" attached hereto and incorporated herein by this reference, together with such rights as Lessor may have in any drillsites, roads, streets, alleys, waterways, canals, sloughs, levees, ditches, easements, right of way upon, within or adjoining the above described property, and containing **692.25 acres**, more or less.

To have and to hold the same for a term of <u>twenty (20)</u> years from and after the date hereof (hereinafter referred to as the "primary term") and so long thereafter oil, gas, hydrocarbons, or other substances are produced therefrom in quantities deemed paying by Lessee; or so long thereafter Lessee shall conduct drilling (including without limitations, deepening, plugging back, repairing, redrilling and reworking operations on the leased land or be excused therefrom as in this lease provided, and should production result form such operations, this lease shall remain in full force and effect so long as oil, gas, hydrocarbons or other substance shall be produce therefrom.

In consideration of the premises, the parties hereby mutually agree as follow:

1.    Notwithstanding anything herein to the contrary, commencing March 1, 2007, Lessee shall pay to Lessor annually for as long as this lease remains in full force and effect a minimum royalty in the amount of <u>**Twenty-Five Thousand Dollars ($25,000.00)**</u> (hereinafter referred to as "annual rental") which shall serve as rental for each following year paid. For each rental year commencing March 1, 2008, Lessee shall calculate the amount of royalties actually paid to Lessor for the prior year from March 1 through February 28 and shall deduct said actual royalties paid from the annual rental, the balance of which shall be payable to Lessor by April 1ˢᵗ. This lease shall terminate as to all rights and obligations created hereby unless Lessee (a) shall make or tender the royalty payments as herein provided or (b) shall within said period commence drilling operations or reworking existing wells for oil, gas or other substances on the leased land and prosecute the drilling or reworking of such well with reasonable diligence until oil, gas or other substances are found in quantities deemed paying by Lessee or (c) and until Lessee deems that further drilling or operations of the existing wells would be unprofitable or impracticable in which event Lessee may abandon such wells. In the event Lessee shall not have commenced such drilling operations or reworking of a well on or before the expiration of each one-year rental period, Lessee may, at its option, from time to time defer commencement of drilling operations or reworking of wells only within the primary term hereof by the payment or tender to Lessor of annual rental payable annually and such payments shall operate to defer obligation to commence drilling operations or reworking of wells during any period for which rental is paid, or Lessee may, quitclaim and surrender this lease as is hereafter provided. Notwithstanding anything herein to the contrary, Lessor acknowledges and agrees that there are wells existing on the leased land and Lessee has met its drilling or reworking obligations as described in this Paragraph (b). Notwithstanding the foregoing or anything herein to the contrary, it is the intent hereof that the annual rental shall be paid under this Paragraph, before and after the primary term, and that so long as such annual rental is paid, this lease shall continue in full force and effect just as if it were a producing lease.

2.    The payments or tenders required to be made by Lessee hereunder may be made by check issued and made payable as hereinabove provided and mailed or delivered. The mailing of the rental payment shall be deemed a timely tender thereof and shall preclude termination of this lease. The payment or tender of rentals in the manner provided above shall be binding upon the successors and assigned of Lessor. A waiver by Lessee of the provisions of this paragraph in the making of any payment or payments shall not be deemed a waiver thereof with respect to subsequent payments. If at any time there is no person or other entity authorized to receive payments hereunder, the time of making such payments shall be extended until Lessee has been notified in writing of such designation.

3.    Any notice to be given by either party to the other hereunder, which notice shall be in writing, may be delivered in person or by registered or certified mail, postage prepaid / return receipt requested, addressed to the party for whom intended as follows:

3/1/07
Lakeview/Golco Lease
Santa Barbara County, California

1

**EXHIBIT "4"**
**0046**

**0030**

to Lessor:

45 Rockefeller Plaza, Suite 2410
New York, NY 10111;

to Lessee:

P.O. Box 5489
Santa Maria, California 93456

Either party may from time to time, by written notice to the other, designate a different address, which shall be substituted for the one above specified. Service of notice will be considered when actually delivered. Lessee shall be allowed 60 days to alter records before such address shall be deemed effective for rental and royalty payment.

4.     The term "royalty share" wherever used herein shall mean the fraction **one-fourth (1/4) or twenty-five percent (25%).**

5.     Lessee shall pay Lessor as royalty on oil the value of the royalty share of the oil produced from the leased land (after making the customary adjustments for temperature, water, b.s., and the actual cost of treating said royalty oil for market or pipeline acceptance), at the posted available market price at the well or of like gravity and quality on the day the oil is so removed, or, if Lessee is unable to sell oil at a price equal to said posted price then royalty settlement shall be made on the basis of the price received by Lessee, or if Lessee sells said oil at a price higher than said posted price then royalty settlement shall be made on the basis of such higher price. Lessee may deduct from any royalty payment to Lessor a reasonable charge for the cost of any diluent used in connection with production and for the dehydration, cleaning and treating of such oil and reasonable charge for transportation to the treating plant or refinery. Nothing herein contained shall be construed as obligating Lessee to treat oil.

6.     Lessee shall pay to Lessor as royalty on gas the royalty share of the net proceeds derived from the sale of gas produced hereunder, after deducting treatment and delivery costs, and also the royalty share of the value at the field market price of any gas used by Lessee in operations other than those conducted under this lease. Nothing herein contained shall obligate Lessee to treat or process natural gas nor shall Lessee be obligated to save, sell or otherwise dispose of natural gas or residual dry gas, as the case may be, unless there is a market therefor at the well or processing plant at a price and under conditions which Lessee believes to be for the best interests of both parties hereto, or to pay royalty on any gas which is neither sold nor used..

7.     Lessee shall pay Lessor as royalty the market value at the well, in the condition as produced, of the royalty share of any substance covered by this lease, other than oil and gas and the products thereof, which Lessee may elect to produce and save or market or utilize from the leased land. Provided, however, that, Lessee shall not be required to account to Lessor for or pay royalty on oil, gas or other substances used by Lessee in its operations hereunder, including, but not limited to, fuel, lifting, injecting, gathering, compressing for processing and processing purposes, and Lessee may use such substance free of charge. In no event shall Lessee be liable to Lessor for its failure or inability to save any of said substances, or for shrinkage or loss thereof, and royalty shall not be payable in respect to any of such substances lost through evaporation, leakage, fire or otherwise.

Lessee shall have the right to treat or cause to be treated all or any portion of the oil and gas produced from the leased land for the purpose of extraction, and for such purpose Lessee may transport or cause to be transported to a facility or plant either on the leased land or other land all or portion of such oil and gas where it may be commingled with oil and gas from other properties. Lessee shall meter such oil and gas to be transported, and such meter readings together with tests that are standard and custom in the industry at regular intervals, such as once each month, shall furnish the basis for computation of the amounts of such oil and gas or other hydrocarbons, and of the residue to be credited to this lease. Oil and gas actually and reasonably used or consumed or lost in the operations of any such extraction shall be free of charge and Lessee shall not be held accountable to Lessor for that proportion of the oil and gas used, consumed or lost which, on the basis of quantity determinations made as above stated, is reasonably estimated to come from the leased land.

8.     Settlement shall be made by Lessee on or before the last day of each calendar month for all royalties which accrued during the preceding month and Lessee shall furnish Lessor monthly statements showing the computation of royalties. Lessor agrees to examine promptly each and all statements and remittance forwarded by Lessee to it hereunder and promptly advise Lessee of any objection thereto.

9.     The rentals and royalties provided for in this lease are based on the whole of the oil and gas rights in the leased land described above. If Lessor owns less than the whole of the oil and gas rights in said land, the rentals and royalties accruing hereunder shall be proportionately reduced. If any claim is asserted or any action or proceeding instituted by Lessor, or by any third party claiming title to the leased land or any part thereof or any interest therein or in any production therefrom, adverse to Lessor or in hostility to rights claimed in good faith by Lessee under this lease, then during the pendency of such controversy and until 90 days after final determination thereof, Lessee may defer or discontinue all operations on the leased lands which are subject of controversy, or, if it operates wells, it may hold any contested royalties accruing hereunder in suspense until thirty (30) days following the final determination (including applicable judicial and administrative appeal periods) of such controversy.

Unless expressly prohibited by covenant, it is hereby agreed between the Lessor and Lessee that the right to use of the surface is a part of the mineral rights and the mineral estate leased. If Lessor owns a greater interest in the lands described than is purported to be leased hereby or hereafter acquires any additional interest or title in the leased land, then this lease shall cover such greater or additional after-acquired interest or title as if owned by Lessor on the date hereof, and Lessor agrees to give Lessee written notice of any such acquisition as soon as the same is made; in which event the rentals and royalties payable to Lessor shall be increased proportionately.

2

**0047**                                                             **0031**

10. Lessee, or its agents, shall have the exclusive right during the term hereof to enter upon the leased land at any time for the purpose of conducting any geological and geophysical work and the drilling of holes and other operations to secure geological and geophysical information.

11. [reserved]

12. Except as otherwise provided herein, Lessee shall drill any new well and operate each completed well in accordance with good oil field practice so long as such well shall produce oil or gas in quantities deemed paying by Lessee but in conformity with any reasonable conservation or curtailment program affecting the drilling of wells or the production of oil or gas or either thereof from said leased land to which Lessee may voluntarily subscribe or become a party, or with any conservation or curtailment program which may be imposed by law, or by any appropriate governmental agency.

13. Lessee shall pay all taxes levied upon or assessed against its improvements, fixtures and personal property on the leased land, including Lessee's oil stored thereon. Taxes levied upon or assessed against the minerals and mineral rights subject to this lease (or, if same shall not be separately assessed, such part of the taxes on the leased land as are due to the discovery of oil, gas or any of the above mentioned other substances on the leased land or lands adjacent thereto) shall be paid as follows; The royalty share thereof by all the persons entitled to share in the royalty hereunder, according to their several interests in said royalty, and the remainder thereof by Lessee. Any severance tax or other tax assessment, or license now or hereafter levied or imposed, measured by the quantity or value of the oil, natural gasoline, gas, or said other substances produced from the leased land, or allocated thereto, shall be borne by the parties in the same ratio as taxes on minerals or mineral rights. Lessee shall not be liable for any special assessment for local improvements or benefits. If Lessor shall fail to pay any taxes, assessments, or charges required to be paid by Lessor, Lessee may at its option pay the same and recover such costs, plus maximum interest allowed by law, from Lessor, at its option. Lessee may recover such charges paid by it, plus interest, from any royalties or rental accruing hereunder.

14. Lessor agrees that Lessee, at its option, may pay and discharge any taxes, mortgages or other liens existing, levied or accessed on or against the leased land and, in the event it exercises such option, it shall subrogate to the rights of any holder or holders thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien, any royalty or rental accruing hereunder. Lessee, at its option, shall have the right to defend any suit brought attacking Lessor's title to the leased land, or to bring a quiet-title action in Lessor's name to validate Lessor's title thereto or in its own name to validate Lessee's title to the leasehold created hereby, and in such case Lessor agrees to assist and cooperate with Lessee in any such action and to indemnify and hold Lessee, its affiliates, offices, directors, employees, contractors, and agents harmless from any and all claims, damages, and liabilities arising out of any dispute over Lessor's title (including, without limitation, attorneys fees and costs incurred by Lessee in defending Lessor's title or asserting Lessee's title as a result of such defense).

15. Lessee, at its own cost and expense, shall pay for all labor performed and materials furnished in the operations of Lessee hereunder and Lessor shall not be chargeable with, or liable for, any part thereof. Lessee shall protect the leased land from liens of every character arising from its operations. Lessor may post and keep posted on the leased land notices to protect the same from liens.

16. Upon written request of Lessor at least 30 days prior to pipeline installation, Lessee shall lay all pipelines, which it constructs through cultivated portions of the leased land below plow depth. Upon similar request Lessee shall fence all excavations to safeguard livestock.

17. If Lessor is the owner of the surface of the leased land, Lessee shall pay the amount of all damages to livestock, crops, fruit or nut trees, timber, fences, ditches, buildings and other improvements caused by Lessee's operations on the leased land, which payment shall be made to Lessor or Lessor's tenant, whichever shall sustain such damage. If Lessor is not the owner of such surface, Lessee will hold Lessor harmless from all claims and demands arising out of Lessee's operations hereunder which may be asserted by the owner of the surface or by any tenant of such owner.

18. Notwithstanding anything to the contrary in this lease or any addenda or modifications thereto, if Lessor is not the owner of the surface of the leased land, then all the provisions of this lease requiring Lessor's written consent to utilize the surface of the leased land shall not be applicable to this lease and shall not be binding upon Lessee.

19. Lessee shall not drill any well on said leased land within 100 feet of any dwelling house now on the leased land without written consent of the owner of such dwelling house.

20. Lessor, at all reasonable times, may inspect the leased land and the work done and in progress thereon, and the production therefrom. During normal business hours, Lessor may examine the books kept by Lessee in relation to the amount and character of the production from the leased land and disposition thereof.

21. Lessee shall have the right at any time to remove from the leased land any machinery, rigs, piping, casing and other property and improvements belonging to or furnished by Lessee, including that installed wells or otherwise affixed to the land; provided that, in the event of termination of the lease in its entirety, such removal shall be completed within six (6) months thereafter and, in the event of termination of this lease as to a portion of the leased lands, all such property not needed by Lessee for its operations on land retained under the lease shall be removed from the land as to which lease is terminated within six (6) months after such partial termination. Lessee, after termination of this lease, shall fill all sump holes and other excavation made by it on the leased land and in other respects restore the leased land as nearly to its original condition as is reasonably practical, but Lessee shall not be obligated to restore anything for which it may theretofore have made payment by way of damages.

22. Notwithstanding anything herein contained to the contrary, Lessee, at its option may at any time quitclaim and surrender all of the leased land, in which event this lease shall be at an end and Lessee shall be released and discharged from all obligations thereunder, save and except the obligation to pay royalties therefore accrue and any obligations hereby imposed for the removal of equipment and the restoration of the leased land. Lessee, at its option, may at any time, quitclaim and surrender

any part of the leased land not desired by it, and in such event the amount of any rental provided for in this lease shall thereafter accrue only on the basis of the land not so quitclaimed. Lands so quitclaimed shall remain subject to the easements and rights of way herein provided for so long as operations are being carried on by Lessee on the retained part of the leased land or on lands with which any part of the leased lands may be pooled, and Lessor agrees that there shall not be drilled on the quitclaimed land any oil or gas well which is within 330 feet of any boundary of the retained leased land.

23.    Lessee may at any time with respect to a designated part or all of the leased land, (a) surrender its right to produce oil or (b) surrender its rights to produce gas. A surrender of the rights to produce oil shall include the surrender of the rights to produce gas which will necessarily be produce therewith; however, a surrender of gas shall limit Lessee's right to produce gas which may be necessarily be produce with oil.

24.    Other than Lessee's obligation to pay the annual rent, performance of covenants and conditions imposed upon Lessee hereunder shall be excused while, and to the extent that, Lessee is hindered in or prevented from complying therewith, in whole or in part directly or indirectly, by war, riots, strike, lockouts, action of the elements, accidents, lack of suitable production facilities or equipment due to damage, inability to obtain drilling rigs, equipment or other materials in the open market or to obtain transportation therefore, laws, rules, and regulations of any federal state, municipal or other government agency, including but not limited to processing delays in obtaining drilling permits, or any other cause beyond the control of the Lessee, whether similar or dissimilar to those herein specifically enumerated and without regard to whether such cause exists at the date thereof or thereafter arises. In no event shall Lessee be compelled to settle strikes, or lockouts on any term except those acceptable to Lessee in its own discretion.

25.    In case of default by Lessee with respect to any conditions or covenant hereof and the failure to commence to remedy the same within ninety (90) days following written notice from Lessor to Lessee to perform such condition or covenant, then at the option of Lessor this Lease shall forthwith cease and terminate; EXCEPT THAT, as to any well on the leased land which Lessee is not in default in connection therewith, the lease shall nevertheless continue in effect as to an area (amount of acres) to be selected by Lessee. Lessee shall not, however, be deemed to be in default while work is in progress in good faith which when completed will constitute compliance with such condition or covenant. The right to terminate this lease as to the leased land in respect to which Lessee is in default and the right to re-enter and take possession of said leased land shall be the sole and exclusive remedy of Lessor for such breach and default except as to accrued royalty obligations herein specified and the obligations of Lessee to restore the leased as provided for in this lease. A termination of this lease as to a part only of the leased land or as to a part only of Lessor's rights shall not affect such right of way and easements over the terminated portion of the leased land as may be necessary in Lessee's operation on the part of the leased land as to which no such termination shall have occurred. Temporary discontinuance of production from any well in order to work on such well, or cessation of production in any well which is followed by work on such well diligently conducted to restore production therefrom shall not be deemed to be an end of production from such well within the meaning of this Paragraph.

26.    If the estate of either party hereto is assigned or conveyed (and the privilege of assigning in whole or in part is expressly allowed), the rights and obligations created hereby and the covenants hereof shall extend to and be binding upon such party's assigns or transferees, and the party so assigning or transferring such interest shall thenceforth be released from all obligations hereunder to the extent of the interest so assigned or transferred, but no change of ownership in the land or in the rentals or royalties shall be recognized by Lessee until Lessee has been furnished with satisfactory written notice of such transfer or assignment, together with a certified, recorded copy of the instruments of transfer or assignments. Upon receipt of such instruments, Lessee shall be allowed 60 days to alter its records for payment purposes.

27.    If this lease shall be assigned as to a particular part or parts of the leased land, such division of the leasehold estate shall constitute and create separate and distinct holdings under the lease of and according to the several portions of the leased land as thus divided, and the holder or owner of each such portion of the leased land shall be required to comply with and perform Lessee's obligations under this lease for, and only to the extent of, its portion of the leased land; provided, however, that nothing herein shall be construed to impose a drilling obligation or to enlarge the rental obligations upon Lessee or any assignee, and provided further that payment of the annual rental, as set forth in this lease, either by the Lessee or any assignee hereunder shall protect and continue the lease as a whole.

28.    Lessee shall have the right at its option at any time and from time to time to combine and pool all or any part of the leased land or interest therein into one or more operating units with any other land or interest therein (whether held by Lessee or others and whether or not the surface of such other land may be used for oil or gas development purposes). Each operating unit may be of the size and shape, as Lessee may desire. Each operating unit created hereunder shall be created by and shall become effective upon the execution by Lessee of a Declaration of Pooling setting forth the exterior boundaries of the unit so created and describing the land pooled thereunder. If there are any lands or interests to such unit by executing a Supplemental Declaration of Pooling, but no retroactive adjustment of royalties shall be made. Promptly after execution of each Declaration of Pooling and each Supplemental Declaration of Pooling Lessee shall give written notice thereof to Lessor. Any operating unit may include land upon which a well has therefore been completed or upon which operations for drilling have theretofore been commenced, and within meaning of the requirements of this lease any such well or operations if off the leased land shall be considered as having been commenced immediately after the effective date of such pooling. Production, drilling or reworking operations anywhere on any pooled land in an operating unit created hereunder shall be treated a production, drilling or reworking operations on the leased land. There shall be allocated to the leased land the proportion of the pooled production from any such operating unit (whether or not such production is from the leased land) that the number of surface acres covered by this lease and included in such unit bears to the total number of surface acres pooled in such unit; royalties shall be paid hereunder only upon that portion of such production so allocated and as to pooled production from land in such unit such royalties shall be in lieu of any other royalties. If taxes of any kind are levied or assessed which are based on the quantity of pooled substances underlying or produced from any such operating unit, then the share of such taxes to be borne by Lessor as provided in this lease shall be proportion to the share of production from such unit allocated to the leased land. Lessee may at any time quitclaim to the persons entitled thereto all or any part of the land in any such operating unit, and no owner or land in such unit not owning any interest in the quitclaimed land, except by virtue of such pooling, shall have any interest in such quitclaimed land after quitclaim is delivered or recorded. Allocation of production as aforesaid from any such operating unit, whether to the leased land or in like

manner to other lands therein, shall continue not withstanding any quitclaim or other termination, either in whole or in part of this or any other lease covering lands in such unit until such time as the owner of such land, or owner's agent or representative, shall drill or produce any of the pooled substances from any part of such lands, whereupon all such lands formerly included in such unit and as to which the lease covering the same shall have been terminated shall be excluded in determining the production to be allocated to the respective lands in such unit and in prorating taxes; and in the event of the failure of Lessor's or any other owner's title as to the portion of the land included in any such operating unit, such portion of such land shall likewise be excluded from such unit; provided, that Lessee shall not be held to account for any production allocated to any lands excluded from any such operating unit unless and until Lessee has actual knowledge of the aforesaid circumstances requiring such exclusion. Lessee may at any time either before or after the commencement of the drilling of a well on lands included in any operating unit but prior to the discovery thereon of the substances for which the unit was formed, or at any time after the abandonment of all wells drilled on such units, wholly dissolve such units by executing a Declaration of Dissolution. Promptly after execution of such Declaration of Dissolution Lessee shall give written notice thereof to Lessor. Upon the dissolution of any such operating unit, whether or not this lease or any other lease involved therein remains in effect, all rights of Lessor hereunder to royalty on pooled substances from the lands which were so pooled (other than the leased land) shall cease and terminate; but such dissolution shall not otherwise affect or impair any of the Lessee any of the Lessee's rights or obligations under this lease, including its right to create a new operating unit or units out of the lands previously pooled pursuant to this paragraph, or constitute a surrender of any part of or any interest in the leasehold estate created hereby. The sale, conveyance or other transfer of, or of any interest in, any portion or portions of the leased land which are at the time of such transfer subject to an operating unit shall (unless the instrument effecting such transfer expressly provides otherwise) be deemed to include and shall operate as a transfer and assignment of all the transferor's interest, rights and benefits under this lease (including the right to royalty on allocated production from the lands subject to any such unit) insofar as such interest, rights and benefits pertain to or are allocable hereunder to the portion or portions of leased land or interest therein so transferred. The size and/or shape of any such unit created pursuant to the provisions of this paragraph may be changed at any time within twenty one (21) years from the date hereof without Lessor's Joinder or further consent to permit more efficient and economical operations, to include acreage believed to be productive and to exclude acreage believed to be unproductive or which is not committed to the unit, but any increase or decrease in Lessor's royalties resulting from any such change in any such unit shall not be retroactive.

29.    Drilling operations under this lease may be conducted by means of a well or wells, the surface locations of which are on other lands and which are drilled into and bottomed in the lease land (any such well being deemed to be drilled on the leased land), or by means of a well or wells, the surface locations of which are on the leased land and which are bottomed in the leased land, or by a combination of such wells. Drilling operations under lands pooled in accordance with the terms of this lease may also be conducted by means of a well or wells, the surface location of which are on other lands and which are drilled into and bottomed in the pooled lands (any such well being deemed to be drilled on the pooled lands) or by means of a well or wells, the surface locations of which are on the pooled lands and which are bottomed in the pooled lands, or by combination of such wells.

30.    Lessee has acquired, or may acquire, rights in respect to oil gas or other substances underlying other lands in the vicinity of the leased land in which the Lessor has no interest and Lessor hereby grants unto Lessee such right of way, easements and servitudes in and through the subsurface of the leased land as Lessee may from time to time desire for boring well holes through the subsurface of the leased land from the surface locations outside of the leased land and casing same and otherwise completing and maintaining such wells in and producing such wells from the lands other than the leased land. Such right of way, easements and servitudes, notwithstanding the prior termination of this lease, shall continue for so long as Lessee, its successors and assigns, retain its or their interest in such other lands.

31.    During the term of this lease, Lessor shall not execute and/or grant an oil and gas lease or oil, gas and mineral lease to a third party or agree to execute or grant such a lease by letter agreement or otherwise. Should Lessor grant such a lease during the term of this lease, it shall be deemed a breach of this lease and shall excuse all further performance by Lessee under this lease until such lease or agreement is terminated Lessee is provided with satisfactory evidence of such termination. Further, the term of this lease shall be continued during such suspension of Lessee's performance hereunder.

32.    Lessor acknowledges that oil and gas operations on this property may result in the presence of substances covered by California Health and Safety Code S25249.5 and/or S25359.7. Lessor acknowledges that clear and reasonable notices and warnings have been provided by Lessee to Lessor as required by law. If any third party asserts any claim against Lessor on account of Lessee's extraction or removal of hydrocarbons from the leased land or other operations of Lessee thereon (including without limiting the generality of the foregoing, any governmental or other action or proceeding for the abatement of a nuisance or the cleanup, removal or other protection against a hazardous waste as now defined), Lessee will defend and indemnify and hold harmless from all such claims except such portion thereof as represents a claim to Lessor's royalty, provided that upon receiving notice thereof, Lessor shall notify Lessee with reasonable promptness of bringing any action or the assertion of any such claim and shall allow Lessee to have Lessee's attorney's appear therein, either alone or in association with Lessor's attorney (as Lessor may elect).

33.    "Drilling Operations" as used in this lease is defined to mean any work or actual operations on the leased land for the purpose of drilling a well, including but not limited to the preparation of the ground therefore and the building of road and facilities, provided the same be followed by construction or erection of derrick, the installation of drilling equipment and actual drilling in the ground, and that all such work be prosecuted diligently. If drilling operations are in progress at the end of the primary term hereof, drilling operations shall be deemed to continue so long as the Lessee diligently continue to drill allowing not more than 6 months to elapse between the completion or abandonment of one well and the commencement of the next succeeding well.

34.    The terms "paying quantities" or "quantities deemed paying" as used in this lease shall mean revenue from production sufficient to yield Lessee a reasonable profit over and above direct operating costs (not including exploration, drilling, completing, testing and equipping costs) and after deducting royalties, taxes and other burdens on production.

35.    In the event that Lessee drills a water well on the leased land for the production of water for its operation on the leased land, Lessee agrees that if said well is no longer desired by Lessee, or upon termination of this lease, it will, at Lessor's

3/1/07
Lakeview/Golco Lease
Santa Barbara County, California

5

**0050**                                                                        **0034**

request, remove the pump, tubing and power plant from said water well and will cap the surface casing and otherwise leave same in such condition as may be required by law or regulatory agency, but otherwise will leave said well in such condition that Lessor may subsequently equip the well for the production of water for Lessor's own use. Lessor hereby indemnifies and hold Lessee harmless against any and all liability arising from Lessor's use of said well.

36.     If at the termination of the primary term hereof, oil or gas or another of said substances is being produced by Lessee, and if thereafter such production shall cease, then and as often as such event shall occur, the term of this lease shall continue for six (6) months from the date of last production, and if during that time Lessee resumes operations for the drilling of a well or restoration of production, the term shall continue during the prosecution of such operations, and, if production results therefrom, as long as production continues, with no cessation thereof for periods in excess of six (6) months.

37.     On the expiration or sooner termination of this lease in its entirety Lessee shall surrender possession to Lessor and file for record a quitclaim deed in the County Recorder's office of said County and State.

38.     If any term, covenant, condition or provision of this lease is held by court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and in no way be affected, impaired or invalidated thereby.

39.     [reserved]

40.     If more than one person is named as Lessor herein and one or more of them fails to execute this lease, it shall, nevertheless (if acceptable by Lessee) become effective as a lease from each such Lessor as may have executed the same.

41.     This lease may be executed with electronic signatures and in any number of counterparts and all such counterparts shall be deemed to constitute a single lease and the execution of one counterpart by any Lessor shall have the same force and effect as if he or she had signed all other counterparts.

42.     This lease and all its terms, conditions and stipulations shall extend to and be binding upon all successors and assigns of said Lessor and Lessee.

**IN WITNESS WHEREOF,** the parties hereto have caused this lease to be executed as of the day and year first hereinabove written but effective March 1, 2007.

Grewal Land Holdings, LLC                        HVI Cat Canyon, Inc.

By                                               By
    Susan M. Whalen, Counsel                         Andrew deVegvar, President

**EXHIBIT A**

**LEGAL DESCRIPTION**

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

PARCEL 1:

THE SOUTHERLY 1,143.15 FEET OF THE WESTERLY 1,143.15 FEET OF THAT PORTION OF SECTION 8, IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE 93 RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN IN SAID MAP BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, 2,683.13 FEET TO A SPIKE SET IN PAVEMENT; THENCE NORTH 0° 14' 55" EAST 5,274.16 FEET TO A 2 INCH BRASS CAP MONUMENT; THENCE SOUTH 89° 35' 20" EAST 2,687.61 FEET TO A 2 INCH BRASS CAP MONUMENT SET AT OR NEAR THE NORTHEASTERLY CORNER OF SAID SECTION 8, AS SHOWN ON SAID SURVEY MAPS HEREINBEFORE REFERRED TO; THENCE SOUTH 0° 17' 45" WEST (ST. 2,637.20 FEET, A 2 INCH BRASS CAP MONUMENT MARKED R.E 4643) 5,274.40 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY FILED IN BOOK 34, PAGE 93 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2-INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN ON SAID MAP, BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, (AT 2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD AS SHOWN ON SAID MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST, 2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD AND THE TRUE POINT OF BEGINNING; THENCE SOUTH 89° 35' 10" EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89°35'10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 2,487.08 FEET TO A 2 INCH B.C. MONUMENT STAMPED R.S. 2928; THENCE NORTH 89° 35' 20" WEST, 2,537.61 FEET; THENCE SOUTH 0° 12' 00" WEST, 150.00 FEET; THENCE NORTH 89° 35' 20" WEST, 150.00 FEET; THENCE SOUTH 0° 12' 00" WEST, 2,486.955 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT TRACT OF LAND AS CONVEYED TO WHITEGATES, A CALIFORNIA CORPORATION, IN DEED RECORDED JULY 10, 1964 AS INSTRUMENT NO. 29535 IN BOOK 2059, PAGE 507 OF OFFICIAL RECORDS, BEING THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA

Page 1

**0052**                                                                                   **0036**

**EXHIBIT A**

BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF LOT 10 OF TRACT 10102, ACCORDING TO THE MAP THEREOF RECORDED IN BOOK 55, PAGE 30 SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 89° 35' 10" EAST, 1,695.90 FEET ALONG THE NORTHERLY LINE OF SAID LOT 10 AND THE EASTERLY PROLONGATION OF SAID LINE; THENCE NORTH 0° 12' 00" EAST, 1,000.00 FEET; THENCE NORTH 89° 35' 10" WEST, 1,742.4 FEET TO THE POINT OF INTERSECTION WITH THAT CERTAIN LINE DESCRIBED IN THE QUITCLAIM DEED TO JOS. H. GILLILAND, ET UX., RECORDED JULY 22, 1960 AS INSTRUMENT NO. 23168 IN BOOK 1764, PAGE 600 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE SOUTH 0° 12, 00" WEST ALONG SAID LAST MENTIONED LINE DESCRIBED IN SAID QUITCLAIM DEED, 1,000.00 FEET TO A SPIKE AND LINE AS SHOWN ON SAID MAP OF TRACT 10102; THENCE SOUTH 89° 35' 10" EAST, 46.50 FEET TO THE POINT OF BEGINNING.

PARCEL 6:

THAT CERTAIN REAL PROPERTY IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE 93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN ON SAID MAP BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, (AT 2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD, AS SHOWN ON SAID MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST, 2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD; THENCE SOUTH 89° 35' 10" EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 2,487.08 FEET TO A 2 INCH B.C. MONUMENT STAMPED R.E. 2928; THENCE NORTH 89° 35' 20" WEST, 2,537.61 FEET TO THE TRUE POINT OF BEGINNING FOR THE PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING, SOUTH 0° 12' 00" WEST, 150.00 FEET; THENCE NORTH 89° 35' 00" WEST, 150.00 FEET; THENCE NORTH 0° 12' 00" EAST, 150.00 FEET TO A POINT WHICH BEARS NORTH 89° 35' 20" WEST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 89° 35' 20" EAST, 150.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 8:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF LOT 10 OF TRACT 10102, ACCORDING TO THE MAP THEREOF RECORDED IN BOOK 55, PAGE 30 SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 89° 35' 10" EAST, 1,695.90 FEET ALONG THE NORTHERLY LINE OF SAID LOT 10 AND THE EASTERLY PROLONGATION OF SAID LINE; THENCE NORTH 0° 12' 00" EAST, 1,000.00 FEET; THENCE NORTH 89° 35' 10" WEST, 1,742.4 FEET TO THE POINT OF INTERSECTION WITH THAT CERTAIN LINE DESCRIBED IN THE QUITCLAIM DEED TO JOS. H. GILLILAND, ET UX., RECORDED JULY 22, 1960 AS INSTRUMENT

Page 2

## EXHIBIT A

NO. 23168 IN BOOK 1764, PAGE 600 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE SOUTH 0° 12, 00" WEST ALONG SAID LAST MENTIONED LINE DESCRIBED IN SAID QUITCLAIM DEED, 1,000.00 FEET TO A SPIKE AND LINE AS SHOWN ON SAID MAP OF TRACT 10102; THENCE SOUTH 89° 35' 10" EAST, 46.50 FEET TO THE POINT OF BEGINNING.

PARCEL 10:

THE NORTH HALF OF THE NORTHEAST QUARTER OF SECTION 9 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND.

EXCEPTING THEREFROM THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH CAPPED PIPE LOCATED AT THE NORTHEAST CORNER OF SAID SECTION 9, THENCE SOUTH 0° 37' 45" WEST ALONG THE EAST LINE OF SAID SECTION 9, 287.53 FEET TO A POINT AND THE TRUE POINT OF BEGINNING; THENCE NORTH 89° 22' 15" WEST, 520.00 FEET TO A POINT; THENCE SOUTH 0° 37' 45" WEST, PARALLEL TO THE EAST LINE OF SAID SECTION 9, 419.00 FEET TO A POINT, THENCE SOUTH 89° 22' 15" EAST, 520.00 FEET TO A POINT ON THE EAST LINE OF SAID SECTION 9, THENCE NORTH 0° 37' 45" EAST ALONG SAID EAST LINE, 419.00 FEET TO THE TRUE POINT OF BEGINNING.

SAID LAND IS ALSO SHOWN AS PARCEL "B" OF PARCEL MAP NO. 11434 ON FILE IN BOOK 8, PAGE 95 OF PARCEL MAPS, RECORDS OF SANTA BARBARA COUNTY, CALIFORNIA.

APN:  129-120-04 (Parcel 6); 129-120-14 (Parcel 8); 129-120-15 (Parcel 2); 129-120-16 (Parcel 1); 129-170-25 (Parcel 10);

Page 3

Order Number: **4204-2506461JO**
Page Number: **10**

*Exhibit "A"*

**LEGAL DESCRIPTION**

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

PARCEL 1 (FORMERLY PARCEL 3): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP OF A SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 2,683.13 FEET TO A SPIKE SET IN THE PAVEMENT FROM WHICH A 2 INCH B.C. MONUMENT AS SHOWN ON SAID RECORD OF SURVEY, BEARS NORTH 0° 14' 55" EAST, 25.00 FEET; THENCE NORTH 0° 14' 55" EAST, 1,143.15 FEET TO THE TRUE POINT OF BEGINNING FOR THE PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING CONTINUING NORTH 0° 14' 55" EAST, 449.62 FEET TO THE SOUTH WEST CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO LAKE MARIE WATER COMPANY, RECORDED MARCH 16, 1961 AS INSTRUMENT NO. 8878 IN BOOK 1834, PAGE 394 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE ALONG THE BOUNDARY OF SAID WATER COMPANY'S PARCEL OF LAND, THE FOLLOWING COURSES AND DISTANCES, EAST 161.67 FEET, NORTH 161.67 FEET, WEST 161.67 FEET TO THE NORTHWEST CORNER THEREOF; THENCE LEAVING SAID BOUNDARY, NORTH 0° 14' 55" EAST, 882.64 FEET TO A 2 INCH B.C. MONUMENT AS SHOWN ON SAID MAP OF RECORD OF SURVEYS, BOOK 46, PAGE 57; THENCE NORTH 0° 14' 55" EAST, 2,637.08 FEET TO A 2 INCH MONUMENT AS SHOWN ON SAID MAP; THENCE SOUTH 89° 35' 20" EAST, 1,343.80 FEET ALONG THE NORTH LINE OF THE PARCEL OF LAND SHOWN ON SAID MAP; THENCE SOUTH 0° 17' 45" WEST 4,131.01 FEET PARALLEL WITH THE EAST LINE OF THE PARCEL OF LAND SHOWN ON SAID MAP TO A POINT WHICH BEARS SOUTH 89° 35' 00" EAST FROM THE TRUE POINT OF BEGINNING. THENCE SOUTH 89°35'00" EAST, 1,340.55 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF THE ABOVE PARCEL LYING WITHIN PARCEL "A" OF THE RECORD OF SURVEY, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, RECORDED NOVEMBER 1987 IN BOOK 118, PAGE 94 IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS, BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER SAID LAND, TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR AND RESERVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS

*First American Title*

4

Order Number: 4204-2606451JO
Page Number: 11

THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE
RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE FOLLOWING DRILLSITE:

DRILLSITE "B"

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45' WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 2,683.13 FEET TO A
SPIKE SET IN THE PAVEMENT; THENCE NORTH 0° 14' 55" EAST, 3,727.08 FEET TO THE TRUE
POINT OF BEGINNING OF THIS DESCRIPTION; THENCE CONTINUING NORTH 0° 14' 55" EAST,
1,547.08 FEET TO A 2 INCH B.C. MONUMENT DESCRIBED IN QUITCLAIM DEED, TO LAKE MARIE
LAND AND INVESTMENT COMPANY, A CORPORATION, RECORDED AS INSTRUMENT NO. 52322,
BOOK 2082, PAGE 1417 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE SOUTH 89° 35' 20"
EAST, 30.00 FEET; THENCE SOUTH 0° 14' 55" WEST, 1,127.08 FEET; THENCE SOUTH 89° 35'
20" EAST, 180.00 FEET; THENCE SOUTH 0° 14' 55" WEST, 420.00 FEET; THENCE NORTH 89°
35' 20" WEST, 210.00 FEET TO THE TRUE POINT OF BEGINNING AND DRILLSITES ON OTHER
PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND LAND CO., A CORPORATION, ET AL., IN
DEED RECORDED, OCTOBER 4, 1972 AS INSTRUMENT NO. 39146, IN BOOK 2424, AT PAGE 567
OF OFFICIAL RECORDS.

PARCEL 2 (FORMERLY PARCEL 4): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, SATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED
R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE, AS SHOWN ON THE MAP OF A
SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 1,539.98 FEET TO A
POINT WHICH IS SOUTH 89° 35' 00" EAST, 1,143.15 FEET FROM A SPIKE SET IN THE
PAVEMENT, SAID SPIKE BEING SOUTH 0° 14' 55" WEST, 25.00 FEET FROM A 2 INCH B.C.
MONUMENT AS SHOWN ON SAID RECORD OF SURVEY; THENCE NORTH 0° 14' 55" EAST,
1,143.15 FEET; THENCE SOUTH 89° 35' 00" EAST, 197.40 FEET TO A POINT ON A LINE
PARALLEL WITH AND 1,343.81 FEET WESTERLY OF (MEASURED ALONG THE NORTH LINE) THE
EAST LINE OF THE PARCEL OF LAND AS SHOWN ON SAID MAP; THENCE NORTH 0° 17' 45"
EAST, 4,131.01 FEET PARALLEL WITH SAID EAST LINE TO A POINT ON THE NORTH LINE OF
SAID PARCEL OF LAND; THENCE SOUTH 89° 35' 20" EAST, 1,343.81 FEET ALONG SAID NORTH
LINE TO THE NORTHEAST CORNER OF SAID PARCEL OF LAND; THENCE SOUTH 0° 17' 45"
WEST, 5,274.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THE NORTH 660.00 FEET OF THE EAST 660.00 FEET THEREOF.

*First American Title*

Order Number: 4204-260646130
Page Number: 12

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER
DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A
CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS
RIGHTS AND OTHER HYDROCARBONS, BY WHATEVER, NAME KNOWN, THAT MAY BE WITHIN
OR UNDER SAID LAND TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND
OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND,
INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN
THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE
SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED
OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS
THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE
RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE FOLLOWING DRILLSITE:

DRILLSITE "A"

PART ONE:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 0° 17' 45" EAST ALONG THE EASTERLY
LINE OF SAID LANE, 2,167.20 FEET TO THE TRUE POINT OF BEGINNING OF THIS
DESCRIPTION; THENCE NORTH 89° 35' 20" WEST 450.00 FEET; THENCE NORTH 0° 17' 45"
EAST 210.00 FEET; THENCE SOUTH 89° 35' 20" EAST 450.00 FEET; THENCE SOUTH 0° 17' 45"
WEST 210.00 FEET TO THE POINT OF BEGINNING.

PART TWO:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA,
DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 0° 17' 45" EAST ALONG THE EASTERLY
LINE OF SAID LAND, 2,167.20 FEET TO THE TRUE POINT OF BEGINNING OF THIS
DESCRIPTION; THENCE NORTH 89° 35' 20" WEST 190 FEET; THENCE NORTH 0° 17' 45"
EAST 470 FEET; THENCE SOUTH 89° 35' 20" EAST 190 FEET; THENCE SOUTH 0° 17' 45" WEST 470
FEET TO THE POINT OF BEGINNING.

DRILLSITE "D"

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO

*First American Title*

Order Number:  4204-260546110
Page Number:   13

BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH IRON PIPE WITH BRASS CAP MARKED R.E. 4643 SET ON THE
NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON A MAP OF SURVEY FILED IN BOOK 35,
PAGE 93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY
AND ALSO SHOWN ON A MAP OF SURVEY FILED IN BOOK 46, PAGE 57, RECORDS OF SURVEYS,
FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A
RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF
SECTIONS 8 AND 9 BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET; THENCE FROM SAID POINT OF
BEGINNING NORTH 0° 17' 45" EAST, 420.00 FEET; THENCE NORTH 89° 35' 00" WEST, 250.00
FEET; THENCE SOUTH 0° 17' 45" WEST, 420.00 FEET TO A POINT ON THE NORTH LINE OF
SAID, CLARK AVENUE; THENCE SOUTH 89° 35' 00" EAST, 250.00 FEET TO THE POINT OF
BEGINNING AND DRILLSITES ON OTHER PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND
LAND CO., A CORPORATION, ET AL., IN DEED RECORDED OCTOBER 4, 1972 AS INSTRUMENT
NO. 39146, IN BOOK 2424, PAGE 567 OF OFFICIAL RECORDS.

PARCEL 3 (FORMERLY PARCEL 5): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE
93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND
ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP
MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN
ON SAID MAP, BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, (AT
2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE
INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD AS SHOWN ON SAID MAP OF
SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST,
2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD; THENCE SOUTH 89° 35' 10"
EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89°
35' 10" EAST, 150.00 FEET, SAID POINT BEING THE TRUE POINT OF BEGINNING FOR THE
PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING,
NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89°35' 10" EAST, 150.00 FEET; THENCE
SOUTH 0° 14' 55" WEST, 150.00 FEET TO SAID 2 INCH B.C. MONUMENT WHICH BEARS SOUTH
89° 35' 10" EAST FROM THE TRUE POINT OF BEGINNING; THENCE NORTH 89° 35' 10" WEST,
150.00 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED
RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD
OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER
HYDROCARBONS, BUT WHATEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER SAID
LAND TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR
AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO
WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE
DESCRIBED, OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND
HEREINABOVE DESCRIBES AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY
DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO
REDRILL, RETUNNEL, EQUIP, MAINTAIN REPAIR, DEEPEN, AND OPERATE ANY SUCH WELLS,
WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE RIGHT HOWEVER, IS

*First American Title*

Order Number: 4204-2606461JO
Page Number: 14

RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE AND THE UPPER 2,000 FEET TO THE SUBSURFACE OF THE DRILLSITE THEREIN DESCRIBED COVERING OTHER PROPERTY, AS RESERVED BY GILLILAND OIL AND LAND CO., A CORPORATION, ET AL., IN DEED RECORDED OCTOBER 4, 1972 AS INSTRUMENT NO. 39146 IN BOOK 2424, PAGE 567 OF OFFICIAL RECORDS.

PARCEL 4 (FORMERLY PARCEL 7): (PTN APN 129-120-26)

THE NORTH 660 FEET OF THE EAST 660 FEET OF THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT BEARS SOUTH 0° 17' 49" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE, AS SHOWN ON THE MAP OF A SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 1,539.98 FEET TO A POINT WHICH IS SOUTH 89° 35' 00" EAST, 1,143.15 FEET FROM A SPIKE SET IN THE PAVEMENT, SAID SPIKE BEING SOUTH 0° 14' 55" WEST, 25.00 FEET FROM A 2 INCH B.C. MONUMENT AS SHOWN ON SAID RECORD OF SURVEY; THENCE NORTH 0° 14' 55" EAST, 1,143.15 FEET; THENCE SOUTH 89° 35' 00" EAST, 197.40 FEET TO A POINT ON A LINE PARALLEL WITH AND 1,343.81 FEET WESTERLY OF (MEASURED ALONG THE NORTH LINE) THE EAST LINE OF THE PARCEL OF LAND AS SHOWN ON SAID MAP; THENCE NORTH 0° 17' 45" EAST, 4,131.01 FEET PARALLEL WITH SAID EAST LINE TO A POINT ON THE NORTH LINE OF SAID PARCEL OF LAND; THENCE SOUTH 89° 35' 20" EAST, 1,343.81 FEET ALONG SAID NORTH LINE TO THE NORTHEAST CORNER OF SAID PARCEL OF LAND; THENCE SOUTH 0° 17' 45" WEST, 5,274.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THE NORTH 295.16 FEET OF THE EAST 295.16 FEET THEREOF.

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS, BY WHATEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER SAID LAND, TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL, OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE DRILLSITES THEREIN DESCRIBED COVERING OTHER PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND LAND CO., A CORPORATION, ET AL., IN DEED RECORDED OCTOBER 4, 1974 AS INSTRUMENT NO. 39146 IN BOOK 2424, PAGE 567 OF OFFICIAL RECORDS.

PARCEL 5 (FORMERLY PARCEL 9): (129-170-27 AND 129-170-28)

THE NORTHWEST QUARTER OF SECTION 9 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN

*First American Title*

8

Order Number: 4204-2606461JO
Page Number: 15

BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND.

EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS, BY WHATEVER NAME KNOWN, THAT MAY HE WITHIN. OR UNDER THE ABOVE DESCRIBED LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND; INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE OF THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND, EXCEPT FROM 19 DRILLSITES THEREIN DESCRIBED AS EXCEPTED AND RESERVED, IN DEEDS RECORDED JUNE 19, 1972 AS INSTRUMENT NO. 22590 IN BOOK 2406, PAGE 991 OF OFFICIAL RECORDS AND RECORDED FEBRUARY 23, 1975 AS INSTRUMENT NO. 7028 IN BOOK 2448, PAGE 1383 OF OFFICIAL RECORDS AND RECORDED APRIL 9, 1974 AS INSTRUMENT NO. 12226 IN BOOK 2510, PAGE 48 OF OFFICIAL RECORDS.

APN: 129-120-26 and 129-170-27 and 129-170-28

*First American Title*

9

# EXHIBIT "5"

### FIRST AMENDMENT TO OIL, GAS AND MINERAL LEASE

THIS FIRST AMENDMENT ("Amendment"), made and entered into on November 6, 2015 by and between GLR, LLC, a Delaware limited liability company (f/k/a Grewal Land Holdings, LLC, a Delaware limited liability company), hereinafter called "Lessor" and HVI Cay Canyon, Inc., a Colorado corporation, hereinafter called "Lessee".

### W I T N E S S E T H:

THAT, REFERENCE IS HERBY MADE to that certain Oil, Gas and Mineral Lease dated January 15, 2013 but effective March 1, 2007, (such lease or a memorandum of such lease being made of record in the Office of the County Recorder of Santa Barbara County, California, on January 15, 2013 as Instrument No. 2013-0029242 of Official Records) whereby Lessor did demise, lease, and let unto Lessee for oil and gas development purposes, certain lands situated in said County and State particularly described in such lease, and in such memorandum, such lease and such memorandum, together with previous amendments thereof, if any, being hereinafter collectively referred to as "said lease";

AND, WHEREAS, Lessor and Lessee have agreed to amend said lease in the particulars hereinafter set forth;

NOW, THERFORE, in consideration of the sum of One Dollar ($1.00) and other valuable consideration paid to Lessor by Lessee, receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.  Said lease is hereby amended as follows:

    A. Notwithstanding anything herein to the contrary, the primary term shall be three (3) years from November 06, 2015.

    B. Paragraph 1 of said lease shall be replaced in its entirety with the following language:

    "Notwithstanding anything herein to the contrary, commencing March 1, 2007, Lessee shall pay to Lessor annually for as long as this lease remains in full force and effect a minimum royalty in the amount of Twenty-Five Thousand Dollars ($25,000.00) (hereinafter referred to as "annual rental") which shall serve as rental for each following year paid. For each rental year commencing March 1, 2008, Lessee shall calculate the amount of royalties actually paid to Lessor for the prior year from March 1 through February 28 and shall deduct said actual royalties paid from the annual rental, the balance of which shall be payable to Lessor by April 1st. Notwithstanding anything herein to the contrary, this lease shall terminate as to all rights and obligations created hereby unless Lessee (a) shall make or tender the royalty payments as herein provided or (b) shall within said primary term commence drilling operations or reworking existing wells for oil, gas or other substances on the leased land and prosecute the drilling or reworking of such well with reasonable diligence until either injection or oil, gas or other substances are found in quantities deemed paying by Lessee for no less than six (6) consecutive months by November 6, 2018 or (c) and until Lessee deems that further drilling or operations of the existing wells would be unprofitable or impracticable in which event Lessee may abandon such wells. In the event Lessee shall not have commenced such drilling operations or reworking of a well on or before the expiration of each one-year rental period, Lessee may, at its option, from time to time defer commencement of drilling operations or reworking of wells only within the primary term hereof by the payment or tender to Lessor of annual rental payable annually and such payments shall operate to defer obligation to commence drilling operations or reworking of wells during any period for which rental is paid, or Lessee may, quitclaim and surrender this lease as is hereafter provided."

    C. Paragraph 25 of said lease shall be amended by inserting the following language at the beginning of the first sentence:

    "Except as to a default by Lessee to pay Lessor any monetary obligations owed hereunder,".

2.   All other covenants, terms and conditions of said lease shall remain unchanged and in full force and effect.

3.   This Amendment may be executed in any number of counterparts which shall be construed together and constitute one agreement, and this instrument and each such counterpart shall, as to the party or parties signatory thereto, be effective when signed and the failure of any person to execute this instrument or a counterpart hereof shall not affect the binding force of this instrument as to those who have executed this instrument or such a counterpart or counterparts.

4.   This Amendment shall bind and inure to the benefit of the respective heirs, executors, administrators, successors, and assigns of the parties hereto.

Lakeview/Golco Lease

IN WITNESS WHEREOF, said parties have caused this Amendment to be duly executed as of the date first hereinabove written.

"LESSOR"
GLR, LLC

By _____
Randeep S. Grewal,
Chairman

"LESSEE"
HIV Cat Canyon, Inc.

By _____
Susan M. Whalen
SVP and General Counsel

# EXHIBIT "6"

RECORDING REQUESTED BY AND

WHEN RECORDED MAIL TO:

AND MAIL TAX STATEMENTS
TO:

NAME

GLR, LLC

45 Rockefeller Plaza, #2410
New York, NY 10111

MAILING
ADDRESS

CITY,
STATE
ZIP CODE

2019-0030458

| Recorded | REC FEE | 60.00 |
| Official Records | | |
| County of | PCOR | 20.00 |
| Santa Barbara | SB2 HOUSING | 75.00 |
| Joseph E. Holland | | |
| County Clerk Recorder | | |
| | JKM | |
| 04:34PM 19-Jul-2019 | Page 1 of 13 | |

(SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE)

Documentary Transfer Tax $ 0.00
___ Computed on value of interest conveyed.
___ Computed on value of interest conveyed less liens
and encumbrances remaining thereon at time of sale.
√ No property transfer tax due (value of interest or property conveyed is less than $100.00 [Rev. & Tax. Code § 11911]).

### QUITCLAIM DEED

FOR GOOD AND VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, HVI Cat Canyon, Inc., a Colorado Corporation ("Grantor") hereby remises, releases, relinquishes, surrenders and forever quitclaims to GLR, LLC, a Delaware limited liability company (hereinafter referred to as "Grantee") any and all right, title and interest that Grantor may have in that certain real property described in Exhibits A-X1, A-X2, and A-X3 attached hereto and incorporated herein by this reference, in the County of Santa Barbara, State of California, and including without limitation any rights Grantor may have had under the following instrument:

| Instrument Date of Instrument | Original Lessor / Original Lessee | Recording Data |
| --- | --- | --- |
| Oil, Gas & Mineral Lease 1/15/13 | Grewal Land Holdings, LLC / HVI Cat Canyon, Inc. | No. 2013-0029242 |

IN WITNESS WHEREOF, Grantor has executed this Quitclaim Deed on the date affixed to its signature.

**HVI CAT CANYON, INC.**

By: _____
Alex G. Dimitrijevic, President

Dated: January 16, 2019

**EXHIBIT "6"**

Order: 0022-004
Doc: CASANT:2019 00030458

Page 1 of 13
**0066**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0050**

**A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA )
                                           ) ss.
COUNTY OF ~~SANTA BARBARA~~ )

On __January 16, 2019__ before me, __Victoria A. Winn__, a notary public, personally appeared __Alex G. Dimitrijevic__, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(~~ies~~), and that by his/~~her/their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(~~s~~) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(AFFIX NOTARIAL SEAL)                          ___Victoria Winn___
                                                                    NOTARY PUBLIC

> VICTORIA A. WINN
> COMM. #2243692
> Notary Public - California
> Santa Barbara County
> My Comm. Expires June 20, 2022

Exhibits A-X1, A-X2, and A-X3

Consisting of ten (10) pages that immediately follow

Order: 0022-004
Doc: CASANT:2019 00030458

Page 3 of 13
**0068**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM
**0052**

EXHIBIT A—X.1

LEGAL DESCRIPTION

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

PARCEL 1:

THE SOUTHERLY 1,143.15 FEET OF THE WESTERLY 1,143.15 FEET OF THAT PORTION OF SECTION 8, IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE 93 RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN IN SAID MAP BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, 2,683.13 FEET TO A SPIKE SET IN PAVEMENT; THENCE NORTH 0° 14' 55" EAST 5,274.16 FEET TO A 2 INCH BRASS CAP MONUMENT; THENCE SOUTH 89° 35' 20" EAST 2,687.61 FEET TO A 2 INCH BRASS CAP MONUMENT SET AT OR NEAR THE NORTHEASTERLY CORNER OF SAID SECTION 8, AS SHOWN ON SAID SURVEY MAPS HEREINBEFORE REFERRED TO; THENCE SOUTH 0° 17' 45" WEST (ST. 2,637.20 FEET, A 2 INCH BRASS CAP MONUMENT MARKED R.E 4643) 5,274.40 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY FILED IN BOOK 34, PAGE 93 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2-INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN ON SAID MAP, BEARS NORTH 0° 17' 45" EAST; THENCE NORTH 89° 35' WEST, (AT 2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD AS SHOWN ON SAID MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST, 2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD AND THE TRUE POINT OF BEGINNING; THENCE SOUTH 89° 35' 10" EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89°35'10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 2,487.08 FEET TO A 2 INCH B.C. MONUMENT STAMPED R.S. 2928; THENCE NORTH 89° 35' 20" WEST, 2,537.61 FEET; THENCE SOUTH 0° 12' 00' WEST, 150.00 FEET; THENCE NORTH 89° 35' 20" WEST, 150.00 FEET; THENCE SOUTH 0° 12' 00" WEST, 2,486.955 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT TRACT OF LAND AS CONVEYED TO WHITEGATES, A CALIFORNIA CORPORATION, IN DEED RECORDED JULY 10, 1964 AS INSTRUMENT NO. 29535 IN BOOK 2059, PAGE 507 OF OFFICIAL RECORDS, BEING THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA

Page 1

Order: 0022-004
Doc: CASANT:2019 00030458

Page 4 of 13
**0069**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0053**

## EXHIBIT A - ×1

BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF LOT 10 OF TRACT 10102, ACCORDING TO THE MAP THEREOF RECORDED IN BOOK 55, PAGE 30 SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 89° 35' 10" EAST, 1,695.90 FEET ALONG THE NORTHERLY LINE OF SAID LOT 10 AND THE EASTERLY PROLONGATION OF SAID LINE; THENCE NORTH 0° 12' 00" EAST, 1,000.00 FEET; THENCE NORTH 89° 35' 10" WEST, 1,742.4 FEET TO THE POINT OF INTERSECTION WITH THAT CERTAIN LINE DESCRIBED IN THE QUITCLAIM DEED TO JOS. H. GILLILAND, ET UX., RECORDED JULY 22, 1960 AS INSTRUMENT NO. 23168 IN BOOK 1764, PAGE 600 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE SOUTH 0° 12, 00" WEST ALONG SAID LAST MENTIONED LINE DESCRIBED IN SAID QUITCLAIM DEED, 1,000.00 FEET TO A SPIKE AND LINE AS SHOWN ON SAID MAP OF TRACT 10102; THENCE SOUTH 89° 35' 10" EAST, 46.50 FEET TO THE POINT OF BEGINNING.

PARCEL 6:

THAT CERTAIN REAL PROPERTY IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE 93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND ALSO SHOWN ON A MAP OF SURVEY; FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN ON SAID MAP BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, (AT 2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD, AS SHOWN ON SAID MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST, 2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD; THENCE SOUTH 89° 35' 10" EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89° 35' 10" EAST, 150.00 FEET; THENCE NORTH 0° 14' 55" EAST, 2,487.08 FEET TO A 2 INCH B.C. MONUMENT STAMPED R.E. 2928; THENCE NORTH 89° 35' 20" WEST, 2,537.61 FEET TO THE TRUE POINT OF BEGINNING FOR THE PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING, SOUTH 0° 12' 00" WEST, 150.00 FEET; THENCE NORTH 89° 35' 00" WEST, 150.00 FEET, THENCE NORTH 0° 12' 00" EAST, 150.00 FEET TO A POINT WHICH BEARS NORTH 89° 35' 20" WEST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 89° 35' 20" EAST, 150.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 8:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF LOT 10 OF TRACT 10102, ACCORDING TO THE MAP THEREOF RECORDED IN BOOK 55, PAGE 30 SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 89° 35' 10" EAST, 1,695.90 FEET ALONG THE NORTHERLY LINE OF SAID LOT 10 AND THE EASTERLY PROLONGATION OF SAID LINE; THENCE NORTH 0° 12' 00" EAST, 1,000.00 FEET; THENCE NORTH 89° 35' 10" WEST, 1,742.4 FEET TO THE POINT OF INTERSECTION WITH THAT CERTAIN LINE DESCRIBED IN THE QUITCLAIM DEED TO JOS. H. GILLILAND, ET UX., RECORDED JULY 22, 1960 AS INSTRUMENT

Page 2

Order: 0022-004
Doc: CASANT:2019 00030458

Page 5 of 13
**0070**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0054**

**EXHIBIT A-⊀1**

NO. 23168 IN BOOK 1764, PAGE 600 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE SOUTH 0° 12, 00" WEST ALONG SAID LAST MENTIONED LINE DESCRIBED IN SAID QUITCLAIM DEED, 1,000.00 FEET TO A SPIKE AND LINE AS SHOWN ON SAID MAP OF TRACT 10102; THENCE SOUTH 89° 35' 10" EAST, 46.50 FEET TO THE POINT OF BEGINNING.

PARCEL 10:

THE NORTH HALF OF THE NORTHEAST QUARTER OF SECTION 9 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND.

EXCEPTING THEREFROM THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH CAPPED PIPE LOCATED AT THE NORTHEAST CORNER OF SAID SECTION 9, THENCE SOUTH 0° 37' 45" WEST ALONG THE EAST LINE OF SAID SECTION 9, 287.53 FEET TO A POINT AND THE TRUE POINT OF BEGINNING; THENCE NORTH 89° 22' 15" WEST, 520.00 FEET TO A POINT; THENCE SOUTH 0° 37' 45" WEST, PARALLEL TO THE EAST LINE OF SAID SECTION 9, 419.00 FEET TO A POINT, THENCE SOUTH 89° 22' 15" EAST, 520.00 FEET TO A POINT ON THE EAST LINE OF SAID SECTION 9, THENCE NORTH 0° 37' 45" EAST ALONG SAID EAST LINE, 419.00 FEET TO THE TRUE POINT OF BEGINNING.

SAID LAND IS ALSO SHOWN AS PARCEL "B" OF PARCEL MAP NO. 11434 ON FILE IN BOOK 8, PAGE 95 OF PARCEL MAPS, RECORDS OF SANTA BARBARA COUNTY, CALIFORNIA.

APN:  129-120-04 (Parcel 6); 129-120-14 (Parcel 8); 129-120-15 (Parcel 2); 129-120-16 (Parcel 1); 129-170-25 (Parcel 10);

Page 3

Order: 0022-004
Doc: CASANT:2019 00030458

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

0055

Order Number: 4204-260646110
Page Number: 10

Exhibit "A-1-2"

### LEGAL DESCRIPTION

Real property in the unincorporated area of the County of Santa Barbara, State of California, described as follows:

PARCEL 1 (FORMERLY PARCEL 3): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST; SAID POINT BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP OF A SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 2,683.13 FEET TO A SPIKE SET IN THE PAVEMENT FROM WHICH A 2 INCH B.C. MONUMENT AS SHOWN ON SAID RECORD OF SURVEY, BEARS NORTH 0° 14' 55" EAST, 25.00 FEET; THENCE NORTH 0° 14' 55" EAST, 1,143.15 FEET TO THE TRUE POINT OF BEGINNING FOR THE PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING CONTINUING NORTH 0° 14' 55" EAST, 449.62 FEET TO THE SOUTH WEST CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO LAKE MARIE WATER COMPANY, RECORDED MARCH 16, 1961 AS INSTRUMENT NO. 8878 IN BOOK 1834, PAGE 394 OF OFFICIAL RECORDS, RECORDS OF SAID COUNTY; THENCE ALONG THE BOUNDARY OF SAID WATER COMPANY'S PARCEL OF LAND, THE FOLLOWING COURSES AND DISTANCES, EAST 161.67 FEET, NORTH 161.67 FEET, WEST 161.67 FEET TO THE NORTHWEST CORNER THEREOF; THENCE LEAVING SAID BOUNDARY, NORTH 0° 14' 55" EAST, 882.64 FEET TO A 2 INCH B.C. MONUMENT AS SHOWN ON SAID MAP OF RECORD OF SURVEYS, BOOK 46, PAGE 57; THENCE NORTH 0° 14' 55" EAST, 2,637.08 FEET TO A 2 INCH MONUMENT AS SHOWN ON SAID MAP; THENCE SOUTH 89° 35' 20" EAST, 1,343.80 FEET ALONG THE NORTH LINE OF THE PARCEL OF LAND SHOWN ON SAID MAP; THENCE SOUTH 0° 17' 45" WEST 4,131.01 FEET PARALLEL WITH THE EAST LINE OF THE PARCEL OF LAND SHOWN ON SAID MAP TO A POINT WHICH BEARS SOUTH 89° 35' 00" EAST FROM THE TRUE POINT OF BEGINNING. THENCE SOUTH 89°35'00" EAST, 1,340.55 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF THE ABOVE PARCEL LYING WITHIN PARCEL "A" OF THE RECORD OF SURVEY, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA, RECORDED NOVEMBER 1987 IN BOOK 118, PAGE 94 IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS, BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER SAID LAND, TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR AND RESERVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS

*First American Title*

I.

Order: 0022-004
Doc: CASANT:2019 00030458
Page 7 of 13
**0072**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM
**0056**

Exhibit A-X2

Order Number: 4204-2505451JO
Page Number: 11

THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE
RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE FOLLOWING DRILLSITE:

DRILLSITE "B"

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17'. 45' WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 2,683.13 FEET TO A
SPIKE SET IN THE PAVEMENT; THENCE NORTH 0° 14' 55' EAST, 3,727.08 FEET TO THE TRUE
POINT OF BEGINNING OF THIS DESCRIPTION; THENCE CONTINUING NORTH 0° 14' 55" EAST,
1,547.08 FEET TO A 2 INCH B.C. MONUMENT DESCRIBED IN QUITCLAIM DEED, TO LAKE MARIE
LAND AND INVESTMENT COMPANY, A CORPORATION, RECORDED AS INSTRUMENT NO. 52322,
BOOK 2082, PAGE 1417 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE SOUTH 89° 35' 20"
EAST, 30.00 FEET; THENCE SOUTH 0° 14' 55' WEST, 1,127.08 FEET; THENCE SOUTH 89° 35'
20" EAST, 180.00 FEET; THENCE SOUTH 0° 14' 55' WEST, 420.00 FEET; THENCE NORTH 89°
35' 20" WEST, 210.00 FEET TO THE TRUE POINT OF BEGINNING AND DRILLSITES ON OTHER
PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND LAND CO., A CORPORATION, ET AL., IN
DEED RECORDED, OCTOBER 4, 1972 AS INSTRUMENT NO. 39146, IN BOOK 2424, AT PAGE 567
OF OFFICIAL RECORDS.

PARCEL 2 (FORMERLY PARCEL 4): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, SATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED
R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE, AS SHOWN ON THE MAP OF A
SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 1,539.98 FEET TO A
POINT WHICH IS SOUTH 89° 35' 00" EAST, 1,143.15 FEET FROM A SPIKE SET IN THE
PAVEMENT, SAID SPIKE BEING SOUTH 0° 14' 55" WEST, 25.00 FEET FROM A 2 INCH B.C.
MONUMENT AS SHOWN ON SAID RECORD OF SURVEY; THENCE NORTH 0° 14' 55" EAST,
1,143.15 FEET; THENCE SOUTH 89° 35' 00" EAST, 197.40 FEET TO A POINT ON A LINE
PARALLEL WITH AND 1,343.81 FEET WESTERLY OF (MEASURED ALONG THE NORTH LINE) THE
EAST LINE OF THE PARCEL OF LAND AS SHOWN ON SAID MAP; THENCE NORTH 0° 17' 45"
EAST, 4,131.01 FEET PARALLEL WITH SAID EAST LINE TO A POINT ON THE NORTH LINE OF
SAID PARCEL OF LAND; THENCE SOUTH 89° 35' 20" EAST, 1,343.81 FEET ALONG SAID NORTH
LINE TO THE NORTHEAST CORNER OF SAID PARCEL OF LAND; THENCE SOUTH 0° 17' 45"
WEST, 5,274.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THE NORTH 660.00 FEET OF THE EAST 660.00 FEET THEREOF.

*First American Title*

2

Order: 0022-004
Doc: CASANT:2019 00030458

Page 8 of 13
0073

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

0057

Exhibit A-X2

Order Number: 4204-260648130
Page Number: 12

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER
DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A
CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS
RIGHTS AND OTHER HYDROCARBONS, BY WHATEVER, NAME KNOWN, THAT MAY BE WITHIN
OR UNDER SAID LAND TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND
OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND,
INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN
THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE
SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED
OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS
THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE
RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE FOLLOWING DRILLSITE:

DRILLSITE "A"

PART ONE:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE, AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 0° 17' 45" EAST ALONG THE EASTERLY
LINE OF SAID LANE, 2,167.20 FEET TO THE TRUE POINT OF BEGINNING OF THIS
DESCRIPTION; THENCE NORTH 89° 35' 20" WEST 450.00 FEET; THENCE NORTH 0° 17' 45"
EAST 210.00 FEET; THENCE SOUTH 89° 35' 20" EAST 450.00 FEET; THENCE SOUTH 0° 17' 45"
WEST 210.00 FEET TO THE POINT OF BEGINNING.

PART TWO:

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA,
DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 OF SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 45" WEST 25.00 FEET FROM A 2 INCH IRON PIPE WITH BRASS CAP
MARKED R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON THE MAP
OF A SURVEY FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 0° 17' 45" EAST ALONG THE EASTERLY
LINE OF SAID LAND, 2,167.20 FEET TO THE TRUE POINT OF BEGINNING OF THIS
DESCRIPTION; THENCE NORTH 89° 35' 20" WEST 190 FEET; THENCE NORTH 0° 17' 45" EAST
470 FEET; THENCE SOUTH 89° 35' 20" EAST 190 FEET; THENCE SOUTH 0° 17' 45" WEST 470
FEET TO THE POINT OF BEGINNING.

DRILLSITE "D"

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO

*First American Title*

3

Order: 0022-004
Doc: CASANT:2019 00030458

Page 9 of 13
0074

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

0058

Exhibit A-¥2

Order Number: 4204-260646130
Page Number: 13

BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A 2 INCH IRON PIPE WITH BRASS CAP MARKED R.E. 4643 SET ON THE
NORTHERLY LINE OF CLARK AVENUE AS SHOWN ON A MAP OF SURVEY FILED IN BOOK 35,
PAGE 93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY
AND ALSO SHOWN ON A MAP OF SURVEY FILED IN BOOK 46, PAGE 57, RECORDS OF SURVEYS,
FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A
RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH CORNER OF
SECTIONS 8 AND 9 BEARS SOUTH 0° 17' 45" WEST, 25.00 FEET; THENCE FROM SAID POINT OF
BEGINNING NORTH 0° 17' 45" EAST, 420.00 FEET; THENCE NORTH 89° 35' 00" WEST, 250.00
FEET; THENCE SOUTH 0° 17' 45" WEST, 420.00 FEET TO A POINT ON THE NORTH LINE OF
SAID, CLARK AVENUE; THENCE SOUTH 89° 35' 00" EAST, 250.00 FEET TO THE POINT OF
BEGINNING AND DRILLSITES ON OTHER PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND
LAND CO., A CORPORATION, ET AL., IN DEED RECORDED OCTOBER 4, 1972 AS INSTRUMENT
NO. 39146, IN BOOK 2424, PAGE 567 OF OFFICIAL RECORDS.

PARCEL 3 (FORMERLY PARCEL 5): (PTN APN 129-120-26)

THAT PORTION OF SECTION 8 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN BERNARDINO
BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9 AS SHOWN ON A MAP OF SURVEY, FILED IN BOOK 34, PAGE
93, RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND
ALSO SHOWN ON A MAP OF SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, FROM WHICH A 2 INCH BRASS CAP
MONUMENT MARKED R.E. 4643, SET ON THE NORTHERLY SIDE OF CLARK AVENUE AS SHOWN
ON SAID MAP, BEARS NORTH 0° 17' 45" EAST, 25.00 FEET; THENCE NORTH 89° 35' WEST, (AT
2,683.13 FEET, A SPIKE SET IN PAVEMENT), 5,366.26 FEET TO A COPPER PLATE SET IN THE
INTERSECTION OF CLARK AVENUE AND TELEPHONE ROAD AS SHOWN ON SAID MAP OF
SURVEY, FILED IN BOOK 46, PAGE 57, RECORD OF SURVEYS; THENCE NORTH 0° 12' 00" EAST,
2,636.955 FEET TO A SPIKE STAMPED R.E. 2928 SET IN ROAD; THENCE SOUTH 89° 35' 10"
EAST, 2,535.37 FEET TO A POINT FROM WHICH A 2 INCH B.C. MONUMENT BEARS SOUTH 89°
35' 10" EAST, 150.00 FEET, SAID POINT BEING THE TRUE POINT OF BEGINNING FOR THE
PARCEL OF LAND HEREIN DESCRIBED; THENCE FROM SAID TRUE POINT OF BEGINNING,
NORTH 0° 14' 55" EAST, 150.00 FEET; THENCE SOUTH 89°35' 10" EAST, 150.00 FEET; THENCE
SOUTH 0° 14' 55" WEST, 150.00 FEET TO SAID 2 INCH B.C. MONUMENT WHICH BEARS SOUTH
89° 35' 10" EAST FROM THE TRUE POINT OF BEGINNING; THENCE NORTH 89° 35' 10" WEST,
150.00 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED
RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD
OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER
HYDROCARBONS, BUT WHATEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER SAID
LAND TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND OPERATING THEREFOR
AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO
WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN THOSE HEREINABOVE
DESCRIBED, OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE SUBSURFACE OF SAID LAND
HEREINABOVE DESCRIBES AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY
DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO
REDRILL, RETUNNEL, EQUIP, MAINTAIN REPAIR, DEEPEN, AND OPERATE ANY SUCH WELLS,
WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE RIGHT HOWEVER, IS

*First American Title*

4

Order: 0022-004
Doc: CASANT:2019 00030458

Page 10 of 13
**0075**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0059**

Exhibit A-X2

Order Number: 4204-2606461JO
Page Number: 14

RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE AND THE UPPER 2,000
FEET TO THE SUBSURFACE OF THE DRILLSITE THEREIN DESCRIBED COVERING OTHER
PROPERTY, AS RESERVED BY GILLILAND OIL AND LAND CO., A CORPORATION, ET AL., IN
DEED RECORDED OCTOBER 4, 1972 AS INSTRUMENT NO. 39146 IN BOOK 2424, PAGE 567 OF
OFFICIAL RECORDS.

PARCEL 4 (FORMERLY PARCEL 7): (PTN APN 129-120-26)

THE NORTH 660 FEET OF THE EAST 660 FEET OF THAT PORTION OF SECTION 8 IN TOWNSHIP
9 NORTH, RANGE 33 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF
SANTA BARBARA, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF,
DESCRIBED AS FOLLOWS:

BEGINNING AT A RAILROAD SPIKE SET IN THE PAVEMENT AT OR NEAR THE COMMON SOUTH
CORNER OF SECTIONS 8 AND 9, SAID TOWNSHIP 9 NORTH, RANGE 33 WEST, SAID POINT
BEARS SOUTH 0° 17' 49" WEST, 25.00 FEET FROM A 2 INCH BRASS CAP MONUMENT MARKED
R.E. 4643 SET ON THE NORTHERLY LINE OF CLARK AVENUE, AS SHOWN ON THE MAP OF A
SURVEY, FILED IN BOOK 46, PAGE 57 OF RECORD OF SURVEYS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 35' 00" WEST, 1,539.98 FEET TO A
POINT WHICH IS SOUTH 89° 35' 00" EAST, 1,143.15 FEET FROM A SPIKE SET IN THE
PAVEMENT, SAID SPIKE BEING SOUTH 0° 14' 55" WEST, 25.00 FEET FROM A 2 INCH B.C.
MONUMENT AS SHOWN ON SAID RECORD OF SURVEY; THENCE NORTH 0° 14' 55" EAST,
1,143.15 FEET; THENCE SOUTH 89° 35' 00" EAST, 197.40 FEET TO A POINT ON A LINE
PARALLEL WITH AND 1,343.81 FEET WESTERLY OF (MEASURED ALONG THE NORTH LINE) THE
EAST LINE OF THE PARCEL OF LAND AS SHOWN ON SAID MAP; THENCE NORTH 0° 17' 45"
EAST, 4,131.01 FEET PARALLEL WITH SAID EAST LINE TO A POINT ON THE NORTH LINE OF
SAID PARCEL OF LAND; THENCE SOUTH 89° 35' 20" EAST, 1,343.81 FEET ALONG SAID NORTH
LINE TO THE NORTHEAST CORNER OF SAID PARCEL OF LAND; THENCE SOUTH 0° 17' 45"
WEST, 5,274.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THE NORTH 295.16 FEET OF THE EAST 295.16 FEET THEREOF.

ALSO EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER
DESCRIBED RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A
CONTINUOUS PERIOD OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS
RIGHTS AND OTHER HYDROCARBONS, BY WHATEVER NAME KNOWN, THAT MAY BE WITHIN
OR UNDER SAID LAND, TOGETHER WITH THE RIGHT OF DRILLING, EXPLORING AND
OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND,
INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER THAN
THOSE HEREINABOVE DESCRIBED, OIL, OR GAS WELLS INTO, THROUGH OR ACROSS THE
SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED
OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS
THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OR THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND; THE
RIGHT, HOWEVER, IS RESERVED TO DRILL, EXPLORE AND OPERATE THROUGH THE SURFACE
AND THE UPPER 2,000 FEET OF THE SUBSURFACE OF THE DRILLSITES THEREIN DESCRIBED
COVERING OTHER PROPERTY, ALL AS RESERVED BY GILLILAND OIL AND LAND CO, A
CORPORATION, ET AL., IN DEED RECORDED OCTOBER 4, 1974 AS INSTRUMENT NO. 39146 IN
BOOK 2424, PAGE 567 OF OFFICIAL RECORDS.

PARCEL 5 (FORMERLY PARCEL 9): (129-170-27 AND 129-170-28)

THE NORTHWEST QUARTER OF SECTION 9 IN TOWNSHIP 9 NORTH, RANGE 33 WEST, SAN

*First American Title*

S

Order: 0022-004
Doc: CASANT:2019 00030458

Page 11 of 13
**0076**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0060**

Exhibit A-x2

Order Number: 4204-260546170
Page Number: 15

BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SANTA BARBARA, STATE OF
CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND.

EXCEPTING THEREFROM UNTIL SUCH TIME THAT NONE OF THE HEREINAFTER DESCRIBED
RESERVED SUBSTANCES SHALL BE PRODUCED FROM SAID LAND FOR A CONTINUOUS PERIOD
OF FIVE YEARS, ALL OIL, OIL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER
HYDROCARBONS, BY WHATEVER NAME KNOWN, THAT MAY HE WITHIN. OR UNDER THE
ABOVE DESCRIBED LAND, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, EXPLORING
AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER
LAND; INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL FROM LANDS OTHER
THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELLS INTO, THROUGH OR ACROSS THE
SUBSURFACE OF SAID LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED
OR DIRECTIONALLY DRILLED WELLS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS
THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE
ANY SUCH WELLS, WITHOUT, HOWEVER, THE RIGHT TO DRILL, EXPLORE AND OPERATE
THROUGH THE SURFACE OF THE UPPER 2,000 FEET OF THE SUBSURFACE OF SAID LAND,
EXCEPT FROM 19 DRILLSITES THEREIN DESCRIBED AS EXCEPTED AND RESERVED, IN DEEDS
RECORDED JUNE 19, 1972 AS INSTRUMENT NO. 22590 IN BOOK 2406, PAGE 991 OF OFFICIAL
RECORDS AND RECORDED FEBRUARY 23, 1975 AS INSTRUMENT NO. 7028 IN BOOK 2448,
PAGE 1383 OF OFFICIAL RECORDS AND RECORDED APRIL 9, 1974 AS INSTRUMENT NO. 12226
IN BOOK 2510, PAGE 48 OF OFFICIAL RECORDS.

APN: 129-120-26 and 129-170-27 and 129-170-28

*First American Title*

6

Order: 0022-004
Doc: CASANT:2019 00030458

Page 12 of 13
**0077**

Requested By: GKerley, Printed: 7/22/2019 3:28 PM

**0061**

Exhibit A-X3

LEGAL DESCRIPTION

The oil, oil rights, natural gas, natural gas rights and other hydrocarbons more particularly described in the following instruments:

1. Corporation Grant Deed dated March 14, 1977, from Gilliland Oil & Land Co., and Gilliland Oil and Land Company, Grantor, to Husky Oil Company, Grantee, recorded March 15, 1977 at No. 77-11852;

2. Grant Deed dated March 14, 1977, from Gilliland Oil & Land Co., a/k/a Gilliland Oil and Land Company, Grantor, to Husky Oil Company, Grantee, recorded March 15, 1977 at No. 77-11857;

3. Quitclaim Deed dated March 14, 1977, from Gilliland Oil & Land Co., a/k/a Gilliland Oil and Land Company, Grantor, to Husky Oil Company, Grantee, recorded March 15, 1977 at No. 77-11858.

Order: 0022-004
Doc: CASANT:2019 00030458

Page 13 of 13
0078

Requested By: GKerley, Printed: 7/22/2019 3:28 PM
0062

# EXHIBIT "7"

# OIL, GAS AND MINERAL LEASE

**THIS LEASE AND AGREEMENT**, made and entered into this 6th day of November, 2015 by and between **GLR, LLC, a Delaware limited liability company**, hereinafter called "Lessor" and HVI Cat Canyon, Inc., a Colorado corporation, hereinafter called "Lessee"

WITNESSETH: That for and in consideration of a rental paid in advance upon execution hereof, the receipt and sufficiency of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of Lessee to be kept and performed, Lessor does hereby lease, let and demise unto Lessee the lands hereinafter described (herein sometimes referred to as the "leased lands") for the purpose and with the exclusive right of prospecting, exploring, mining, drilling and operating leased land for oil, gas, other hydrocarbons, associated substances, sulphur, nitrogen, carbon dioxide, helium, geothermal steam and other commercially valuable substances which may be produced through wells on the leased land, whether or not similar to the above mentioned substances (collectively called "substances") and producing, taking, treating, storing, removing and disposing of said substances from the leased land, together with the right for such purposes for the free use of oil, gas and water (but not water from Lessor's well unless Lessor shall expressly allow such use) from the leased land and the right to inject in the leased land gas, water or other fluids for purposes of pressure maintenance or secondary and tertiary recovery of oil, gas and other hydrocarbon substances from the leased lands and the right to conduct secondary and tertiary recovery operations: and also the right to construct, erect, maintain, operate, use, repair, replace and remove (including casing in wells) tanks, oil and gas treating plants, roads, pipelines, power lines, telephone and telegraph lines, machinery, appliances, buildings and all structures or improvements as may be necessary or convenient in carrying on Lessee's operations on the leased land, together with all other rights necessary or convenient for any and all said purposes, including, but not limited to, rights of way for road and easements over, upon and across and ingress and egress to and from leased land for any or all above-mentioned purposes. Any pipelines, pole lines or roads constructed by Lessee may also be used by it in operations on lands in the vicinity of the leased land. Lessor shall have the right to occupy and use the leased land in any manner and to the extent not inconsistent with Lessee's rights or in interference with Lessee's operations hereunder. The land hereby leased is situated in the County of Santa Barbara, State of California, and is described as follows:

> **The South Half of the Northeast Quarter and the North Half of the Southeast Quarter of Section 11, Township 9 North Range 33 West, San Bernadino Meridian.**

together with such rights as Lessor may have in any roads, streets, alleys, waterways, canals, sloughs, levees, ditches, easements, right of way upon, within or adjoining the above described property, and containing **160**acres, more or less.

To have and to hold the same for a term of **three(3)** years from and after the date hereof (hereinafter referred to as the "primary term") and so long thereafter oil, gas, hydrocarbons, or other substances are produced therefrom in quantities deemed paying by Lessee; or so long thereafter Lessee shall conduct drilling (including without limitations, deepening, plugging back, repairing, redrilling and reworking operations on the leased land or be excused therefrom as in this lease provided, and should production result form such operations, this lease shall remain in full force and effect so long as oil, gas, hydrocarbons or other substance shall be produce therefrom.

In consideration of the premises, the parties hereby mutually agree as follow:

1. Notwithstanding anything herein to the contrary, commencing December 1, 2015, Lessee shall pay to Lessor annually for as long as this lease remains in full force and effect a minimum royalty in the amount of **Twenty-Five Thousand Dollars ($25,000.00)** (hereinafter referred to as "annual rental") which shall serve as rental for each following year paid. For each rental year commencing December 1, 2016, Lessee shall calculate the amount of royalties actually paid to Lessor for the prior year from December 1 through November 30 and shall deduct said actual royalties paid from the annual rental, the balance of which shall be payable to Lessor by January 1st. Notwithstanding anything herein to the contrary, this lease shall terminate as to all rights and obligations created hereby unless Lessee (a) shall make or tender the royalty payments as herein provided or (b) shall within said primary term commence drilling operations or reworking existing wells for oil, gas or other substances on the leased land and prosecute the drilling or reworking of such well with reasonable diligence until either injection or oil, gas or other substances are found in quantities deemed paying by Lessee for no less than six (6) consecutive months by November 6, 2018 or (c) and until Lessee deems that further drilling or operations of the existing wells would be unprofitable or impracticable in which event Lessee may abandon such wells. In the event Lessee shall not have commenced such drilling operations or

**EXHIBIT "7"**

**0080**                                                                 **0064**

reworking of a well on or before the expiration of each one-year rental period, Lessee may, at its option, from time to time defer commencement of drilling operations or reworking of wells only within the primary term hereof by the payment or tender to Lessor of annual rental payable annually and such payments shall operate to defer obligation to commence drilling operations or reworking of wells during any period for which rental is paid, or Lessee may, quitclaim and surrender this lease as is hereafter provided.

2.      The payments or tenders required to be made by Lessee hereunder may be made by check issued and made payable as hereinafter provided and mailed or delivered.  The mailing of the rental payment shall be deemed a timely tender thereof and shall preclude termination of this lease. The payment or tender of rentals in the manner provided above shall be binding upon the successors and assigned of Lessor. A waiver by Lessee of the provisions of this paragraph in the making of any payment or payments shall not be deemed a waiver thereof with respect to subsequent payments.  If at any time there is no person or other entity authorized to receive payments hereunder, the time of making such payments shall be extended until Lessee has been notified in writing of such designation.

3.      Any notice to be given by either party to the other hereunder, which notice shall be in writing, may be delivered in person or by registered or certified mail, postage prepaid / return receipt requested, addressed to the party for whom intended as follows:

        to Lessor:

        45 Rockefeller Plaza, Suite 2410
        New York, NY 10111;

        to Lessee:

        P.O. Box 5489
        Santa Maria, California 93456

Either party may from time to time, by written notice to the other, designate a different address, which shall be substituted for the one above specified.  Service of notice will be considered when actually delivered.  Lessee shall be allowed 60 days to alter records before such address shall be deemed effective for rental and royalty payment.

4.      The term "royalty share" wherever used herein shall mean the fraction **one-fourth (1/4) or twenty-five percent (25%).**

5.      Lessee shall pay Lessor as royalty on oil the value of the royalty share of the oil produced from the leased land (after making the customary adjustments for temperature, water, b.s., and the actual cost of treating said royalty oil for market or pipeline acceptance), at the posted available market price at the well or oil of like gravity and quality on the day the oil is so removed, or, if Lessee is unable to sell oil at a price equal to said posted price then royalty settlement shall be made on the basis of the price received by Lessee, or if Lessee sells said oil at a price higher than said posted price then royalty settlement shall be made on the basis of such higher price.  Lessee may deduct from any royalty payment to Lessor a reasonable charge for the cost of any diluent used in connection with production and for the dehydration, cleaning and treating of such oil and reasonable charge for transportation to the treating plant or refinery.  Nothing herein contained shall be construed as obligating Lessee to treat oil.

6.      Lessee shall pay to Lessor as royalty on gas the royalty share of the net proceeds derived from the sale of gas produced hereunder, after deducting treatment and delivery costs, and also the royalty share of the value at the field market price of any gas used by Lessee in operations other than those conducted under this lease.  Nothing herein contained shall obligate Lessee to treat or process natural gas nor shall Lessee be obligated to save, sell or otherwise dispose of natural gas or residual dry gas, as the case may be, unless there is a market therefor at the well or processing plant at a price and under conditions which Lessee believes to be for the best interests of both parties hereto, or to pay royalty on any gas which is neither sold nor used..

7.      Lessee shall pay Lessor as royalty the market value at the well, in the condition as produced, of the royalty share of any substance covered by this lease, other than oil and gas and the products thereof, which Lessee may elect to produce and save or market or utilize from the leased land. Provided, however, that, Lessee shall not be required to account to Lessor for or pay

11/6/15
Mortensen Lease
Santa Barbara County, California

2

royalty on oil, gas or other substances used by Lessee in its operations hereunder, including, but not limited to, fuel, lifting, injecting, gathering, compressing for processing and processing purposes, and Lessee may use such substance free of charge. In no event shall Lessee be liable to Lessor for its failure or inability to save any of said substances, or for shrinkage or loss thereof, and royalty shall not be payable in respect to any of such substances lost through evaporation, leakage, fire or otherwise.

Lessee shall have the right to treat or cause to be treated all or any portion of the oil and gas produced from the leased land for the purpose of extraction, and for such purpose Lessee may transport or cause to be transported to a facility or plant either on the leased land or other land all or portion of such oil and gas where it may be commingled with oil and gas from other properties. Lessee shall meter such oil and gas to be transported, and such meter readings together with tests that are standard and custom in the industry at regular intervals, such as once each month, shall furnish the basis for computation of the amounts of such oil and gas or other hydrocarbons, and of the residue to be credited to this lease. Oil and gas actually and reasonably used or consumed or lost in the operations of any such extraction shall be free of charge and Lessee shall not be held accountable to Lessor for that proportion of the oil and gas used, consumed or lost which, on the basis of quantity determinations made as above stated, is reasonably estimated to come from the leased land.

8.      Settlement shall be made by Lessee on or before the last day of each calendar month for all royalties which accrued during the preceding month and Lessee shall furnish Lessor monthly statements showing the computation of royalties. Lessor agrees to examine promptly each and all statements and remittance forwarded by Lessee to it hereunder and promptly advise Lessee of any objection thereto.

9.      The rentals and royalties provided for in this lease are based on the whole of the oil and gas rights in the leased land described above. If Lessor owns less than the whole of the oil and gas rights in said land, the rentals and royalties accruing hereunder shall be proportionately reduced. If any claim is asserted or any action or proceeding instituted by Lessor, or by any third party claiming title to the leased land or any part thereof or any interest therein or in any production therefrom, adverse to Lessor or in hostility to rights claimed in good faith by Lessee under this lease, then during the pendency of such controversy and until 90 days after final determination thereof, Lessee may defer or discontinue all operations on the leased lands which are subject of controversy, or, if it operates wells, it may hold any contested royalties accruing hereunder in suspense until thirty (30) days following the final determination (including applicable judicial and administrative appeal periods) of such controversy.

Unless expressly prohibited by covenant, it is hereby agreed between the Lessor and Lessee that the right to use of the surface is a part of the mineral rights and the mineral estate leased. If Lessor owns a greater interest in the lands described than is purported to be leased hereby or hereafter acquires any additional interest or title in the leased land, then this lease shall cover such greater or additional after-acquired interest or title as if owned by Lessor on the date hereof, and Lessor agrees to give Lessee written notice of any such acquisition as soon as the same is made; in which event the rentals and royalties payable to Lessor shall be increased proportionately.

10.      Lessee, or its agents, shall have the exclusive right during the term hereof to enter upon the leased land at any time for the purpose of conducting any geological and geophysical work and the drilling of holes and other operations to secure geological and geophysical information.

11.      [reserved]

12.      Except as otherwise provided herein, Lessee shall drill any new well and operate each completed well in accordance with good oil field practice so long as such well shall produce oil or gas in quantities deemed paying by Lessee but in conformity with any reasonable conservation or curtailment program affecting the drilling of wells or the production of oil or gas or either thereof from said leased land to which Lessee may voluntarily subscribe or become a party, or with any conservation or curtailment program which may be imposed by law, or by any appropriate governmental agency.

13.      Lessee shall pay all taxes levied upon or assessed against its improvements, fixtures and personal property on the leased land, including Lessee's oil stored thereon. Taxes levied upon or assessed against the minerals and mineral rights subject to this lease (or, if same shall not be separately assessed, such part of the taxes on the leased land as are due to the discovery of oil, gas or any of the above mentioned other substances on the leased land or lands adjacent thereto) shall be paid as follows; The royalty share thereof by all the persons entitled to share in the royalty hereunder, according to their several interests in said royalty, and the remainder thereof by Lessee. Any severance tax or other tax assessment, or license now or hereafter levied or imposed, measured by the quantity or value of the oil, natural gasoline, gas, or said other substances produced from the leased land, or allocated thereto, shall be borne by the parties in the same ratio as taxes on minerals or mineral rights. Lessee shall not

11/6/15                                                                                                                                3
Mortensen Lease
Santa Barbara County, California

**0082**                                                                                                          **0066**

be liable for any special assessment for local improvements or benefits. If Lessor shall fail to pay any taxes, assessments, or charges required to be paid by Lessor, Lessee may at its option pay the same and recover such costs, plus maximum interest allowed by law, from Lessor, at its option. Lessee may recover such charges paid by it, plus interest, from any royalties or rental accruing hereunder.

14.      Lessor agrees that Lessee, at its option, may pay and discharge any taxes, mortgages or other liens existing, levied or accessed on or against the leased land and, in the event it exercises such option, it shall subrogate to the rights of any holder or holders thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien, any royalty or rental accruing hereunder. Lessee, at its option, shall have the right to defend any suit brought attacking Lessor's title to the leased land, or to bring a quiet-title action in Lessor's name to validate Lessor's title thereto or in its own name to validate Lessee's title to the leasehold created hereby, and in such case Lessor agrees to assist and cooperate with Lessee in any such action and to indemnify and hold Lessee, its affiliates, offices, directors, employees, contractors, and agents harmless from any and all claims, damages, and liabilities arising out of any dispute over Lessor's title (including, without limitation, attorneys fees and costs incurred by Lessee in defending Lessor's title or asserting Lessee's title as a result of such defense).

15.      Lessee, at its own cost and expense, shall pay for all labor performed and materials furnished in the operations of Lessee hereunder and Lessor shall not be chargeable with, or liable for, any part thereof. Lessee shall protect the leased land from liens of every character arising from its operations. Lessor may post and keep posted on the leased land notices to protect the same from liens.

16.      Upon written request of Lessor at least 30 days prior to pipeline installation, Lessee shall lay all pipelines, which it constructs through cultivated portions of the leased land below plow depth. Upon similar request Lessee shall fence all excavations to safeguard livestock.

17.      If Lessor is the owner of the surface of the leased land, Lessee shall pay the amount of all damages to livestock, crops, fruit or nut trees, timber, fences, ditches, buildings and other improvements caused by Lessee's operations on the leased land, which payment shall be made to Lessor or Lessor's tenant, whichever shall sustain such damage. If Lessor is not the owner of such surface, Lessee will hold Lessor harmless from all claims and demands arising out of Lessee's operations hereunder which may be asserted by the owner of the surface or by any tenant of such owner.

18.      Notwithstanding anything to the contrary in this lease or any addenda or modifications thereto, if Lessor is not the owner of the surface of the leased land, then all the provisions of this lease requiring Lessor's written consent to utilize the surface of the leased land shall not be applicable to this lease and shall not be binding upon Lessee.

19.      Lessee shall not drill any well on said leased land within 100 feet of any dwelling house now on the leased land without written consent of the owner of such dwelling house.

20.      Lessor, at all reasonable times, may inspect the leased land and the work done and in progress thereon, and the production therefrom. During normal business hours, Lessor may examine the books kept by Lessee in relation to the amount and character of the production from the leased land and disposition thereof.

21.      Lessee shall have the right at any time to remove from the leased land any machinery, rigs, piping, casing and other property and improvements belonging to or furnished by Lessee, including that installed wells or otherwise affixed to the land; provided that, in the event of termination of the lease in its entirety, such removal shall be completed within six (6) months thereafter and, in the event of termination of this lease as to a portion of the leased lands, all such property not needed by Lessee for its operations on land retained under the lease shall be removed from the land as to which lease is terminated within six (6) months after such partial termination. Lessee, after termination of this lease, shall fill all sump holes and other excavation made by it on the leased land and in other respects restore the leased land as nearly to its original condition as is reasonably practical, but Lessee shall not be obligated to restore anything for which it may theretofore have made payment by way of damages.

22.      Notwithstanding anything herein contained to the contrary, Lessee, at its option may at any time quitclaim and surrender all of the leased land, in which event this lease shall be at an end and Lessee shall be released and discharged from all obligations thereunder, save and except the obligation to pay royalties therefore accrue and any obligations hereby imposed for the removal of equipment and the restoration of the leased land. Lessee, at its option, may at any time, quitclaim and surrender any part of the leased land not desired by it, and in such event the amount of any rental provided for in this lease shall thereafter

11/6/15                                                                                                                  4
Mortensen Lease
Santa Barbara County, California

**0083**                                                                                      **0067**

accrue only on the basis of the land not so quitclaimed. Lands so quitclaimed shall remain subject to the easements and rights of way herein provided for so long as operations are being carried on by Lessee on the retained part of the leased land or on lands with which any part of the leased lands may be pooled, and Lessor agrees that there shall not be drilled on the quitclaimed land any oil or gas well which is within 330 feet of any boundary of the retained leased land.

23.    Lessee may at any time with respect to a designated part or all of the leased land, (a) surrender its right to produce oil or (b) surrender its rights to produce gas. A surrender of the rights to produce oil shall include the surrender of the rights to produce gas which will necessarily be produce therewith; however, a surrender of gas shall limit Lessee's right to produce gas which may be necessarily be produce with oil.

24.    Other than Lessee's obligation to pay the annual rent, performance of covenants and conditions imposed upon Lessee hereunder shall be excused while, and to the extent that, Lessee is hindered in or prevented from complying therewith, in whole or in part directly or indirectly, by war, riots, strike, lockouts, action of the elements, accidents, lack of suitable production facilities or equipment due to damage, inability to obtain drilling rigs, equipment or other materials in the open market or to obtain transportation therefore, laws, rules, and regulations of any federal state, municipal or other government agency, including but not limited to processing delays in obtaining drilling permits, or any other cause beyond the control of the Lessee, whether similar or dissimilar to those herein specifically enumerated and without regard to whether such cause exists at the date thereof or thereafter arises. In no event shall Lessee be compelled to settle strikes, or lockouts on any term except those acceptable to Lessee in its own discretion.

25.    Except as to a default by Lessee to pay Lessor any monetary obligations owed hereunder, in case of default by Lessee with respect to any conditions or covenant hereof and the failure to commence to remedy the same within ninety (90) days following written notice from Lessor to Lessee to perform such condition or covenant, then at the option of Lessor this Lease shall forthwith cease and terminate; EXCEPT THAT, as to any well on the leased land which Lessee is not in default in connection therewith, the lease shall nevertheless continue in effect as to an area (amount of acres) to be selected by Lessee. Lessee shall not, however, be deemed to be in default while work is in progress in good faith which when completed will constitute compliance with such condition or covenant. The right to terminate this lease as to the leased land in respect to which Lessee is in default and the right to re-enter and take possession of said leased land shall be the sole and exclusive remedy of Lessor for such breach and default except as to accrued royalty obligations herein specified and the obligations of Lessee to restore the leased as provided for in this lease. A termination of this lease as to a part only of the leased land or as to a part only of Lessor's rights shall not affect such right of way and easements over the terminated portion of the leased land as may be necessary in Lessee's operation on the part of the leased land as to which no such termination shall have occurred. Temporary discontinuance of production from any well in order to work on such well, or cessation of production in any well which is followed by work on such well diligently conducted to restore production therefrom shall not be deemed to be an end of production from such well within the meaning of this Paragraph.

26.    If the estate of either party hereto is assigned or conveyed (and the privilege of assigning in whole or in part is expressly allowed), the rights and obligations created hereby and the covenants hereof shall extend to and be binding upon such party's assigns or transferees, and the party so assigning or transferring such interest shall thenceforth be released from all obligations hereunder to the extent of the interest so assigned or transferred, but no change of ownership in the land or in the rentals or royalties shall be recognized by Lessee until Lessee has been furnished with satisfactory written notice of such transfer or assignment, together with a certified, recorded copy of the instruments of transfer or assignments. Upon receipt of such instruments, Lessee shall be allowed 60 days to alter its records for payment purposes.

27.    If this lease shall be assigned as to a particular part or parts of the leased land, such division of the leasehold estate shall constitute and create separate and distinct holdings under the lease of and according to the several portions of the leased land as thus divided, and the holder or owner of each such portion of the leased land shall be required to comply with and perform Lessee's obligations under this lease for, and only to the extent of, its portion of the leased land; provided, however, that nothing herein shall be construed to impose a drilling obligation or to enlarge the rental obligations upon Lessee or any assignee, and provided further that payment of the annual rental, as set forth in this lease, either by the Lessee or any assignee hereunder shall protect and continue the lease as a whole.

28.    Lessee shall have the right at its option at any time and from time to time to combine and pool all or any part of the leased land or interest therein into one or more operating units with any other land or interest therein (whether held by Lessee or others and whether or not the surface of such other land may be used for oil or gas development purposes). Each operating unit may be of the size and shape, as Lessee may desire. Each operating unit created hereunder shall be created by and shall become

11/6/15                                                                                                                  5
Mortensen Lease
Santa Barbara County, California



effective upon the execution by Lessee of a Declaration of Pooling setting forth the exterior boundaries of the unit so created and describing the land pooled thereunder. If there are any lands or interests to such unit by executing a Supplemental Declaration of Pooling, but no retroactive adjustment of royalties shall be made. Promptly after execution of each Declaration of Pooling and each Supplemental Declaration of Pooling Lessee shall give written notice thereof to Lessor. Any operating unit may include land upon which a well has therefore been completed or upon which operations for drilling have theretofore been commenced, and within meaning of the requirements of this lease any such well or operations if off the leased land shall be considered as having been commenced immediately after the effective date of such pooling. Production, drilling or reworking operations anywhere on any pooled land in an operating unit created hereunder shall be treated a production, drilling or reworking operations on the leased land. There shall be allocated to the leased land the proportion of the pooled production from any such operating unit (whether or not such production is from the leased land) that the number of surface acres covered by this lease and included in such unit bears to the total number of surface acres pooled in such unit; royalties shall be paid hereunder only upon that portion of such production so allocated and as to pooled production from land in such unit such royalties shall be in lieu of any other royalties. If taxes of any kind are levied or assessed which are based on the quantity of pooled substances underlying or produced from any such operating unit, then the share of such taxes to be borne by Lessor as provided in this lease shall be proportion to the share of production from such unit allocated to the leased land. Lessee may at any time quitclaim to the persons entitled thereto all or any part of the land in any such operating unit, and no owner or land in such unit not owning any interest in the quitclaimed land, except by virtue of such pooling, shall have any interest in such quitclaimed land after quitclaim is delivered or recorded. Allocation of production as aforesaid from any such operating unit, whether to the leased land or in like manner to other lands therein, shall continue not withstanding any quitclaim or other termination, either in whole or in part of this or any other lease covering lands in such unit until such time as the owner of such land, or owner's agent or representative, shall drill or produce any of the pooled substances from any part of such lands, whereupon all such lands formerly included in such unit and as to which the lease covering the same shall have been terminated shall be excluded in determining the production to be allocated to the respective lands in such unit and in prorating taxes; and in the event of the failure of Lessor's or any other owner's title as to the portion of the land included in any such operating unit, such portion of such land shall likewise be excluded from such unit; provided, that Lessee shall not be held to account for any production allocated to any lands excluded from any such operating unit unless and until Lessee has actual knowledge of the aforesaid circumstances requiring such exclusion. Lessee may at any time either before or after the commencement of the drilling of a well on lands included in any such operating unit but prior to the discovery thereon of the substances for which the unit was formed, or at any time after the abandonment of all wells drilled on such units, wholly dissolve such units by executing a Declaration of Dissolution. Promptly after execution of such Declaration of Dissolution Lessee shall give written notice thereof to Lessor. Upon the dissolution of any such operating unit, whether or not this lease or any other lease involved therein remains in effect, all rights of Lessor hereunder to royalty on pooled substances from the lands which were so pooled (other than the leased land) shall cease and terminate; but such dissolution shall not otherwise affect or impair any of the Lessee any of the Lessee's rights or obligations under this lease, including its right to create a new operating unit or units out of the lands previously pooled pursuant to this paragraph, or constitute a surrender of any part of or any interest in the leasehold estate created hereby. The sale, conveyance or other transfer of, or of any interest in, any portion or portions of the leased land which are at the time of such transfer subject to an operating unit shall (unless the instrument effecting such transfer expressly provides otherwise) be deemed to include and shall operate as a transfer and assignment of all the transferor's interest, rights and benefits under this lease (including the right to royalty on allocated production from the lands subject to any such unit) insofar as such interest, rights and benefits pertain to or are allocable hereunder to the portion or portions of leased land or interest therein so transferred. The size and/or shape of any such unit created pursuant to the provisions of this paragraph may be changed at any time within twenty one (21) years from the date hereof without Lessor's Joinder or further consent to permit more efficient and economical operations, to include acreage believed to be productive and to exclude acreage believed to be unproductive or which is not committed to the unit, but any increase or decrease in Lessor's royalties resulting from any such change in any such unit shall not be retroactive.

29.     Drilling operations under this lease may be conducted by means of a well or wells, the surface locations of which are on other lands and which are drilled into and bottomed in the lease land (any such well being deemed to be drilled on the leased land), or by means of a well or wells, the surface locations of which are on the leased land and which are bottomed in the leased land, or by a combination of such wells. Drilling operations under lands pooled in accordance with the terms of this lease may also be conducted by means of a well or wells, the surface location of which are on other lands and which are drilled into and bottomed in the pooled lands (any such well being deemed to be drilled on the pooled lands) or by means of a well or wells, the surface locations of which are on the pooled lands and which are bottomed in the pooled lands, or by combination of such wells.

30.     Lessee has acquired, or may acquire, rights in respect to oil gas or other substances underlying other lands in the vicinity of the leased land in which the Lessor has no interest and Lessor hereby grants unto Lessee such right of way, easements and servitudes in and through the subsurface of the leased land as Lessee may from time to time desire for boring well holes

11/6/15
Mortensen Lease
Santa Barbara County, California

6

through the subsurface of the leased land from the surface locations outside of the leased land and casing same and otherwise completing and maintaining such wells in and producing such wells from the lands other than the leased land. Such right of way, easements and servitudes, notwithstanding the prior termination of this lease, shall continue for so long as Lessee, its successors and assigns, retain its or their interest in such other lands.

31.    During the term of this lease, Lessor shall not execute and/or grant an oil and gas lease or oil, gas and mineral lease to a third party or agree to execute or grant such a lease by letter agreement or otherwise. Should Lessor grant such a lease during the term of this lease, it shall be deemed a breach of this lease and shall excuse all further performance by Lessee under this lease until such lease or agreement is terminated Lessee is provided with satisfactory evidence of such termination. Further, the term of this lease shall be continued during such suspension of Lessee's performance hereunder.

32.    Lessor acknowledges that oil and gas operations on this property may result in the presence of substances covered by California Health and Safety Code S25249.5 and/or S25359.7. Lessor acknowledges that clear and reasonable notices and warnings have been provided by Lessee to Lessor as required by law. If any third party asserts any claim against Lessor on account of Lessee's extraction or removal of hydrocarbons from the leased land or other operations of Lessee thereon (including without limiting the generality of the foregoing, any governmental or other action or proceeding for the abatement of a nuisance or the cleanup, removal or other protection against a hazardous waste as now defined), Lessee will defend and indemnify and hold harmless from all such claims except such portion thereof as represents a claim to Lessor's royalty, provided that upon receiving notice thereof, Lessor shall notify Lessee with reasonable promptness of bringing any action or the assertion of any such claim and shall allow Lessee to have Lessee's attorney's appear therein, either alone or in association with Lessor's attorney (as Lessor may elect).

33.    "Drilling Operations" as used in this lease is defined to mean any work or actual operations on the leased land for the purpose of drilling a well, including but not limited to the preparation of the ground therefore and the building of road and facilities, provided the same be followed by construction or erection of derrick, the installation of drilling equipment and actual drilling in the ground, and that all such work be prosecuted diligently. If drilling operations are in progress at the end of the primary term hereof, drilling operations shall be deemed to continue so long as the Lessee diligently continue to drill allowing not more than 6 months to elapse between the completion or abandonment of one well and the commencement of the next succeeding well.

34.    The terms "paying quantities" or "quantities deemed paying" as used in this lease shall mean revenue from production sufficient to yield Lessee a reasonable profit over and above direct operating costs (not including exploration, drilling, completing, testing and equipping costs) and after deducting royalties, taxes and other burdens on production.

35.    In the event that Lessee drills a water well on the leased land for the production of water for its operation on the leased land, Lessee agrees that if said well is no longer desired by Lessee, or upon termination of this lease, it will, at Lessor's request, remove the pump, tubing and power plant from said water well and will cap the surface casing and otherwise leave same in such condition as may be required by law or regulatory agency, but otherwise will leave said well in such condition that Lessor may subsequently equip the well for the production of water for Lessor's own use. Lessor hereby indemnifies and hold Lessee harmless against any and all liability arising from Lessor's use of said well.

36.    If at the termination of the primary term hereof, oil or gas or another of said substances is being produced by Lessee, and if thereafter such production shall cease, then and as often as such event shall occur, the term of this lease shall continue for six (6) months from the date of last production, and if during that time Lessee resumes operations for the drilling of a well or restoration of production, the term shall continue during the prosecution of such operations, and, if production results therefrom, as long as production continues, with no cessation thereof for periods in excess of six (6) months.

37.    On the expiration or sooner termination of this lease in its entirety Lessee shall surrender possession to Lessor and file for record a quitclaim deed in the County Recorder's office of said County and State.

38.    If any term, covenant, condition or provision of this lease is held by court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and in no way be affected, impaired or invalidated thereby.

39.    [reserved]

11/6/15
Mortensen Lease
Santa Barbara County, California

7

40.    If more than one person is named as Lessor herein and one or more of them fails to execute this lease, it shall, nevertheless (if acceptable by Lessee) become effective as a lease from each such Lessor as may have executed the same.

41.    This lease may be executed with electronic signatures and in any number of counterparts and all such counterparts shall be deemed to constitute a single lease and the execution of one counterpart by any Lessor shall have the same force and effect as if he or she had signed all other counterparts.

42.    This lease and all its terms, conditions and stipulations shall extend to and be binding upon all successors and assigns of said Lessor and Lessee.

11/6/15
Mortensen Lease
Santa Barbara County, California

8

IN WITNESS WHEREOF, said parties have caused this lease to be duly executed as of the date first hereinabove written.

**"LESSOR"**
**GLR, LLC**

By _____

**Violeta Berniczky**
**Treasurer**

**"LESSEE"**
**HIV Cat Canyon, Inc.**

By: _____

**Susan M. Whalen,**
**SVP and General Counsel**

[Signature page to Mortensen Lease]

# EXHIBIT "8"

|||||| (barcode)
**2019-0030459**

| Recorded | REC FEE | 27.00 |
| Official Records | | |
| County of | PCOR | 20.00 |
| Santa Barbara | SB2 HOUSING | 75.00 |
| Joseph E. Holland | | |
| County Clerk Recorder | | |
| | JKM | |
| 04:34PM 19-Jul-2019 | Page 1 of 2 | |

RECORDING REQUESTED BY AND

    WHEN RECORDED MAIL TO:

*AND MAIL TAX STATEMENTS
TO:*

NAME     GLR, LLC

     45 Rockefeller Plaza, #2410
     New York, NY 10111

MAILING
ADDRESS

CITY,
STATE
ZIP CODE

*D2*
*PCOR $3cpy*

(SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE)

Documentary Transfer Tax $ 0.00

___ Computed on value of interest conveyed.
___ Computed on value of interest conveyed less liens
    and encumbrances remaining thereon at time of sale.
√ No property transfer tax due (value of interest or property conveyed is less than $100.00 [Rev. & Tax. Code § 11911]).

### QUITCLAIM DEED

FOR GOOD AND VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, HVI Cat Canyon, Inc., a Colorado Corporation ("Grantor") hereby remises, releases, relinquishes, surrenders and forever quitclaims to GLR, LLC, a Delaware limited liability company (hereinafter referred to as "Grantee") any and all right, title and interest that Grantor may have in that certain real property described as the S/2 of NE/4 and N/2 of SE/4 of Section 11, T9N, R33W, SBB&M, in the County of Santa Barbara, State of California (the "Lands"), including without limitation any rights Grantor may have had under the following instrument, but excluding those certain wells on the Lands together with and all associated facilities, structures, plants, pipelines, flowlines, surface and subsurface equipment, pumps, tanks, and other property used in connection therewith and located on the Lands:

*Mortensen*

| Instrument<br>Date of Instrument | Original Lessor /<br>Original Lessee | Recording Data |
| --- | --- | --- |
| Oil, Gas & Mineral Lease<br>11/6/15 | GLR, LLC /<br>HVI Cat Canyon, Inc. | No. 2015-0059261<br>No. 2015-0065129 (correction) |

IN WITNESS WHEREOF, Grantor has executed this Quitclaim Deed on the date affixed to its signature.

    **HVI CAT CANYON, INC.**

    By: _(signature)_
       Alex G. Dimitrijevic, President

    Dated: January _16_, 2019

### EXHIBIT "8"

Order: 0022-004
Doc: CASANT:2019 00030459
Page 1 of 2
**0090**
Requested By: GKerley, Printed: 7/22/2019 3:28 PM
**0074**

<u>ACKNOWLEDGEMENT</u>

> **A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF SANTA BARBARA      )

On _January 16, 2019_ before me, _Victoria A. Winn_, a notary public, personally appeared _Alex G. Dimitrijevic_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(AFFIX NOTARIAL SEAL)

_Victoria A. Winn_
NOTARY PUBLIC

VICTORIA A. WINN
COMM. #2243692
Notary Public - California
Santa Barbara County
My Comm. Expires June 20, 2022

**EXHIBIT "B"**

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  ZEV SHECHTMAN (State Bar No. 266280)
   *zs@DanningGill.com*
3  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@DanningGill.com*
4  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
5  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  Attorneys for Plaintiff Michael A. McConnell,
   Chapter 11 Trustee

8

                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                         **NORTHERN DIVISION**
11

| In re | Case No. 9:19-bk-11573-MB |
|---|---|
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | |

| MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | Adv. No. _____ |
|---|---|
| Plaintiff, | **CHAPTER 11 TRUSTEE'S COMPLAINT: (1) TO AVOID AND RECOVER PREFERENTIAL TRANSFERS; (2) TO AVOID AND RECOVER FRAUDULENT TRANSFERS; AND (3) FOR TURNOVER AND ACCOUNTING** |
| vs. | |
| GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware limited liability company, | |
| Defendants. | Date:    See Summons |
| | Time:    See Summons |
| | Crtrm.:  See Summons |

22      Plaintiff Michael A. McConnell, the Chapter 11 trustee (the "Trustee" or "Plaintiff") for the

23  estate of HVI Cat Canyon, Inc. (the "Debtor"), alleges as follows:

24

25                           **JURISDICTION**

26      1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

27  157(b) and 1334(b).  This adversary proceeding is brought pursuant to 11 U.S.C. §§ 542, 547, 548,

28  and 550.  This adversary proceeding arises in and under and relates to the bankruptcy case under

1568697.2  26932                          1

1  Chapter 11 of the Bankruptcy Code (the "Code") entitled *In re HVI Cat Canyon, Inc.*, Case No.

2  9:19-bk-11573-MB (the "Bankruptcy Case"), which is presently pending before the United States

3  Bankruptcy Court for the Central District of California, Northern Division.

4      2.      This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and

5  (O).

6      3.      This action is commenced pursuant to Federal Rule of Bankruptcy Procedure 7001.

7      4.      The Court can and should enter a final judgment herein.  If and to the extent that the

8  Court determines that it lacks jurisdiction or authority to enter a final judgment, Plaintiff requests

9  that the Court submit findings of fact and conclusions of law for consideration by the District

10  Court.

11

12                              **THE PARTIES**

13      5.      Plaintiff is Michael A. McConnell, who brings this adversary proceeding solely in

14  his capacity as the Chapter 11 Trustee serving in the Bankruptcy Case pending for the Debtor.

15      6.      Plaintiff is informed and believes, and based thereon alleges, that defendant, GLR,

16  LLC, a Delaware limited liability company ("GLR") is and, at all relevant times, was a business

17  with an address in New York, New York.

18      7.      Plaintiff is informed and believes, and based thereon alleges, that defendant, GRL,

19  LLC, a Delaware limited liability company ("GRL") is and, at all relevant times, was a business

20  with an address in New York, New York.

21      8.      GLR and GRL are referred to herein jointly and severally as the "Defendants."

22      9.      Plaintiff is informed and believes, and based thereon alleges, that the Defendants are

23  each affiliates of each other and of the Debtor.

24      10.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are

25  insiders of the Debtor.

26      11.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are

27  creditors of the Debtor.

28

1568697.2 26932

2

## GENERAL ALLEGATION

**Bankruptcy Background**

12.     On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Code").

13.     The case was originally filed in the Southern District of New York.  The case was transferred to the Northern District of Texas, and then later to the Central District of California.

14.     On or about October 16, 2019, the Court entered its order directing the United State Trustee to appoint a Chapter 11 trustee.

15.     On or about October 21, 2019, the Court approved the appointment of Michael A. McConnell as the Chapter 11 trustee in the Debtor's case.

**The Debtor's Business**

16.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor is a Colorado corporation authorized to conduct business in the state of California.

17.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor is the owner and operator of producing oil and gas interests in California.

18.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in Kern County, and Richfield East Dome Unit in Orange County.

19.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor has over 1,000 oil wells, although many of them are currently idle.

**The Subject Transfers**

20.     Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030457, purporting to transfer an interest in real property from the Debtor to GRL, a copy of which is attached hereto as Exhibit "1" and incorporated herein by this

1568697.2  26932

3

1  reference.  Such deed was signed by Alex G. Dimitrijevic, as President of the Debtor, and dated

2  January 16, 2019.

3       21.    Plaintiff is informed and believes, and based thereon alleges, that on or about July

4  19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as

5  document number 2019-0030458, purporting to transfer an interest in real property from the Debtor

6  to GLR, a copy of which is attached hereto as Exhibit "2" and incorporated herein by this

7  reference.  Such deed was signed by Alex G. Dimitrijevic, as President of the Debtor, and dated

8  January 16, 2019.

9       22.    Plaintiff is informed and believes, and based thereon alleges, that on or about July

10  19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as

11  document number 2019-0030459, purporting to transfer an interest in real property from the Debtor

12  to GLR, a copy of which is attached hereto as Exhibit "3" and incorporated herein by this

13  reference.  Such deed was signed by Alex G. Dimitrijevic, as President of the Debtor, and dated

14  January 16, 2019.

15       23.    The transfers described in the above paragraphs 20, 21 and 22 are hereinafter

16  referred to, collectively, as the "Subject Transfers."

17       24.    The real property interests described in the above paragraphs 20, 21 and 22 are

18  hereinafter referred to, collectively, as the "Properties."

19       25.    The Debtor's statement of financial affairs, in the list of transfers made to insiders

20  within one year before the Petition Date, says that the Debtor "returned defaulted non-producing

21  property" to the Defendants in January 2019.

22

23                  **FIRST CLAIM FOR RELIEF**

24      **(To Avoid and Recover Preferential Transfers Under 11 U.S.C. §§ 547 and 550)**

25       26.    Plaintiff refers to and incorporates herein by reference each and every allegation

26  contained in paragraphs 1 through 25, inclusive, of this Complaint as though fully set forth herein.

27       27.    Plaintiff is informed and believes, and based thereon alleges, that the Subject

28  Transfers transferred an interest in property of the Debtor to the Defendants.

1568697.2  26932

4

28.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made to or for the benefit of the Defendants as creditors of the Debtor.

29.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendants before such transfers were made.

30.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made while the Debtor was insolvent.

31.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers, which were made within one-year prior to the Petition Date, are preferential transfers.

32.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers enabled the Defendants, as creditors, to receive more than the Defendants would have received if the transfers had not been made and the Defendants instead were to receive payment on the Defendants' claims only to the extent provided by Chapter 7 of the Code.

33.    By reason of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the Subject Transfers.

34.    Pursuant to Section 550 of the Code, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

## SECOND CLAIM FOR RELIEF

### (To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)

35.    Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 25, inclusive, of this Complaint as though fully set forth herein.

36.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor made the Subject Transfers with the actual intent to hinder, delay or defraud one or more of its creditors.

37.    Pursuant to 11 U.S.C. § 548 Plaintiff is entitled to avoid the Subject Transfers.

1    38.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the

2    Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject

3    Transfers, in a sum according to proof.

4

5    **THIRD CLAIM FOR RELIEF**

6    **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)**

7    39.    Plaintiff refers to and incorporates herein by reference each and every allegation

8    contained in paragraphs 1 through 25, inclusive, of this Complaint as though fully set forth herein.

9    40.    Plaintiff is informed and believes, and based thereon alleges, that the Debtor

10    received less than a reasonably equivalent value in exchange for the Subject Transfers.

11    41.    Plaintiff is informed and believes, and based thereon alleges, that at the time the

12    Subject Transfers were made, the Debtor was either insolvent or became insolvent as a result of the

13    Subject Transfers.

14    42.    Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject Transfers.

15    43.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the

16    Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject

17    Transfers, in a sum according to proof.

18

19    **FOURTH CLAIM FOR RELIEF**

20    **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)**

21    44.    Plaintiff refers to and incorporates herein by reference each and every allegation

22    contained in paragraphs 1 through 25, inclusive, and paragraph 40 of this Complaint as though

23    fully set forth herein.

24    45.    Plaintiff is informed and believes, and based thereon alleges, that at the time of the

25    Subject Transfers, the Debtor was engaged, or was about to engage, in business or a transaction or

26    transactions for which its remaining assets were unreasonably small in relation to the business or

27    transaction.

28    46.    Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject Transfers.

1568697.2  26932                                                6

47.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

**FIFTH CLAIM FOR RELIEF**

**(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)**

48.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 25, inclusive, and paragraph 40, of this Complaint as though fully set forth herein.

49.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts became due.

50.     Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject Transfers.

51.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

**SIXTH CLAIM FOR RELIEF**

**(For Turnover and Accounting under 11 U.S.C. § 542)**

52.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 25, inclusive, of this Complaint as though fully set forth herein.

53.     Plaintiff is informed and believes, and based thereon alleges, that the Properties each are property that the Trustee may sell, use, or lease under 11 U.S.C. § 363.

54.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are in possession of the Properties.

55.     Pursuant to 11 U.S.C. § 542(a), Plaintiff is entitled to turnover of the Properties, and an accounting thereof, from the Defendants.

1568697.2 26932

7

1    **WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

2

3    **ON THE FIRST THROUGH FIFTH CLAIMS FOR RELIEF:**

4    1.    For judgment in favor of Plaintiff and against the Defendants avoiding the Subject

5    Transfers and recovering the Properties, or damages, subject to proof at trial, plus interest thereon

6    as provided by law.

7

8    **ON THE SIXTH CLAIM FOR RELIEF:**

9    2.    For turnover of the Properties.

10    3.    For an accounting with respect to the Properties.

11

12    **ON ALL CLAIMS FOR RELIEF:**

13    4.    For an award of Plaintiff's reasonable costs incurred in connection with this

14    Complaint.

15    5.    For such other and further relief as the Court deems just and proper.

16

17    DATED:  January 9, 2020                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

18

19                                            By:    _____/s/ Zev Shechtman_____

20                                                    ZEV SHECHTMAN
                                                    Attorneys for Plaintiff Michael A. McConnell,
21                                                    Chapter 11 Trustee

22

23

24

25

26

27

28

1568697.2 26932                                        8
**00100**

# EXHIBIT "C"

ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
AARON E. DE LEEST (State Bar No. 216832)
*adeleest@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Plaintiff and
Counterdefendant Michael A. McConnell,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# NORTHERN DIVISION

| | |
|---|---|
| In re | Case No. 9:19-bk-11573-MB |
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | |
| MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | Adv. No. 9:20-ap-01006-MB |
| Plaintiff, | **CHAPTER 11 TRUSTEE'S FIRST AMENDED COMPLAINT: (1) TO AVOID AND RECOVER PREFERENTIAL TRANSFERS; (2) TO AVOID AND RECOVER FRAUDULENT TRANSFERS; AND (3) FOR TURNOVER AND ACCOUNTING** |
| vs. | |
| GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware limited liability company, | |
| Defendants. | |
| GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware limited liability company, | Date: April 17, 2020<br>Time: 10:00 a.m.<br>Crtrm.: 201<br>1415 State Street<br>Santa Barbara, CA 93101 |
| Counterclaimants, | |
| vs. | |
| MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | |
| Counterdefendant. | |

1

Plaintiff Michael A. McConnell, the Chapter 11 trustee (the "Trustee" or "Plaintiff") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), alleges as follows:

## **JURISDICTION**

1.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This adversary proceeding is brought pursuant to 11 U.S.C. §§ 542, 547, 548, and 550.  This adversary proceeding arises in and under and relates to the bankruptcy case under Chapter 11 of the Bankruptcy Code (the "Code") entitled *In re HVI Cat Canyon, Inc.*, Case No. 9:19-bk-11573-MB (the "Bankruptcy Case"), which is presently pending before the United States Bankruptcy Court for the Central District of California, Northern Division.

2.     This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (O).

3.     This action is commenced pursuant to Federal Rule of Bankruptcy Procedure 7001.

4.     The Court can and should enter a final judgment herein.  If and to the extent that the Court determines that it lacks jurisdiction or authority to enter a final judgment, Plaintiff requests that the Court submit findings of fact and conclusions of law for consideration by the District Court.

## **THE PARTIES**

5.     Plaintiff is Michael A. McConnell, who brings this adversary proceeding solely in his capacity as the Chapter 11 Trustee serving in the Bankruptcy Case pending for the Debtor.

6.     Plaintiff is informed and believes, and based thereon alleges, that defendant, GLR, LLC, a Delaware limited liability company ("GLR") is and, at all relevant times, was a business with an address in New York, New York.

1579645.1 26932

2

7.     Plaintiff is informed and believes, and based thereon alleges, that defendant, GRL, LLC, a Delaware limited liability company ("GRL") is and, at all relevant times, was a business with an address in New York, New York.

8.     GLR and GRL are referred to herein jointly and severally as the "Defendants."

9.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are each affiliates of each other and of the Debtor.

10.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are insiders of the Debtor.

11.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants are creditors of the Debtor.

## **GENERAL ALLEGATION**

**Bankruptcy Background**

12.     On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Code").

13.     The case was originally filed in the Southern District of New York.  The case was transferred to the Northern District of Texas, and then later to the Central District of California.

14.     On or about October 16, 2019, the Court entered its order directing the United State Trustee to appoint a Chapter 11 trustee.

15.     On or about October 21, 2019, the Court approved the appointment of Michael A. McConnell as the Chapter 11 trustee in the Debtor's case.

**The Debtor's Business**

16.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor is a Colorado corporation authorized to conduct business in the state of California.

17.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor is the owner and operator of producing oil and gas interests in California.

18.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in Kern County, and Richfield East Dome Unit in Orange County.

19.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor has over 1,000 oil wells, although many of them are currently idle.

**The Subject Transfers**

  **The North Orcutt Lease**

20.     Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about February 24, 2012, the Debtor, as lessee executed a twenty-year oil, gas and mineral lease, commencing March 1, 2012, described as the "North Orcutt Lease," with Grewal (Royalty) LLC, a Delaware limited liability company, as lessor.  A copy of the North Orcutt Lease is attached herewith as Exhibit "1."

21.     Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor as lessee, executed with Defendant GRL, LLC (f/k/a Grewal (Royalty) LLC), the "First Amendment to Oil, Gas and Mineral Lease," amending the North Orcutt Lease to the detriment of the Debtor in a number of

1   respects, including changing the commencement date of from March 1, 2012 to

2   March 1, 2007, and changing the term of the lease from twenty years to three years

3   from November 6, 2015.  A copy of the First Amendment to Oil, Gas and Mineral

4   Lease regarding the North Orcutt Lease is attached herewith as Exhibit "2."

5        22.    Plaintiff is informed and believes, and based thereon alleges, that on or

6   about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County

7   Recorder's Office as document number 2019-0030457, purporting to transfer an

8   interest in the real property that is the subject of the North Orcutt Lease from the

9   Debtor to GRL, a copy of which is attached hereto as Exhibit "3" and incorporated

10   herein by this reference.  Such deed was signed and dated January 16, 2019.

11

12   **The Lakeview/Golco Lease**

13        23.    Plaintiff is informed and believes, and based thereon alleges, based on

14   copies of documents received from Defendants, if genuine, that on or about January

15   15, 2013, but effective March 1, 2007, the Debtor, as lessee executed a twenty-year

16   oil, gas and mineral lease, commencing March 1, 2007, described as the

17   "Lakeview/Golco Lease," with Grewal Land Holdings, LLC, a Delaware limited

18   liability company, as lessor.  A copy of the Lakeview/Golco Lease is attached

19   herewith as Exhibit "4."

20        24.    Plaintiff is informed and believes, and based thereon alleges, based on

21   copies of documents received from Defendants, if genuine, that on or about

22   November 6, 2015, the Debtor as lessee, executed with Defendant GLR, LLC (f/k/a

23   Grewal Land Holdings, LLC), as lessor, a "First Amendment to Oil, Gas and Mineral

24   Lease," amending the Lakeview/Golco Lease in a number of respects, including

25   changing the term of the lease from twenty years to three years from November 6,

26   2015.  A copy of the First Amendment to Oil, Gas and Mineral Lease regarding the

27   Lakeview/Golco Lease is attached herewith as Exhibit "5."

28

25.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030458, purporting to transfer an interest in the real property that is the subject of the Lakeview/Golco Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "6" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

### The Mortensen Lease

26.    Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor, as lessee executed a three-year oil, gas and mineral lease, commencing December 1, 2015, described as the "Mortenson Lease," with Defendant GLR, LLC, as lessor.  A copy of the Mortenson Lease is attached herewith as Exhibit "7."

27.    Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030459, purporting to transfer an interest in the real property that is the subject of the Mortenson Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference.  Such deed was signed and dated January 16, 2019.

28.    The transfers and transactions described in the above paragraphs 21, 22, 24, 25, and 27, without limitation, are hereinafter referred to, collectively, as the "Subject Transfers."

29.    The real property interests described in the above paragraphs 20 through 27 are hereinafter referred to, collectively, as the "Properties."

30.    The Debtor's statement of financial affairs, in the list of transfers made to insiders within one year before the Petition Date, says that the Debtor "returned defaulted non-producing property" to the Defendants in January 2019.

## FIRST CLAIM FOR RELIEF

### (To Avoid and Recover Preferential Transfers Under 11 U.S.C. §§ 547 and 550)

31.    Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30, inclusive, of this Complaint as though fully set forth herein.

32.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers transferred an interest in property of the Debtor to the Defendants.

33.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made to or for the benefit of the Defendants as creditors of the Debtor.

34.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendants before such transfers were made.

35.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers were made while the Debtor was insolvent.

36.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers, which were made within one-year prior to the Petition Date, are preferential transfers.

37.    Plaintiff is informed and believes, and based thereon alleges, that the Subject Transfers enabled the Defendants, as creditors, to receive more than the Defendants would have received if the transfers had not been made and the Defendants instead were to receive payment on the Defendants' claims only to the extent provided by Chapter 7 of the Code.

38.    By reason of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the Subject Transfers.

39.    Pursuant to Section 550 of the Code, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

## SECOND CLAIM FOR RELIEF

### (To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550,

40.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30, inclusive, of this Complaint as though fully set forth herein.

41.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor made the Subject Transfers with the actual intent to hinder, delay or defraud one or more of its creditors.

42.     Pursuant to 11 U.S.C. § 548 Plaintiff is entitled to avoid the Subject Transfers.

43.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

## THIRD CLAIM FOR RELIEF

### (To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)

44.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30, inclusive, of this Complaint as though fully set forth herein.

45.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor received less than a reasonably equivalent value in exchange for the Subject Transfers.

46.     Plaintiff is informed and believes, and based thereon alleges, that at the time the Subject Transfers were made, the Debtor was either insolvent or became insolvent as a result of the Subject Transfers.

47.     Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject Transfers.

48.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

## **FOURTH CLAIM FOR RELIEF**

### **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)**

49.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30, inclusive, and paragraph 40 of this Complaint as though fully set forth herein.

50.     Plaintiff is informed and believes, and based thereon alleges, that at the time of the Subject Transfers, the Debtor was engaged, or was about to engage, in business or a transaction or transactions for which its remaining assets were unreasonably small in relation to the business or transaction.

51.     Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject Transfers.

52.     Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants the Properties, or damages plus interest thereon at the maximum legal rate from the date of the Subject Transfers, in a sum according to proof.

## **FIFTH CLAIM FOR RELIEF**

### **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 548 and 550)**

53.     Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30, inclusive, and paragraph 40, of this Complaint as though fully set forth herein.

54.     Plaintiff is informed and believes, and based thereon alleges, that the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts became due.

1579645.1 26932

9

1    55.    Pursuant to 11 U.S.C. § 548, Plaintiff is entitled to avoid the Subject

2    Transfers.

3    56.    Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

4    the Properties, or damages plus interest thereon at the maximum legal rate from the

5    date of the Subject Transfers, in a sum according to proof.

6

7    **SIXTH CLAIM FOR RELIEF**

8    **(For Turnover and Accounting under 11 U.S.C. § 542)**

9    57.    Plaintiff refers to and incorporates herein by reference each and every

10    allegation contained in paragraphs 1 through 30, inclusive, of this Complaint as

11    though fully set forth herein.

12    58.    Plaintiff is informed and believes, and based thereon alleges, that the

13    Properties each are property that the Trustee may sell, use, or lease under 11 U.S.C. §

14    363.

15    59.    Plaintiff is informed and believes, and based thereon alleges, that the

16    Defendants are in possession of the Properties.

17    60.    Pursuant to 11 U.S.C. § 542(a), Plaintiff is entitled to turnover of the

18    Properties, and an accounting thereof, from the Defendants.

19

20    **WHEREFORE**, Plaintiff prays for judgment against the Defendants as

21    follows:

22

23    **ON THE FIRST THROUGH FIFTH CLAIMS FOR RELIEF:**

24    1.    For judgment in favor of Plaintiff and against the Defendants avoiding

25    the Subject Transfers and recovering the Properties, or damages, subject to proof at

26    trial, plus interest thereon as provided by law.

27

28

1579645.1 26932

10

1

**ON THE SIXTH CLAIM FOR RELIEF:**

2  2.  For turnover of the Properties.

3  3.  For an accounting with respect to the Properties.

4

5  **ON ALL CLAIMS FOR RELIEF:**

6  4.  For an award of Plaintiff's reasonable costs incurred in connection with

7 this Complaint.

8  5.  For such other and further relief as the Court deems just and proper.

9

10 DATED:  March 9, 2020    DANNING, GILL, ISRAEL &

11            KRASNOFF, LLP

12

13

14        By:   /s/ Zev Shechtman

            ZEV SHECHTMAN

15          Attorneys for Plaintiff and Counder-

16          defendant Michael A. McConnell, Chapter

17          11 Trustee

18

19

20

21

22

23

24

25

26

27

28

1579645.1  26932

11

# EXHIBIT "D"

## Zev Shechtman

| | |
|---|---|
| **From:** | Will Beall <Will@beallandburkhardt.com> |
| **Sent:** | Friday, March 27, 2020 1:06 PM |
| **To:** | Zev Shechtman |
| **Subject:** | RE: HVI - Avoidance Action |

I have no authority to stipulate

Sent from Mail for Windows 10

---

**From:** Zev Shechtman <ZShechtman@DanningGill.com>
**Sent:** Friday, March 27, 2020 1:04:51 PM
**To:** Will Beall <Will@beallandburkhardt.com>
**Cc:** Eric Israel <EPI@DanningGill.com>; George E. Schulman <georgeschulman@DanningGill.com>
**Subject:** RE: HVI - Avoidance Action

Will,
I assume the answer is no, at this point, and am proceeding accordingly.
Sincerely,
Zev



**Zev Shechtman**
**Danning, Gill, Israel & Krasnoff, LLP**
1901 Avenue of the Stars, Suite 450
Los Angeles CA 90067-6006
(310) 277-0077 **|** (310) 277-5735 fax
zs@DanningGill.com  |  www.DanningGill.com



---

**From:** Zev Shechtman
**Sent:** Thursday, March 26, 2020 2:54 PM
**To:** Will Beall <Will@beallandburkhardt.com>
**Cc:** Eric Israel <EPI@DanningGill.com>; George E. Schulman <georgeschulman@DanningGill.com>
**Subject:** RE: HVI - Avoidance Action

Hi Will,
I'm following up on the below.  Are your clients willing to stipulate to the amendment, and thereby avoid the need for the Trustee to file a motion to amend?
Thanks,
Zev

**Zev Shechtman**
**Danning, Gill, Israel & Krasnoff, LLP**
1901 Avenue of the Stars, Suite 450
Los Angeles CA 90067-6006
(310) 277-0077 **|** (310) 277-5735 fax
zs@DanningGill.com  |  www.DanningGill.com



---

**From:** Zev Shechtman
**Sent:** Wednesday, March 18, 2020 3:24 PM
**To:** Will Beall <Will@beallandburkhardt.com>
**Cc:** Eric Israel <EPI@DanningGill.com>; George E. Schulman <georgeschulman@DanningGill.com>
**Subject:** RE: HVI - Avoidance Action

Thanks. No, we don't plan to dismiss claims for relief, only to amend.


**Zev Shechtman**
**Danning, Gill, Israel & Krasnoff, LLP**
1901 Avenue of the Stars, Suite 450
Los Angeles CA 90067-6006
(310) 277-0077 **|** (310) 277-5735 fax
zs@DanningGill.com  |  www.DanningGill.com



---

**From:** Will Beall <Will@beallandburkhardt.com>
**Sent:** Wednesday, March 18, 2020 3:21 PM
**To:** Zev Shechtman <ZShechtman@DanningGill.com>
**Subject:** RE: HVI - Avoidance Action

I can ask.

Do you plan to dismiss the other claims for relief?

Sent from Mail for Windows 10

---

**From:** Zev Shechtman <ZShechtman@DanningGill.com>
**Sent:** Wednesday, March 18, 2020 3:10:16 PM
**To:** Will Beall <Will@beallandburkhardt.com>
**Cc:** Eric Israel <EPI@DanningGill.com>; George E. Schulman <georgeschulman@DanningGill.com>
**Subject:** HVI - Avoidance Action

Will,

Thanks for the call yesterday.  You pointed out a couple of issues with our first amended complaint: (1) that the preference claim appears to include claims going back more than 1 year; and (2) that the fraudulent transfer claims go back more than 2 years without invoking section 544 and the California statute.  We intend to file a second amended complaint to make these corrections.  Would you stipulate to the filing of such an amended complaint, and avoid the need for a motion?

Thanks,

Zev

**Zev Shechtman**
**Danning, Gill, Israel & Krasnoff, LLP**
1901 Avenue of the Stars, Suite 450
Los Angeles CA 90067-6006
(310) 277-0077 **|** (310) 277-5735 fax
zs@DanningGill.com  |  www.DanningGill.com



# EXHIBIT "E"

1 | ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
2 | GEORGE E. SCHULMAN (State Bar No. 64572)
*gschulman@DanningGill.com*
3 | ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
4 | ~~AARON E. DE LEEST~~SONIA SINGH (State Bar No. ~~216832~~311080)
~~adeleest~~*ssingh@DanningGill.com*
5 | DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
6 | Los Angeles, California 90067-6006
Telephone: (310) 277-0077
7 | Facsimile: (310) 277-5735

8 | Attorneys for Plaintiff and
Counterdefendant Michael A. McConnell,
9 | Chapter 11 Trustee

10 | **UNITED STATES BANKRUPTCY COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA**

12 | **NORTHERN DIVISION**

| | |
|---|---|
| 13 | In re | Case No.  9:19-bk-11573-MB |
| 14 | HVI CAT CANYON, INC., | Chapter 11 |
| 15 |     Debtor. | |
| 16 | | |
| 17 | MICHAEL A. McCONNELL, CHAPTER 11 TRUSTEE, | Adv. No. 9:20-ap-01006-MB |
| 18 |     Plaintiff, | **CHAPTER 11 TRUSTEE'S ~~FIRST~~SECOND AMENDED** |
| 19 |     vs. | **COMPLAINT: (1) TO AVOID AND RECOVER PREFERENTIAL** |
| 20 | GLR, LLC, a Delaware limited liability company; and GRL, LLC, a Delaware | **TRANSFERS; (2) TO AVOID AND RECOVER FRAUDULENT** |
| 21 | limited liability company, | **TRANSFERS; AND (3) FOR TURNOVER AND ACCOUNTING** |
| 22 |     Defendants. | |
| 23 | GLR, LLC, a Delaware limited liability | Continued Statue Conference |
| 24 | company; and GRL, LLC, a Delaware limited liability company, | Date:    ~~See Summons~~July 15, 2020
Time:    ~~See Summons~~2:30 p.m. |
| 25 |     Counterclaimants, | Crtrm.:  ~~See Summons~~201
          1415 State Street |
| 26 |     vs. |           Santa Barbara, CA 93101 |
| 27 | MICHAEL A. McCONNELL, | |
| 28 | CHAPTER 11 TRUSTEE. | |

1

| Counterdefendant. |

2

3    Plaintiff Michael A. McConnell, the Chapter 11 trustee (the "Trustee" or

4  "Plaintiff") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), alleges as follows:

5

6                                **JURISDICTION**

7    1.    This Court has jurisdiction over this adversary proceeding pursuant to

8  28 U.S.C. §§ 157(b) and 1334(b).  This adversary proceeding is brought pursuant to

9  11 U.S.C. §§ 542, 544, 547, 548, and 550.  This adversary proceeding arises in and

10  under and relates to the bankruptcy case under Chapter 11 of the Bankruptcy Code

11  (the "Code") entitled *In re HVI Cat Canyon, Inc.*, Case No. 9:19-bk-11573-MB (the

12  "Bankruptcy Case"), which is presently pending before the United States Bankruptcy

13  Court for the Central District of California, Northern Division.

14    2.    This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E),

15  (F), (H), and (O).

16    3.    This action is commenced pursuant to Federal Rule of Bankruptcy

17  Procedure 7001.

18    4.    The Court can and should enter a final judgment herein.  If and to the

19  extent that the Court determines that it lacks jurisdiction or authority to enter a final

20  judgment, Plaintiff requests that the Court submit findings of fact and conclusions of

21  law for consideration by the District Court.

22

23                                **THE PARTIES**

24    5.    Plaintiff is Michael A. McConnell, who brings this adversary

25  proceeding solely in his capacity as the Chapter 11 Trustee serving in the Bankruptcy

26  Case pending for the Debtor.

27

28

1590960.1  26932

2

6.      Plaintiff is informed and believes, and based thereon alleges, that defendant, GLR, LLC, a Delaware limited liability company ("GLR") is and, at all relevant times, was a business with an address in New York, New York.

7.      Plaintiff is informed and believes, and based thereon alleges, that defendant, GRL, LLC, a Delaware limited liability company ("GRL") is and, at all relevant times, was a business with an address in New York, New York.

8.      GLR and GRL are referred to herein jointly and severally as the "Defendants."

9.      Plaintiff is informed and believes, and based thereon alleges, that the Defendants are each affiliates of each other and of the Debtor.

10.      Plaintiff is informed and believes, and based thereon alleges, that the Defendants are insiders of the Debtor.

~~11.      Plaintiff is informed and believes, and based thereon alleges, that the Defendants are creditors of the Debtor.~~

## **GENERAL ALLEGATION**

### **Bankruptcy Background**

~~12.~~11.On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Code").

~~13.~~12.The case was originally filed in the Southern District of New York.  The case was transferred to the Northern District of Texas, and then later to the Central District of California.

~~14.~~13.On or about October 16, 2019, the Court entered its order directing the United State Trustee to appoint a Chapter 11 trustee.

~~15.~~14.On or about October 21, 2019, the Court approved the appointment of Michael A. McConnell as the Chapter 11 trustee in the Debtor's case.

**The Debtor's Business**

16.15. Plaintiff is informed and believes, and based thereon alleges, that the Debtor is a Colorado corporation authorized to conduct business in the state of California.

17.16. Plaintiff is informed and believes, and based thereon alleges, that the Debtor is the owner and operator of producing oil and gas interests in California.

18.17. Plaintiff is informed and believes, and based thereon alleges, that the Debtor owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in Kern County, and Richfield East Dome Unit in Orange County.

19.18. Plaintiff is informed and believes, and based thereon alleges, that the Debtor has over 1,000 oil wells, although many of them are currently idle.

**The Subject Transfers**

**The North Orcutt Lease**

20.19. Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about February 24, 2012, the Debtor, as lessee executed a twenty-year oil, gas and mineral lease, commencing March 1, 2012, described as the "North Orcutt Lease," with Grewal (Royalty) LLC, a Delaware limited liability company, as lessor.  A copy of the North Orcutt Lease is attached herewith as Exhibit "1."

21.20. Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor as lessee, executed with Defendant GRL, LLC (f/k/a Grewal (Royalty) LLC), the "First Amendment to Oil, Gas and Mineral Lease," amending the North Orcutt Lease to the detriment of the Debtor in a number of

1 respects, including changing the commencement date of from March 1, 2012 to

2 March 1, 2007, and changing the term of the lease from twenty years to three years

3 from November 6, 2015.  A copy of the First Amendment to Oil, Gas and Mineral

4 Lease regarding the North Orcutt Lease is attached herewith as Exhibit "2."

5     22.21.Plaintiff is informed and believes, and based thereon alleges, that on or

6 about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County

7 Recorder's Office as document number 2019-0030457, purporting to transfer an

8 interest in the real property that is the subject of the North Orcutt Lease from the

9 Debtor to GRL, a copy of which is attached hereto as Exhibit "3" and incorporated

10 herein by this reference.  Such deed was signed and dated January 16, 2019.

11

12         **The Lakeview/Golco Lease**

13     23.22.Plaintiff is informed and believes, and based thereon alleges, based on

14 copies of documents received from Defendants, if genuine, that on or about January

15 15, 2013, but effective March 1, 2007, the Debtor, as lessee executed a twenty-year

16 oil, gas and mineral lease, commencing March 1, 2007, described as the

17 "Lakeview/Golco Lease," with Grewal Land Holdings, LLC, a Delaware limited

18 liability company, as lessor.  A copy of the Lakeview/Golco Lease is attached

19 herewith as Exhibit "4."

20     24.23.Plaintiff is informed and believes, and based thereon alleges, based on

21 copies of documents received from Defendants, if genuine, that on or about

22 November 6, 2015, the Debtor as lessee, executed with Defendant GLR, LLC (f/k/a

23 Grewal Land Holdings, LLC), as lessor, a "First Amendment to Oil, Gas and Mineral

24 Lease," amending the Lakeview/Golco Lease in a number of respects, including

25 changing the term of the lease from twenty years to three years from November 6,

26 2015.  A copy of the First Amendment to Oil, Gas and Mineral Lease regarding the

27 Lakeview/Golco Lease is attached herewith as Exhibit "5."

28

25.24. Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030458, purporting to transfer an interest in the real property that is the subject of the Lakeview/Golco Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "6" and incorporated herein by this reference. Such deed was signed and dated January 16, 2019.

**The Mortensen Lease**

26.25. Plaintiff is informed and believes, and based thereon alleges, based on copies of documents received from Defendants, if genuine, that on or about November 6, 2015, the Debtor, as lessee executed a three-year oil, gas and mineral lease, commencing December 1, 2015, described as the "Mortenson Lease," with Defendant GLR, LLC, as lessor. A copy of the Mortenson Lease is attached herewith as Exhibit "7."

27.26. Plaintiff is informed and believes, and based thereon alleges, that on or about July 19, 2019, a quitclaim deed was recorded in the Santa Barbara County Recorder's Office as document number 2019-0030459, purporting to transfer an interest in the real property that is the subject of the Mortenson Lease from the Debtor to GLR, a copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference. Such deed was signed and dated January 16, 2019.

27.    The transfers and transactions described in the above paragraphs 21, 22, 24, 25, and 27, without limitation, and 24, are hereinafter referred to, collectively, as the "11/6/15 Transfers."

28.    The transfers and transactions described in the above paragraphs 22, 25 and 27 are hereinafter referred to, collectively, as the "7/19/19 Transfers."

28.29. The 11/6/15 Transfers and the 7/19/19 Transfers are hereinafter referred to, collectively, as the "Subject Transfers."

1   29.30.The real property interests described in the above paragraphs 20 through
2   27 are hereinafter referred to, collectively, as the "Properties."

3      30.31.The Debtor's statement of financial affairs, in the list of transfers made
4   to insiders within one year before the Petition Date, says that the Debtor "returned
5   defaulted non-producing property" to the Defendants in January 2019.

6      32.    There exists one or more creditors holding an unsecured claim that is
7   allowable under section 502 of this title, or that is not allowable only under section
8   502(e) of this title, that could avoid a transfer under applicable nonbankruptcy law,
9   including, without limitation, UBS AG, London Branch.

10

11                          **FIRST CLAIM FOR RELIEF**

12  **(To Avoid and Recover Preferential Transfers Under 11 U.S.C. §§ 547 and 550)**

13     31.33.Plaintiff refers to and incorporates herein by reference each and every
14  allegation contained in paragraphs 1 through 3032, inclusive, of this Complaint as
15  though fully set forth herein.

16     34.    Plaintiff is informed and believes, and based thereon alleges, that the
17  SubjectDefendants are creditors of the Debtor.

18     32.35.Plaintiff is informed and believes, and based thereon alleges, that the
19  7/19/19 Transfers transferred an interest in property of the Debtor to the Defendants.

20     33.36.Plaintiff is informed and believes, and based thereon alleges, that the
21  Subject7/19/19 Transfers were made to or for the benefit of the Defendants as
22  creditors of the Debtor.

23     34.37.Plaintiff is informed and believes, and based thereon alleges, that the
24  Subject7/19/19 Transfers were made for or on account of an antecedent debt owing
25  by the Debtor to the Defendants before such transfers were made.

26     35.38.Plaintiff is informed and believes, and based thereon alleges, that the
27  Subject7/19/19 Transfers were made while the Debtor was insolvent.

28

1590960.1  26932

7

**00124**

1    ~~36.~~39.Plaintiff is informed and believes, and based thereon alleges, that the

2    ~~Subject~~7/19/19 Transfers, which were made within one-year prior to the Petition

3    Date, are preferential transfers.

4    ~~37.~~40.Plaintiff is informed and believes, and based thereon alleges, that the

5    ~~Subject~~7/19/19 Transfers enabled the Defendants, as creditors, to receive more than

6    the Defendants would have received if the transfers had not been made and the

7    Defendants instead were to receive payment on the Defendants' claims only to the

8    extent provided by Chapter 7 of the Code.

9    ~~38.~~41.By reason of the foregoing, pursuant to Section 547(b) of the Code,

10    Plaintiff may avoid the ~~Subject~~7/19/19 Transfers.

11    ~~39.~~42.Pursuant to Section 550 of the Code, Plaintiff may recover from the

12    Defendants the Properties, or damages plus interest thereon at the maximum legal

13    rate from the date of the ~~Subject~~7/19/19 Transfers, in a sum according to proof.

14

15    **SECOND CLAIM FOR RELIEF**

16    **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548
      and 550, and California Civil Code § 3439.04(a)(1))**

17

18    ~~40.~~43.Plaintiff refers to and incorporates herein by reference each and every

19    allegation contained in paragraphs 1 through ~~30~~32, inclusive, of this Complaint as

20    though fully set forth herein.

21    ~~41.~~44.Plaintiff is informed and believes, and based thereon alleges, that the

22    Debtor made the Subject Transfers with the actual intent to hinder, delay or defraud

23    one or more of its creditors.

24    ~~42.~~45.Pursuant to 11 U.S.C. ~~§ 548~~§§ 544 and/or 548, and California Civil

25    Code § 3439.04(a)(1), Plaintiff is entitled to avoid the Subject Transfers.

26    ~~43.~~46.Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

27    the Properties, or ~~damages~~the value thereof plus interest thereon at the maximum

28    legal rate from the date of the Subject Transfers, in a sum according to proof.

8

1

2

### THIRD CLAIM FOR RELIEF

3

**(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ §§ 544(b), 548
and 550) and California Civil Code § 3439.05)**

4

5        44.47. Plaintiff refers to and incorporates herein by reference each and every

6    allegation contained in paragraphs 1 through 3032, inclusive, of this Complaint as

7    though fully set forth herein.

8        45.48. Plaintiff is informed and believes, and based thereon alleges, that the

9    Debtor received less than a reasonably equivalent value in exchange for the Subject

10   Transfers.

11       46.49. Plaintiff is informed and believes, and based thereon alleges, that at the

12   time the Subject Transfers were made, the Debtor was either insolvent or became

13   insolvent as a result of the Subject Transfers.

14       47.50. Pursuant to 11 U.S.C. § 548§§ 544 and/or 548, and California Civil

15   Code § 3439.05, Plaintiff is entitled to avoid the Subject Transfers.

16       48.51. Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

17   the Properties, or damagesthe value thereof plus interest thereon at the maximum

18   legal rate from the date of the Subject Transfers, in a sum according to proof.

19

20   ### FOURTH CLAIM FOR RELIEF

21   **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ §§ 544(b), 548
and 550) and California Civil Code § 3439.04(a)(2)(A))**

22

23       49.52. Plaintiff refers to and incorporates herein by reference each and every

24   allegation contained in paragraphs 1 through 3032, inclusive, and paragraph 4047 of

25   this Complaint as though fully set forth herein.

26       50.53. Plaintiff is informed and believes, and based thereon alleges, that at the

27   time of the Subject Transfers, the Debtor was engaged, or was about to engage, in

28

1 business or a transaction or transactions for which its remaining assets were

2 unreasonably small in relation to the business or transaction.

3      51.54. Pursuant to 11 U.S.C. §§§ 544 and/or 548, and California Civil Code §

4 3439.04(a)(2)(A), Plaintiff is entitled to avoid the Subject Transfers.

5      52.55. Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

6 the Properties, or damages the value thereof plus interest thereon at the maximum

7 legal rate from the date of the Subject Transfers, in a sum according to proof.

8

9                          **FIFTH CLAIM FOR RELIEF**

10   **(To Avoid and Recover Fraudulent Transfers under 11 U.S.C. §§ 544(b), 548
      and 550) and California Civil Code § 3439.04(a)(2)(B))**

11

12      53.56. Plaintiff refers to and incorporates herein by reference each and every

13 allegation contained in paragraphs 1 through 30 32, inclusive, and paragraph 40 47, of

14 this Complaint as though fully set forth herein.

15      54.57. Plaintiff is informed and believes, and based thereon alleges, that the

16 Debtor intended to incur, or believed or reasonably should have believed that it

17 would incur, debts that would be beyond its ability to pay as such debts became due.

18      55.58. Pursuant to 11 U.S.C. § 548, §§ 544 and/or 548, and California Civil

19 Code § 3439.04(a)(2)(B), Plaintiff is entitled to avoid the Subject Transfers.

20      56.59. Pursuant to 11 U.S.C. § 550, Plaintiff may recover from the Defendants

21 the Properties, or damages the value thereof plus interest thereon at the maximum

22 legal rate from the date of the Subject Transfers, in a sum according to proof.

23

24                          **SIXTH CLAIM FOR RELIEF**

25           **(For Turnover and Accounting under 11 U.S.C. § 542)**

26      57.60. Plaintiff refers to and incorporates herein by reference each and every

27 allegation contained in paragraphs 1 through 30 32, inclusive, of this Complaint as

28 though fully set forth herein.

58.61.Plaintiff is informed and believes, and based thereon alleges, that the Properties each are property that the Trustee may sell, use, or lease under 11 U.S.C. § 363.

59.62.Plaintiff is informed and believes, and based thereon alleges, that the Defendants are in possession of the Properties.

60.63.Pursuant to 11 U.S.C. § 542(a), Plaintiff is entitled to turnover of the Properties, and an accounting thereof, from the Defendants.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

## ON THE FIRST THROUGH FIFTH CLAIMS FOR RELIEF:

1.    For judgment in favor of Plaintiff and against the Defendants avoiding the Subject Transfers and recovering the Properties, or damages, subject to proof at trial, plus interest thereon as provided by law.

## ON THE SIXTH CLAIM FOR RELIEF:

2.    For turnover of the Properties.

3.    For an accounting with respect to the Properties.

1590960.1  26932

11

1

2      **ON ALL CLAIMS FOR RELIEF:**

3          4.      For an award of Plaintiff's reasonable costs incurred in connection with

4      this Complaint.

5          5.      For such other and further relief as the Court deems just and proper.

6

7

8      DATED: ~~March 9~~May 22, 2020         DANNING, GILL, ISRAEL &
                                              KRASNOFF, LLP
9

10

11                                    By:    ____/s/ Zev Shechtman_____

12                                           ZEV SHECHTMAN
                                             Attorneys for Plaintiff and
13                                           Counterdefendant Michael A. McConnell,
                                             Chapter 11 Trustee
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28